# EXHIBIT E



https://heinonline.org |holsupport@wshein.com



**CITATIONS:**

**Bluebook 22nd ed.**
Nancy Leong, Katelyn Elrod & Matthew Nilsen, Pleading Failures in Monell Litigation,
73 EMORY L.J. 801 (2024).

**ALWD 7th ed.**
Nancy Leong, Katelyn Elrod & Matthew Nilsen, Pleading Failures in Monell Litigation,
73 Emory L.J. 801 (2024).

**APA 7th ed.**
Leong, Nancy, Elrod, Katelyn, & Nilsen, Matthew. (2024). Pleading failures in monell
litigation. Emory Law Journal, 73(4), 801-886.

**Chicago 18th ed.**
Leong, Nancy, Elrod, Katelyn, and Nilsen, Matthew. "Pleading Failures in Monell
Litigation." Emory Law Journal 73, no. 4 (2024): 801-886. HeinOnline.

**McGill Guide 10th ed.**
Nancy Leong et al, "Pleading Failures in Monell Litigation" (2024) 73:4 Emory LJ 801.

**AGLC 4th ed.**
Nancy Leong et al, 'Pleading Failures in Monell Litigation' (2024) 73(4) Emory Law
Journal 801

**MLA 9th ed.**
Leong, Nancy, et al. "Pleading Failures in Monell Litigation." Emory Law Journal,
vol. 73, no. 4, 2024, pp. 801-886. HeinOnline.

**OSCOLA 4th ed.**
Nancy Leong, Katelyn Elrod & Matthew Nilsen, 'Pleading Failures in Monell Litigation'
(2024) 73 Emory LJ 801    Export To:

**Date Downloaded:**    Fri Apr 24 13:32:21 2026

**Source:** https://heinonline.org/HOL/Page?handle=hein.journals/emlj73&id=837

**Terms, Conditions & Use of PDF Document:**
Please note, citations are provided as a general guideline. Users should consult their preferred citation format's style manual
for proper formatting. Your use of this HeinOnline PDF indicates your acceptance of William S. Hein & Co., Inc. and HeinOnline's
Terms & Conditions: https://help.heinonline.org/kb/terms-conditions/ . The search text of this PDF is generated from uncorrected
OCR text. To obtain permission to use this article beyond the scope of your license, please use: https://www.copyright.com.

Please note: citations are provided as a general guideline. Users should consult their preferred citation format's style manual
for proper citation formatting.

*HeinOnline is a product of William S. Hein & Co., Inc. | 2350 North Forest Road, Getzville, NY 14068*

# PLEADING FAILURES IN *MONELL* LITIGATION

*Nancy Leong**

*Katelyn Elrod***

*Matthew Nilsen****

## ABSTRACT

*The doctrine of municipal liability in cases brought under 42 U.S.C. § 1983 has been extensively criticized through widespread agreement that municipal liability claims are difficult for plaintiffs to win. Commentators generally blame stringent doctrinal and pleading standards for plaintiffs' low rates of success.*

*This Article reveals another important contributing factor: the poor quality of many pleadings filed on behalf of civil rights plaintiffs. We present original empirical research documenting widespread pleading failures, or omissions of basic doctrinal elements. Our research demonstrates that pleading failures are common: an analysis of the complaint in every case that resulted in a federal appellate decision in 2019 reveals that 56.5% of complaints filed by represented parties failed even to state the elements of* any *theory of municipal liability, let alone plead those elements sufficient to meet the demanding Iqbal pleading standard.*

*The poor quality of civil rights complaints, while troubling, also offers an opportunity. Given that the current Supreme Court is unlikely to revise municipal liability doctrine, advocates would do well to focus efforts on improving the quality of complaints filed on behalf of civil rights plaintiffs. To this end, we identify areas in which complaints are particularly lacking and*

---

\* Nancy Leong is Associate Dean for Faculty Scholarship and Provost Professor at the University of Denver Sturm College of Law.

\*\* Katelyn Elrod is a law clerk to the Honorable Amanda Maxfield Green, Magistrate Judge for the United States District Court for the Western District of Oklahoma.

\*\*\* Matthew Nilsen is an Associate at Brownstein Hyatt Farber Schreck, LLP. The authors are grateful for the helpful comments of Charlotte Garden, Govind Persad, Nicole Buonocore Porter, Eli Wald, and Michael Whitlow, and for feedback received during Nancy Leong's Constitutional Litigation class taught at the University of Denver Sturm College of Law in fall 2023. Katherine Quinn provided extraordinary research assistance.

EMORY LAW JOURNAL                    [Vol. 73:801

*suggest ways to improve both the overall quality of attorney work product and the environment in which civil rights lawyering takes place.*

TABLE OF CONTENTS

INTRODUCTION ....................................................................................... 803
   I.  BACKGROUND ................................................................................ 807
        A.  *Doctrinal Development* .......................................................... 807
        B.  *Legal Scholarship* .................................................................. 809
  II.  METHODOLOGY ............................................................................ 813
 III.  FINDINGS ...................................................................................... 819
        A.  *Quantitative Data* .................................................................. 819
        B.  *Qualitative Data* .................................................................... 827
 IV.  IMPLICATIONS .............................................................................. 834
        A.  *The Causes of Pleading Failures* ............................................ 834
        B.  *Preventing Pleading Failures* ................................................. 838
            1.  *How Lawyers Can Avoid Pleading Failures* ...................... 839
            2.  *A Roadmap for Structural Reform* ..................................... 842
CONCLUSION ......................................................................................... 847
APPENDIX A: CODING PROTOCOL .............................................................. 849
APPENDIX B: MUNICIPAL LIABILITY COMPLAINTS ....................................... 859

INTRODUCTION

Commentators agree that holding municipalities accountable for constitutional violations committed by their employees is a formidable task.[1] In *Monell v. Department of Social Services*, the Supreme Court held that a municipality can be liable in a suit for damages under 42 U.S.C. § 1983.[2] But *Monell* also held that it is not enough to show that a municipal employee carried out the rights violation; rather, plaintiffs must point to a municipal policy or custom that caused the constitutional violation.[3] In subsequent decades, the Supreme Court recognized a number of theories by which plaintiffs can establish a municipal policy or custom: (1) a written law or policy;[4] (2) a final decision by a policymaker;[5] (3) a widespread pattern of behavior;[6] or (4) a failure by the municipality to train, screen, or supervise its employees.[7]

The doctrinal standards associated with each theory are difficult to satisfy, providing one explanation for the infrequency of plaintiff success.[8] And these doctrinal challenges are compounded by the pleading standards imposed by *Twombly v. Bell Atlantic* and *Ashcroft v. Iqbal*, which require plaintiffs to meet a threshold of plausibility in their complaint.[9] But these substantive and procedural standards, as articulated and applied by the courts, tell only part of the story. Despite all the important prior scholarship that has focused on the work

---

[1]  *See, e.g.,* Karen M. Blum, *Section 1983 Litigation: The Maze, the Mud, and the Madness*, 23 WM. & MARY BILL RTS. J. 913, 922 (2015) (describing challenges of pleading and proof); Alexander Reinert et al., *New Federalism and Civil Rights Enforcement*, 116 NW. U. L. REV. 737, 755 (2021) ("[T]he Supreme Court's limitation on municipality liability operates as a significant barrier to relief for those injured by unconstitutional conduct."); Fred O. Smith, Jr., *Beyond Qualified Immunity*, 119 MICH. L. REV. ONLINE 121, 131 (2021) (noting limitations on recovery created by municipal liability doctrine after *Monell*).

[2]  436 U.S. 658, 700–01 (1978).

[3]  *Id.* at 691–92.

[4]  *Id.* at 682.

[5]  City of St. Louis v. Praprotnik, 485 U.S. 112, 123, 124 n.1 (1988); Pembaur v. City of Cincinnati, 475 U.S. 469, 483–84 (1986) (plurality opinion).

[6]  Adickes v. S.H. Kress & Co., 398 U.S. 144, 167–68 (1970).

[7]  City of Canton v. Harris, 489 U.S. 378, 380 (1989); Bd. of the Cnty. Comm'rs v. Brown, 520 U.S 397, 411 (1997); Connick v. Thompson, 563 U.S. 51, 61 (2011).

[8]  *See, e.g.,* Joanna C. Schwartz, *Municipal Immunity*, 109 VA. L. REV. 1181, 1199–200 (2023); Blum, *supra* note 1, at 922.

[9]  *See* Ashcroft v. Iqbal, 556 U.S. 662, 678–79 (2009) (holding that a complaint must meet a "plausibility standard" to survive a motion to dismiss); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556 (2007) (imposing plausibility standard on plaintiffs alleging violations of Section 1 of the Sherman Act). The influence of the plausibility pleading standard on civil rights litigation has produced a vast literature. For one recent example examining the intersection of plausibility pleading and civil rights litigation empirically, see Alexander A. Reinert, *Supervisory Liability and* Ashcroft v. Iqbal, 41 CARDOZO L. REV. 945, 977–78 (2020) (showing that *Iqbal* has affected § 1983 supervisory liability claims).

of courts, relatively little research has focused on how litigation documents and the lawyers who draft them fit into the municipal liability puzzle.[10]

This Article examines lawyering in civil rights cases through the lens of complaints alleging claims of municipal liability under § 1983. It presents an original, hand-coded dataset consisting of the complaints in every case that resulted in an adjudication of *Monell* liability by a federal appellate court in 2019—a total of 108 complaints.[11] Analysis of these complaints offers insight into how lawsuits against municipalities begin. By focusing on complaints—as opposed to trial court or appellate opinions—our research helps to illuminate why civil rights plaintiffs so often lose.

Troublingly, we find that a significant number of complaints display what we will call *pleading failures*—omissions that justify granting a motion to dismiss.[12] A brief example will illustrate this finding. Let us focus for a moment on the failure-to-train theory of municipal liability.[13] In order to survive a motion to dismiss, the failure-to-train theory requires the plaintiff to plead that: (1) a municipality's training was deficient; (2) the deficiency reflected deliberate indifference to the likelihood of a constitutional violation; and (3) the deficient training caused the constitutional violation.[14] These three elements are central to

---

[10] For an important exception, see Schwartz, *Municipal Immunity*, *supra* note 8, at 1206, 1247–49 (examining litigation documents to track the trajectory of § 1983 cases involving police misconduct).

[11] The methodology of the study is described in detail in Part II. In brief, we identified every case that cited *Monell* in 2019, a total of 215 cases. We then eliminated those that did not involve the adjudication of a municipal liability claim, leaving 108 cases, and coded the complaints in those cases. We chose to focus on complaints that culminated in *Monell* claims because it will allow–in future work–for analysis of the trajectory of those cases from the original complaint all the way through an eventual appellate decision.

[12] In describing the collection of shortcomings we study in this article, we adopt Nicole Buoncore Porter's term "pleading failures," which she uses in an important article on the ADAAA. Nicole Buoncore Porter, *Explaining "Not Disabled" Cases Ten Years After the ADAAA: A Story of Ignorance, Incompetence, and Possibly Animus*, 26 GEO. J. ON POVERTY L. & POL'Y 383, 398–400 (2019) (cataloging "pleading failures" in litigation under ADAAA).

[13] Courts emphasize that plaintiffs are responsible for alleging the elements of a specific theory of municipal liability in order to survive a motion to dismiss. *See, e.g.*, Blue v. District of Columbia, 811 F.3d 14, 20 (D.C. Cir. 2015) ("Section 1983 plaintiffs have several ways to allege a municipal policy, each with its own elements. If the plaintiff fails to identify the type of municipal policy at issue, the court would be unable to determine, as required by *Iqbal*'s second step, whether the plaintiff had provided plausible support for her claim. Although the court could try to surmise which theory of municipal liability has the strongest support in the complaint, this is not our role. It therefore follows that to state a valid claim against a municipality under section 1983, a plaintiff must plead the elements of the relevant type of municipal policy.").

[14] *See, e.g.*, City of Canton v. Harris, 489 U.S. 378, 388–90, 392 (1989).

proving a failure-to-train claim, and their necessity is clearly articulated in several Supreme Court cases and thousands of federal appellate cases.[15]

Despite the weight and clarity of precedent specifying the necessity of these three elements, many complaints did not even mention them. Such omissions were unsurprising in complaints drafted by pro se plaintiffs. But many complaints drafted by lawyers also fell short. In 20.6% of failure-to-train claims in our dataset, the plaintiff failed even to *mention* one or more of the three failure-to-train elements,[16] let alone plead the element at the level necessary to meet *Iqbal*'s plausibility requirement and survive a motion to dismiss.[17]

The same pattern is evident with respect to other theories of municipal liability. While plaintiffs are more successful at satisfying[18] the requirements of some theories than others, the overall rate is troublingly low.[19] Among the complaints that we coded, 56.5% failed to satisfy the basic elements of *any* theory of *Monell* liability.[20] In each of these cases, the defendant could argue— and the court should agree—that this omission is sufficient grounds for dismissing all § 1983 claims against the municipality.

The poor quality of complaints may be partially attributable to a lack of civil rights expertise among the lawyers who filed them: about 30% of the lawyers who filed complaints in our dataset appeared to have no experience litigating civil rights cases.[21] Lawyers with expertise in civil rights litigation did better than their non-expert counterparts—but they still failed to satisfy one or more elements of at least one theory of *Monell* liability more than two-thirds of the time.[22] The explanation for the shortcoming, therefore, is not only a matter of expertise or experience.

---

[15] *See, e.g., id.* at 389–90; Bd. of the Cnty. Comm'rs v. Brown, 520 U.S 397, 400, 404, 410–11 (1997); Connick v. Thompson, 563 U.S. 51, 59, 61 (2011).

[16] *See infra* Table 6.

[17] *See* Ashcroft v. Iqbal, 556 U.S. 662, 678–79 (2009).

[18] As we explain in more detail in Part III.A, we adopted the term "satisfy" as a term of art in our coding. If a plaintiff at least mentioned each substantive element of a *Monell* theory, then the plaintiff "satisfied" that theory. This standard is significantly lower than the standard of plausibility necessary to survive a motion to dismiss under *Iqbal*, 556 U.S. at 678–79. A complete explanation of our methodology appears in Part II, and Appendix A describes the language we used to evaluate whether a complaint "satisfied" a particular element.

[19] *See infra* Table 6.

[20] *See infra* Table 2.

[21] *See infra* Table 9.

[22] *See infra* Table 9.

What does the prevalence of pleading failures tell us? We suggest three primary conclusions. First, many plaintiffs' lawyers do not make the most of their clients' claims. A close reading of the complaints in our dataset indicates that, in many instances, the insufficiency of the complaint is not (or, at least, not only) a product of the stringent municipal liability standards imposed by the court, but rather the result of insufficient familiarity with the *Monell* standard, inadequate research, or hasty work.[23]

Second, pleading failures are a symptom of a systemic problem: not enough plaintiffs have access to lawyers with expertise in § 1983 litigation who are willing to take their cases. We trace this shortfall in part to economic incentives. Due to the Supreme Court's restriction on attorneys' fees under 42 U.S.C. § 1988, some cases—particularly those with low expected damages or involving only injunctive relief—are not financially feasible for many experienced lawyers to accept.[24] The result is that some plaintiffs have no choice but to proceed pro se,[25] while others end up retaining lawyers who lack expertise in litigating municipal liability claims.[26]

Finally, understanding pleading failures is critical to understanding how municipal liability functions in civil rights enforcement. When a pleading failure would preclude recovery regardless of the caliber of the evidence or the challenges of the municipal liability standard, we cannot know whether it is really municipal liability doctrine that is the problem. Careful study of pleading failures—and the lawyering failures that often underlie them—allows stakeholders in civil rights enforcement to make an informed assessment about the best path forward.

Suing a local government directly has many potential advantages for plaintiffs. Local governments cannot raise the qualified immunity defense, as can their employees.[27] The scope of discovery against municipalities is potentially broader than in litigation against an individual officer or officers.[28] Juries may be willing to impose larger judgments against municipalities than

---

[23] *See infra* Part IV.A.

[24] *See, e.g.*, Pamela S. Karlan, *Disarming the Private Attorney General*, 2003 U. ILL. L. REV. 183, 207–08 (2003).

[25] In our dataset, 33 out of 108 plaintiffs were proceeding pro se. *See infra* Table 4.

[26] *See infra* notes 129–34 and accompanying text.

[27] Owen v. City of Indep., 445 U.S. 622, 638 (1980) (holding municipalities are not entitled to qualified immunity); Nancy Leong, *Municipal Failures*, 108 CORNELL L. REV. 345, 352 (2023) (discussing lack of municipal qualified immunity).

[28] Nancy Leong, *Civil Rights Liability for Bad Hiring*, 108 MINN. L. REV. 1, 28 (2024).

against individual officers.[29] And—as one of us (Leong) has noted elsewhere—imposing liability directly against municipalities communicates that the root cause of many constitutional harms is institutional rather than individual.[30] Pleading failures in municipal liability litigation therefore are not only a problem for individual plaintiffs but also an essential component of understanding and reforming the civil rights liability regime.

The Article proceeds in four parts. Part I provides doctrinal background and surveys relevant legal scholarship regarding the *Monell* standard and performance of civil rights lawyers. Part II describes the research methodology. Part III presents the quantitative and qualitative findings of the research. Finally, Part IV discusses the implications of the research, investigating the underlying causes of pleading failures and offering recommendations for future directions.

## I. BACKGROUND

This Part provides context for our examination of pleading failures. Part I.A offers doctrinal background, tracing the evolution of municipal liability under 42 U.S.C. § 1983 from the enactment of the statute to the present. Part I.B surveys the legal scholarship on municipal liability and connects it to the literature on lawyering by plaintiffs' attorneys.

### A. Doctrinal Development

Congress enacted 42 U.S.C. § 1983 in 1871 as part of the Ku Klux Klan Act to address violence against Black people in the South.[31] In passing the legislation, Congress hoped both to deter constitutional rights violations and to compensate those who suffered violations of their rights.[32] The statute offers a remedy against any "person"—a term that the Supreme Court later held to include municipal governments—who causes a violation of constitutional rights.[33]

---

[29] *Id.* at 27.

[30] Leong, *Municipal Failures*, *supra* note 27, at 354.

[31] Monroe v. Pape, 365 U.S. 167, 174 (1961) (recounting legislative history of § 1983).

[32] *See, e.g.*, Robertson v. Wegmann, 436 U.S. 584, 591–92 (1978) ("The policies underlying § 1983 include compensation of persons injured by deprivation of federal rights and prevention of abuses of power by those acting under color of state law."); Valenzuela v. City of Anaheim, 6 F.4th 1098, 1102 (9th Cir. 2021) ("Section 1983's goals include compensation for those injured by a deprivation of federal rights and deterrence to prevent future abuses of power.").

[33] Monell v. Dept. of Soc. Servs., 436 U.S. 658, 690 (1978) (overruling a prior decision in *Monroe v. Pape*, in which the Court had held that the term "person" did not include any municipal entities).

While municipalities qualify as "persons" under § 1983, they are not automatically liable for constitutional violations committed by their employees—that is, they are not liable in respondeat superior.[34] Rather, a municipality is liable only for violations caused by a municipal policy or custom.[35]

The Supreme Court has articulated several avenues by which a plaintiff can establish that "action pursuant to official municipal policy" caused their injury.[36] Such avenues include: (1) "the decisions of a government's lawmakers";[37] (2) "the acts of its policymaking officials";[38] (3) the "practices so persistent and widespread as to practically have the force of law";[39] and (4) a failure to take some action, such as the failure to train, screen, or supervise employees.[40] Courts have held that plaintiffs must make clear which theory or theories they are relying on to establish municipal liability—if the plaintiff fails to identify a specific theory, courts will not "try to surmise which theory of municipal liability has the strongest support in the complaint."[41]

Some appellate courts have expanded the universe of avenues for establishing a municipal policy or custom. Several circuits, for example, include as a separate category "the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval."[42] Others do not recognize a distinct "ratification" theory,[43] or treat ratification as a subset of the

---

[34] *Id.* at 688–89.

[35] *Id.* at 690–91.

[36] *Id.* at 691.

[37] Connick v. Thompson, 563 U.S. 51, 61 (2011).

[38] *Id.*

[39] *Id.*

[40] City of Canton v. Harris, 489 U.S. 378, 389–90 (1989); Bd. of Cnty. Comm'rs v. Brown, 520 U.S 397, 403-04 (1997) ("Locating a 'policy' ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality. Similarly, an act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law." (citations omitted)).

[41] *See, e.g.*, Blue v. District of Columbia, 811 F.3d 14, 20 (D.C. Cir. 2015) ("Section 1983 plaintiffs have several ways to allege a municipal policy, each with its own elements. If the plaintiff fails to identify the type of municipal policy at issue, the court would be unable to determine, as required by [pleading requirements under current Supreme Court precedent] whether the plaintiff had provided plausible support for her claim.").

[42] Bryson v. City of Okla. City, 627 F.3d 784, 788 (2010) (citation omitted); *see also* Starbuck v. Williamsburg James City Cnty. Sch. Bd., 28 F.4th 529, 534 (4th Cir. 2022) (describing ratification as a viable theory of recovery).

[43] Deferio v. City of Syracuse, 770 F. App'x 587, 590 (2d Cir. 2019) (recognizing same four theories as above).

policymaker theory.[44] Likewise, some circuits have recognized a gloss on the "written policy" avenue by allowing plaintiffs to argue that the disregard or absence of a policy was itself a policy that led to a constitutional violation.[45] Some circuits have allowed plaintiffs to litigate under more specific failure theories, such as "failure to investigate" or "failure to discipline."[46] And some describe the theories delineated by the Supreme Court in a more idiosyncratic way.[47] In the next section, we describe how legal scholars have responded to municipal liability doctrine.

## B. Legal Scholarship

This section examines municipal liability in the legal literature. We first identify doctrinal and strategic advantages to plaintiffs of litigation directly against municipalities. We then demonstrate that such advantages do not translate to success for plaintiffs. The obstacles to such success include heightened doctrinal standards, unavailability of legal counsel, and, finally, the capability of such counsel.

Recent scholarship has emphasized the benefits to plaintiffs of litigation directly against municipalities.[48] First, municipalities cannot assert the defense of qualified immunity, which is available to individual government officials.[49] Likewise, a claim against a municipality can succeed regardless of whether an individual employee is held liable—thus, even if an individual employee is entitled to qualified immunity, or if the identity of an individual employee is not known, the municipality may still be held liable. And lawsuits against

---

[44] *Starbuck*, 28 F.4th at 533–36 (analyzing ratification as subset of policymaker liability).

[45] *See, e.g.*, Simmons v. Uintah Health Care Special Serv. Dist., 506 F.3d 1281, 1283 (10th Cir. 2007) ("Municipalities are equally answerable for actions undertaken by their final policymakers, whether or not those actions conform to their own preexisting rules. Were the law otherwise, a municipality's leaders would have the very strange incentive to flout their own policies. Or perhaps even enact policies with the deliberate purpose of disregarding them.").

[46] *See, e.g.*, Waller v. City & Cnty. of Denver, 932 F.3d 1277, 1284 (10th Cir. 2019).

[47] *See, e.g.*, Estate of Roman v. City of Newark, 914 F.3d 789, 798 (3d Cir. 2019) ("Policy is made when a decisionmaker possess[ing] final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict. . . . Custom, on the other hand, can be proven by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law." (citing Andrews v. City of Philadelphia, 895 F.2d 1469, 1480 (3d Cir. 1990)).

[48] *See, e.g.*, Leong, *Civil Rights Liability for Bad Hiring*, *supra* note 28; Schwartz, *Municipal Immunity*, *supra* note 8.

[49] Some jurisdictions have held that a municipality cannot be held liable if the individual government officer who allegedly violated the Constitution was entitled to qualified immunity. Joanna C. Schwartz, *Backdoor Municipal Immunity*, 132 YALE L.J. F. 136, 138 (2022).

EMORY LAW JOURNAL    [Vol. 73:801

municipalities can seek injunctive as well as monetary relief—a critical tool for plaintiffs seeking both structural reform and damages.[50]

Municipal liability offers strategic advantages as well as doctrinal ones. Suing a municipality directly can potentially expand the scope of discovery, or juries might be willing to impose larger damages awards on municipalities.[51] And, more broadly, suing a municipality directly may improve the way that we talk about constitutional harm. In other work, one of us (Leong) has suggested that lawsuits directly against municipalities resist the "few bad apples" narrative popular in some accounts of harms caused by police officers, prison guards, and other governmental actors.[52]

Scholars agree that plaintiffs generally struggle to succeed on claims directly against municipalities.[53] In a comprehensive study of municipal liability in five district courts over a two-year period, Professor Joanna Schwartz found that plaintiffs are more likely to overcome qualified immunity—widely held out as an insurmountable obstacle to liability—than they are to succeed on a municipal liability claim at any stage of litigation.[54] One of us (Leong) has also focused on municipal failure claims in a recent series of articles. One article surveyed a full year of municipal failure claims in every federal appellate court, concluding that failure-to-supervise claims, in particular, could often be deployed by plaintiffs to greater benefit.[55] Another article specifically examined liability for failure to screen prior to hiring, finding that plaintiffs recovered on that theory of liability only *once* at the federal appellate level in the past twenty-five years and did not win a single judgment on the theory at the district court level in cases initiated

---

[50] Schwartz, *Municipal Immunity*, *supra* note 8, at 1199–200.

[51] *See* Robert J. MacCoun, *Differential Treatment of Corporate Defendants by Juries: An Examination of the "Deep Pockets" Hypothesis*, 30 LAW & SOC'Y REV. 121, 140 (1996). Although the research focused on corporate entities, MacCoun suggested that the same might hold true for a government: "[p]erhaps jurors find it easier to impose costly sanctions against an aggregate, impersonal entity—either a corporation or a government—than against a real, flesh-and-blood individual." *Id.*

[52] Leong, *Municipal Failures*, *supra* note 27, at 352.

[53] *See, e.g.*, Blum, *supra* note 1, at 916, 916 nn.17–19, 922 (describing challenges of pleading and proof); Reinert et al., *New Federalism*, *supra* note 1, at 754–55 ("[T]he Supreme Court's limitation on municipality liability operates as a significant barrier to relief for those injured by unconstitutional conduct."); Smith, *supra* note 1, at 131 (noting limitations on recovery created by municipal liability doctrine after *Monell*).

[54] Schwartz, *Municipal Immunity*, *supra* note 8, at 1199–200.

[55] Leong, *Municipal Failures*, *supra* note 27.

during the year 2019.[56] Aside from this recent research, little empirical work has examined municipal liability or the process of litigation against municipalities.[57]

Most scholars have concluded that the reason plaintiffs rarely succeed in holding municipalities liable for constitutional violations is that the municipal liability standard articulated by the Supreme Court is highly demanding.[58] A voluminous literature has criticized the standard and has proposed a wide range of revisions,[59] although the current Supreme Court has given no indication that it is likely to implement any of the proposals.

Certainly the intricate and demanding *Monell* standard is one reason that civil rights plaintiffs fail to hold municipalities liable, particularly as it intersects with the heightened pleading standard imposed by *Ashcroft v. Iqbal*.[60] But these obstacles are intensified by other challenges that have received somewhat less attention.

Availability of counsel is one such issue. In other work, Schwartz has observed that many civil rights plaintiffs proceed pro se.[61] Scholars have

---

[56] Leong, *Civil Rights Liability for Bad Hiring*, *supra* note 28.

[57] Nearly two decades ago, one researcher found that municipalities are generally named as defendants in lawsuits under § 1983, that city attorneys (unsurprisingly) prefer the policy or custom requirement to respondeat superior liability, and that many cities permit indemnification of officers in certain circumstances while also capping damages awards. Lisa D. Hawke, Note, *Municipal Liability and Respondeat Superior: An Empirical Study and Analysis*, 38 SUFFOLK L. REV. 831, 847–50 (2005).

[58] *See supra* note 1 and accompanying text.

[59] *See, e.g.*, Catherine Fisk & Erwin Chemerinsky, *Civil Rights Without Remedies: Vicarious Liability Under Title VII, Section 1983, and Title IX*, 7 WM. & MARY BILL RTS. J. 755, 790–91 (1999) (arguing for vicarious liability against municipalities in lawsuits under § 1983); John C. Jeffries, Jr., *The Liability Rule for Constitutional Torts*, 99 VA. L. REV. 207, 234–35, 263 (2013) (arguing for a single § 1983 liability rule for both individuals and municipalities, with a single defense involving a reformulation of the current qualified immunity rule to a question of whether the defendant's conduct was "clearly unconstitutional" rather than whether rights were "clearly established"); Avidan Y. Cover, *Revisionist Municipality Liability*, 52 GA. L. REV. 375, 385 (2018) (proposing replacing the municipal policy or custom requirement with a legislative framework in which municipalities could be liable for having a pattern or practice of constitutional violations; or in isolated instances where the municipality lacks a policy and there is a national consensus that a policy is necessary to prevent a particular constitutional harm); Edward C. Dawson, *Replacing* Monell *Liability with Qualified Immunity for Municipal Defendants in 42 U.S.C. § 1983 Litigation*, 86 U. CIN. L. REV. 483, 487–88 (2018) (advocating for replacing policy or custom doctrine with respondeat superior liability while allowing municipalities to invoke the same qualified immunity defenses available to individual officers). While these proposals have much to recommend in them, each one would also require overturning Supreme Court precedent or passing federal legislation, both of which are highly unlikely in the near term. *Cf.* Alan K. Chen, *The Intractability of Qualified Immunity*, 93 NOTRE DAME L. REV. 1937, 1963–65 (2018) (explaining why it is highly unlikely that either the Supreme Court or Congress will abolish qualified immunity).

[60] Schwartz, *Municipal Immunity*, *supra* note 8, at 1199–200.

[61] Joanna Schwartz, *Civil Rights Without Representation*, 64 WM. & MARY L. REV. 641, 650 (2023).

EMORY LAW JOURNAL                    [Vol. 73:801

suggested that the Supreme Court's decisions narrowing the availability of attorneys' fees under 42 U.S.C. § 1988 makes many cases financially infeasible for private attorneys.[62] Particularly in cases where plaintiffs' damages are low, attorneys may be unwilling to accept cases even on a contingency basis.[63]

Moreover, research in other doctrinal areas of civil rights law suggests that even when plaintiffs obtain lawyers, those lawyers may not litigate effectively on their behalf.[64] In an ingenious study of employment discrimination lawsuits under Title VII, Professor Scott Moss found that many plaintiffs' lawyers did a poor job of litigating their clients' cases.[65] Moss identified a defense that was subject to intra-circuit splits in multiple jurisdictions, then identified cases in which defendants in those jurisdictions raised the defense at summary judgment.[66] Where the defendant raised the defense, there was "no excuse" for the plaintiff not to point out the contrary authority within the circuit, yet 72% still did not.[67] Moss found that the better lawyers—those who pointed out the contrary authority—obtained much better results for their clients: where the plaintiff rebutted the defense, 30% of decisions accepted it; where the plaintiff did not rebut the defense, 86% of the decisions accepted it.[68] In addition, he found many other instances of bad lawyering that "fail[ed] the most basic professional standards," ranging from extremely poor writing to a complete absence of legal research to boilerplate statements rather than fact-specific arguments.[69]

Similarly, in a careful survey of five years of disability discrimination lawsuits brought under the Americans with Disabilities Amendments Act of 2008, Professor Nicole Buonocore Porter also found evidence of poor lawyering.[70] Porter identified a number of deficiencies that she termed "pleading failures."[71] These failures included failure to specify a cognizable limitation on

---

[62] *See, e.g.*, Paul D. Reingold, *Requiem for Section 1983*, 3 DUKE J. CONST. L. & PUB. POL'Y 1, 1 (2008) ("Today civil rights plaintiffs are treated the same as ordinary tort plaintiffs by the private bar: without high damages, civil rights plaintiffs are denied access to the courts because no one will represent them."); *see also* Evans v. Jeff D., 475 U.S. 717, 734–36 (1986).

[63] Reingold, *supra* note 62, at 16.

[64] *Id.*

[65] Scott Moss, *Bad Briefs, Bad Law, Bad Markets: Documenting the Poor Quality of Plaintiffs' Briefs, Its Impact on the Law, and The Market Failure It Reflects*, 63 EMORY L.J. 59, 62 (2013).

[66] *Id.* at 63.

[67] *Id.* at 77, 80.

[68] *Id.* at 65.

[69] *Id.* at 80–81.

[70] Porter, *supra* note 12, at 398–402 (cataloging "pleading failures" in litigation under ADAAA).

[71] *Id.* at 398.

a major life activity, conclusory allegations that did not specify how an impairment substantially limited a major life activity, and failure to explain how a cited limitation compared to the general public.[72]

Of course, evidence of poor lawyering in employment discrimination and disability cases does not necessarily translate to conclusions about lawyering in lawsuits brought under § 1983 that attempt to establish municipal liability. But poor representation for plaintiffs in one complex area of civil rights law suggests that poor representation may be common in other areas as well.

Given the lack of specific information about the trajectory and outcome of *Monell* claims, municipal liability litigation under § 1983 is ripe for further research. The next Part describes the methodology we used to learn more about this area of litigation.

## II. METHODOLOGY

We began our examination of *Monell* liability by identifying every federal appellate decision that adjudicated an issue of municipal liability under § 1983 in 2019.[73] We found 215 federal appellate cases that cited *Monell*;[74] of these 215 cases, 107 did not adjudicate an issue of *Monell* liability at the appellate level.[75] We removed those cases from the dataset.

For the remaining 108 cases, we used the Bloomberg Law database to identify the docket for the case at the district court level. Our coding focused on complaints. In some instances, there was only one complaint.[76] In other instances, there were up to four amended complaints.[77] For each case, we identified the final complaint that was filed and accepted by the district court prior to the decision that led to the appeal of the municipal liability issue to the

---

[72] Porter, *supra* note 12, at 398–401.

[73] This was the dataset that one of us (Leong) used as the basis for a prior article. *See* Leong, *Municipal Failures, supra* note 27.

[74] The list of cases was obtained by searching "Monell & da(aft 12/31/2018) & da(bef 01/01/2020)" on Westlaw.

[75] These 107 cases referenced *Monell* but did not address the litigation of a claim involving municipal policy or custom. In most of these cases, either the court only mentioned *Monell* in a citation or the plaintiff had brought a *Monell* claim at trial but not on appeal.

[76] *See, e.g.*, Complaint, Stewart v. City of Memphis, 2019 WL 332812 (W.D. Tenn. Jan. 25, 2019) (No. 16-02574).

[77] *See, e.g.*, Fourth Amended Complaint and Jury Demand, Forrest v. Corzine, 2015 WL 6175360 (D.N.J. Oct. 20, 2015) (No. 09-1555).

federal appellate court.[78] This was the version of the complaint that we used in our subsequent coding.

Most complaints were available on Bloomberg.[79] For the few that were not, we found the complaint using PACER or, in one instance, the Joint Appendix for the appellate litigation.[80] We documented the relevant version of the complaint in our coding.

We pause to acknowledge two limitations in the construction of our dataset. First, limiting our research to cases that cited *Monell* may omit some cases that were decided without reference to *Monell* and might therefore skew our data in some way.[81] In reading the federal appellate opinions, however, we saw no evidence that this was happening. Second, we elected to code complaints associated with cases that were litigated to an appellate decision in order to have a dataset in which we could ultimately trace the complete trajectory of a case from complaint to appellate decision. This approach risks creating a dataset that is not representative: municipal liability cases that are litigated through an appellate decision may not be representative of cases overall. While we acknowledge the unrepresentativeness concern, we think it is outweighed by the possibility of assessing, in future work, the full trajectory of a case. And, for present purposes, the trends we identify are so significant that it is unlikely that inclusion of cases in addition to those litigated through appeal would dramatically alter them.

Once we identified the relevant complaint for each of the 108 cases in our dataset, we then coded the complaint for the theories of municipal liability on

---

[78] Rarely—for example, when there was an interlocutory appeal—an amended version of the complaint post-dated the 2019 decision that brought the case into the dataset. In such situations we coded the pre-2019 complaint.

[79] The Bloomberg research database has been used in other empirical research relating to § 1983. *See, e.g.,* Joanna C. Schwartz, *How Qualified Immunity Fails,* 127 YALE L.J. 1, 21 (2017); Leong, *Civil Rights Liability for Bad Hiring, supra* note 28, at 39–40.

[80] J.A. at 2, Kimble v. Kingston City Sch. Dist., 792 Fed. Appx. 80 (2d Cir. 2019) (apparently as the result of a clerical error, a complaint for a different case is uploaded on both Bloomberg and PACER).

[81] As an alternative, we might have constructed our search around cases that used a phrase such as "municipal liability," but a Westlaw search using this term yielded only 154 federal appellate cases during the year 2019. Broader queries would have included more cases, but also would have introduced more ambiguity. For example, many appellate decisions were unclear as to whether they were addressing a municipal liability claim under § 1983 or another type of claim against a municipality—for example, a federal statutory claim or a state statutory or tort claim. While our approach of using cases that cited *Monell* may omit a few cases, it provides a clear criterion for inclusion, and there is no indication that cases that cite *Monell* are not representative of all cases.

which the plaintiffs relied. For purposes of our coding, we focused on six theories by which a plaintiff can establish a municipal policy or custom:[82]

> 1=written policy
>
> 2=decision by final policymaker
>
> 3=informal custom
>
> 4=failure to train
>
> 5=failure to screen
>
> 6=failure to supervise

The theories include some gray areas.[83] In addition, a few plaintiffs advanced theories that the Supreme Court has not recognized and that are not treated consistently among the circuits.[84]

For each of the theories, we identified the theory's substantive elements and coded whether plaintiffs had articulated those elements. For the failure-to-train theory, for example, we coded whether the plaintiff had articulated three elements: (1) that there was a failure to train; (2) that the municipality had acted with deliberate indifference; and (3) that the failure to train had caused the constitutional violation.[85] Table 1 summarizes the elements for each theory of liability.

---

[82]  These theories are discussed in more detail in Part I.A. Although some plaintiffs also attempted theories that did not fall into one of these categories, these six categories captured most claims that plaintiffs attempted and provide a substantial basis for analysis.

[83]  *See* cases cited *supra* notes 42–47.

[84]  *See, e.g.*, Complaint at 11–12, Stewart v. City of Memphis, No. 16-02574, 2019 WL 332812 (W.D. Tenn. Jan. 25, 2019) (raising policymaker ratification theory of liability); Amended Complaint at 8–9, Young v. City of Chester, No. 17-3066, 2018 WL 1583674 (E.D. Pa. Apr. 2, 2018) (raising policymaker ratification, inadequate discipline, and inadequate investigation theories of liability); Second Amended Complaint at 31, Jones v. Eder, No. 15-2919, 2016 WL 4572205 (S.D. Tex. Aug. 31, 2016) (raising failure to investigate and failure to discipline theories of liability).

[85]  We coded the critical substantive elements associated with each theory. To prevail, a plaintiff would also have to prove other elements that we did not code because they were not central to our investigation of *Monell* litigation. For example, plaintiffs would also have to prove that the defendant acted under color of state law. *See* 42 U.S.C. § 1983 (imposing liability for actions "under color of [state law]"); Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n, 531 U.S. 288, 295, 298 (2001) (affirming and applying state action requirement).

***Table 1. Municipal Liability Elements***

Written Policy Elements

1) Formal written policy or legislative enactment
2) Execution of official policy caused constitutional violation

Policymaker Elements

1) Individual with policymaking authority
2) Made decision in official capacity
3) Official decision caused constitutional violation

Informal Custom Elements

1) Pattern, practice, custom, or informal policy alleged
2) Widespread recurring practice is so permanent and settled that it constitutes formal policy
3) Adhering to that practice caused constitutional violation

Failure-to-Train Elements

1) Inadequate training of municipal employees
2) Inadequate training caused constitutional injury
3) Municipality was deliberately indifferent to constitutional rights injured

Failure-to-Supervise Elements

1) Inadequate supervision of municipal employees
2) Inadequate supervision caused constitutional injury
3) Municipality was deliberately indifferent to constitutional rights injured

Failure-to-Screen Elements

1) Inadequate screening of candidates
2) Inadequate screening caused constitutional injury
3) Municipality was deliberately indifferent to constitutional rights injured

Throughout this Article, we use two terms to describe whether complaints met our coding standards: "element satisfaction" and "theory satisfaction." When a plaintiff articulated a particular element of a theory of municipal liability in a manner sufficient to satisfy our coding standards, we describe the element as "satisfied." So, for example, if a plaintiff titled a particular cause of action "Failure to Train by the City" and stated within that cause of action that the city

had been "deliberately indifferent," we would code that the complaint "satisfied" the deliberate indifference element of a failure-to-train claim.

Similarly, when a plaintiff articulated all the elements of a particular theory, we describe the theory as "satisfied." So, for example, if a plaintiff stated that the municipality "failed to train" an employee, that the municipality did so with "deliberate indifference" to the likelihood of a constitutional violation, and that these actions "caused" the plaintiff's injury, we would code that the complaint "satisfied" the failure-to-train theory.

In determining whether a plaintiff satisfied a specified element, we used a standard that is substantially less demanding than the pleading standard that plaintiffs must satisfy to survive a motion to dismiss. After *Twombly v. Bell Atlantic* and *Aschcroft v. Iqbal*, plaintiffs must not only state the elements of a claim but also meet a standard of plausibility.[86] We chose to use a less demanding standard that is much more closely akin to the pre-*Twombly/Iqbal* pleading standard. For example, returning to the failure-to-train theory above, if a plaintiff included the phrase "deliberate indifference," we concluded that the plaintiff had satisfied the element for purposes of our research even though more information would be necessary to meet the standard of plausibility that a court would apply on a motion to dismiss.[87] We settled on this standard for two reasons. First, such a standard is more objective because it relies on predetermined words and phrases rather than an amorphous assessment of "plausibility." Second, such a standard gives plaintiffs the benefit of the doubt by overpredicting the likelihood of success. A representative sample of phrases we accepted as sufficient articulations of each element are listed in Appendix A, along with examples of the minimum information we required to conclude that the plaintiff had "satisfied" the elements.

When coding complaints filed by attorneys, we coded a particular element as satisfied only if the element was enunciated in the *claims*, rather than elsewhere in the complaint such as in the facts. We adopted this bright line approach because the federal appellate courts have made clear the elements of a claim must be alleged in the claim so that the court does not have to guess what

---

[86] *Iqbal* requires that plaintiffs "nudge[] . . . [the] claims . . . across the line from conceivable to plausible." Ashcroft v. Iqbal, 556 U.S. 662, 680 (2009). Further, evaluating whether a plaintiff has met this standard is "context specific, requiring the reviewing court to draw on its experience and common sense." *Id.* at 663–64; Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 556 (2007) (imposing plausibility standard on plaintiffs alleging violations of Section 1 of the Sherman Act).

[87] A representative list of the phrases we accepted for each element is available in Appendix A.

facts support each element.[88] While courts occasionally relax this standard—for example, by allowing an element to be satisfied by a statement in the facts rather than in the claims—the willingness to relax standards varies considerably among jurisdictions, judges, and individual cases. In the interests of both consistency and holding plaintiffs to the standard that a court could and often does choose to apply, we adopted the bright line rule that we have described.[89]

We used more relaxed standards for coding the elements of complaints filed by pro se parties, coding elements as satisfied if they were articulated anywhere in the complaint. We chose this less demanding standard to align our analysis more closely with the pleading standard generally imposed on pro se plaintiffs.[90]

We also coded the complaints in our dataset based on the type of representation a plaintiff had. For each complaint, we coded all the attorneys who signed that complaint.[91] This coding was divided into the following categories:

- Pro Se (unrepresented on the relevant version of the complaint)
- Solo Practice (1 attorney only)
- Small Firm (2–10 attorneys)
- Medium Firm (11–50 attorneys)
- Large Firm (51+ attorneys)
- Public Interest/Nonprofit

---

[88]  *See, e.g.,* Weiland v. Palm Beach Cnty. Sheriff's Office, 792 F.3d 1313, 1324 (11th Cir. 2015).

[89]  After much discussion, we decided that the only administrable rule would be to count only elements that were stated in the claims. Any other rule would require picking through potentially hundreds of allegations that are not attached to any particular claim and assuming a court would do the same.

[90]  *See, e.g.,* Jackson v. Nixon, 747 F.3d 537, 541 (8th Cir. 2014) (holding pro se plaintiffs to less stringent pleading standards than lawyers); Erickson v. Pardus, 551 U.S. 89, 94 (2007) (same).

[91]  As with the rest of our coding, we used the final complaint that was filed and accepted by the district court prior to the decision that led to the appeal to the federal appellate court. For that complaint, we coded the attorney who signed the district court complaint. Where multiple attorneys signed the complaint (or were listed as plaintiffs' counsel on the complaint), we coded for the first two attorneys listed. While other counsel may have been included on the complaints, or elsewhere on the district court dockets, we limited our coding in an effort to approximate the attorneys who served as primary counsel for the complaints that we coded. Though other attorneys may have been involved in drafting the complaint without signing the complaint, we thought it was likely that an attorney who signed the complaint would have been involved to a high degree.

Where plaintiffs were represented by counsel, we also coded whether counsel had civil rights experience or expertise.[92]

Although we did our best to develop clear rules for coding that can be replicated by future researchers, we acknowledge that some of our coding decisions were unavoidably subjective due to the infinite variation of language and the ambiguity of some complaints. We therefore present our quantitative data with the caveat that these results should be contextualized with qualitative information. The next Part turns to these findings.

## III. FINDINGS

This Part presents the results of our research. We first describe the quantifiable findings, then turn to qualitative observations.

### A. Quantitative Data

Within the 108 cases comprising our dataset, a significant number of plaintiffs did not succeed in articulating the elements of any theory of *Monell* liability in their complaint. We found that only 43.5% of plaintiffs successfully satisfied all the elements of at least one theory of *Monell* liability according to the requirements of our study. Further, only 22.2% of plaintiffs successfully satisfied all the theories of *Monell* liability they raised. Table 2 summarizes these findings.

---

[92] We determined whether counsel had civil rights expertise by reviewing the attorney or firm websites, where available. Where such websites were unavailable or unclear, we conducted general internet searches for the attorney(s) and firm(s) and referenced at least five sites from the following list: Martindale, Best Lawyers, Super Lawyers, LinkedIn, Lawyers.com, Justia, Findlaw.com, Avvo.com, and state bar websites. We identified counsel as having civil rights expertise if the website or internet search included relevant indications that the associated attorney(s) or firm(s) had expertise trying civil rights cases or that civil rights litigation was a key practice area. Alternatively, if our searches resulted in no such indications, we coded them as not having civil rights expertise. We also deemed general or ambiguous mentions of civil litigation as insufficient. We selected this approach because it relied on the resources a prospective plaintiff would likely access in searching for an attorney.

*Table 2. Overall Rate of* **Monell** *Theory Satisfaction*[93]

| Total Cases | All Theories Satisfied | Mixed Theory Satisfaction | No Theories Satisfied |
|---|---|---|---|
| 108 (100.0%) | 24 (22.2%) | 23 (21.3%) | 61 (56.5%) |

    Like other scholars,[94] we identified significant differences between represented and unrepresented plaintiffs. To learn more about these differences, we coded each complaint according to the identity of the person(s) who drafted it. Of the 108 complaints in our dataset, thirty-three (30.6%) were prepared by pro se plaintiffs. The remaining seventy-five (69.4%) were prepared by legal counsel. Of the seventy-five complaints prepared by counsel, eighteen complaints (16.7%) were prepared by solo practitioners, twenty-four complaints (22.2%) were prepared by small firms, six complaints (5.6%) were prepared by medium firms, and one complaint (0.9%) was prepared by a public interest organization.[95] An additional twenty-six complaints (24.1%) featured mixed representation, meaning multiple attorneys from different categories of counsel signed the complaint.[96] Table 3 depicts the number of cases by representation type and further classifies them as to whether all, some, or no theories of municipal liability were satisfied in each case.

---

[93] The majority of cases raised multiple *Monell* theories within a single complaint, and Table 2 depicts whether the plaintiffs (1) satisfied all elements across all theories ("All Theories Satisfied"); (2) satisfied all elements of at least one *Monell* theory, while missing at least one element from the other *Monell* theories raised in the complaint ("Mixed Theory Satisfaction"); or (3) missed at least one element in every *Monell* theory raised in the complaint, failing to fully satisfy any *Monell* theory ("No Theories Satisfied").

[94] Schwartz, *Civil Rights Without Representation*, *supra* note 61, at 650; Theodore Eisenberg, *Four Decades of Federal Civil Rights Litigation*, 12 J. EMPIRICAL LEGAL STUD. 4, 7 (2015) [hereinafter Eisenberg, *Four Decades*].

[95] We coded the attorney and law firm who signed each complaint according to the following categories: (1) pro se; (2) solo practice; (3) small firm (2–10 attorneys); (4) medium firm (11–50 attorneys); (5) large firm (51+ attorneys); and (6) public interest/nonprofit organization.

[96] In each case of mixed representation, we coded for the first and second attorneys listed on the complaint. In many cases, more than two attorneys were listed on the complaints or district court dockets. We chose to code only the first two attorneys listed on the complaint in order to capture those attorneys who appeared to have the most significant role in the representation. *See, e.g.*, Second Amended Complaint at 1, Nehad v. Zimmerman, No. 15-1386, 2017 WL 6453475 (S.D. Cal. Dec. 18, 2017) (listing attorneys from Miller Barondess, LLP (a medium firm) and Brian E. Watkins & Associates (a small firm) as counsel for the plaintiffs).

***Table 3. Representation Type, by Rate of Theory Satisfaction[97]***

| Representation Type | # of Cases | All Theories Satisfied | Mixed Theory Satisfaction | No Theories Satisfied |
|---|---|---|---|---|
| Pro Se | 33 (30.6%) | 3 (9.1%) | 6 (18.2%) | 24 (72.7%) |
| Solo Practice | 18 (16.7%) | 2 (11.1%) | 4 (22.2%) | 12 (66.7%) |
| Small Firm | 24 (22.2%) | 7 (29.2%) | 5 (20.8%) | 12 (50.0%) |
| Medium Firm | 6 (5.6%) | 1 (16.7%) | 2 (33.3%) | 3 (50.0%) |
| Public Interest | 1 (0.9%) | 0 (0.0%) | 0 (0.0%) | 1 (100.0%) |
| Mixed Representation | 26 (24.1%) | 11 (42.3%) | 6 (23.1%) | 9 (34.6%) |
| **Total Cases** | **108 (100.0%)** | **24 (22.2%)** | **23 (21.3%)** | **61 (56.5%)** |

Represented plaintiffs achieved a higher rate of theory satisfaction than did pro se plaintiffs. Plaintiffs with legal counsel fully satisfied at least one *Monell* theory in 50.7% of cases, compared to only 27.3% of cases in which the plaintiffs proceeded pro se. Still, it is worth noting that the presence of a lawyer did not always make as much of a difference as one might hope or expect. For example, 66.7% of solo practitioners failed to draft a complaint that satisfied even one theory of *Monell* liability—a rate only slightly better than the 72.7% of pro se plaintiffs who failed to satisfy even one theory. Table 4 depicts the frequency of cases by pro se plaintiffs compared to represented plaintiffs and whether all theories brought in each case were satisfied.

[97] The "Large Firm" category is not represented in Table 3 because no complaints were drafted solely by one large firm, although multiple large firms were involved in "mixed representation" cases.

***Table 4. Pro Se and Represented Plaintiffs, by Rate of Theory Satisfaction***

| Representation Type | # of Cases | All Theories Satisfied | Mixed Theory Satisfaction | No Theories Satisfied |
|---|---|---|---|---|
| Pro Se | 33 (30.6%) | 3 (9.1%) | 6 (18.2%) | 24 (72.7%) |
| Represented | 75 (69.4%) | 21 (28.0%) | 17 (22.7%) | 37 (49.3%) |
| **Total Cases** | **108 (100.0%)** | **24 (22.2%)** | **23 (21.3%)** | **61 (56.5%)** |

As prior research has noted, the challenges facing pro se plaintiffs are a troubling feature of our current system of civil rights enforcement.[98] For the remainder of this section, however, we will focus on the seventy-five cases in which the plaintiffs were represented by counsel in order to examine the work of plaintiffs' lawyers. Among the complaints, in these seventy-five cases, plaintiffs raised a total of 137 theories of *Monell* liability.[99] Twenty-one complaints (28.0%) fully satisfied every theory the plaintiff raised, totaling fifty theories across the cases. Seventeen complaints (22.7%) had mixed success in satisfying the theories raised, which totaled fifty-two theories across the cases. These cases each raised multiple *Monell* theories but satisfied all elements for some theories while missing one or more elements of other theories raised in the same case. Lastly, thirty-seven complaints (49.3%) failed to satisfy any *Monell* theories across thirty-five theories raised.[100] Table 5 depicts the success of plaintiffs across all of the theories raised within individual cases.

---

[98] *See, e.g.*, Schwartz, *Civil Rights Without Representation, supra* note 61, at 650; Eisenberg, *Four Decades, supra* note 94, at 7.

[99] Note, some complaints raised multiple iterations of the same *Monell* theory. For the purposes of our coding, we treated multiple versions of the same theory as one theory per case and coded the strongest attempt. For example, if a case alleged a failure-to-train theory against a municipality for the failings of both a police department and a prison administration, we only coded one failure-to-train theory for that case rather than two.

[100] These thirty-seven complaints raised a total of thirty-five *Monell* theories. The thirty-seven complaints also include those in which no *Monell* theories were identified in our coding of the complaints but that nonetheless adjudicated a *Monell* theory at the federal appellate level.

**Table 5. Rate of Theory Satisfaction, by Number of Cases and Number of Theories**

| Theory Satisfaction | # of Cases | # of Theories |
|---|---|---|
| All Theories Satisfied | 21 (28.0%) | 50 (36.5%) |
| Mixed Theory Satisfaction | 17 (22.7%) | 52 (38.0%) |
| No Theories Satisfied | 37 (49.3%) | 35 (25.5%) |
| **Total Cases** | **75 (100.0%)** | **137 (100.0%)** |

A significant majority of plaintiffs did not satisfy all the elements of all the *Monell* theories they raised. The result is especially notable given that the standard we used for evaluating element satisfaction was more lenient than the *Iqbal* standard that plaintiffs face on a motion to dismiss.[101] Even when cases in which all theories were satisfied are combined with the cases in which only some theories were satisfied, barely half (50.7%) of the complaints satisfied at least one theory of municipal liability.

We also found differences in element satisfaction rates among the six theories of *Monell* liability. Plaintiffs successfully satisfied all elements of the three municipal failure theories at a higher rate than the other three *Monell* theories. When alleging the three municipal failure theories, plaintiffs satisfied all elements in 83.3% of failure-to-screen theories, 79.4% of failure-to-train theories, and 76.7% of failure-to-supervise theories. When alleging the other three *Monell* theories, plaintiffs satisfied all elements in only 66.7% of written policy theories, 54.5% of policymaker theories, and 37.7% of informal custom theories.

The low element satisfaction rate for the informal custom theory is particularly interesting because this theory was raised more times than any other *Monell* theory (fifty-three times compared to the next highest at thirty-four times). Plaintiffs missed one or more elements of this theory in 62.3% of cases,

---

[101] Ashcroft v. Iqbal, 556 U.S. 662, 683 (2009); *see supra* notes 86–87 (discussing element satisfaction standard); *infra* Appendix A: Coding Protocol (representative list of phrases accepted for each element).

more than half of all the times this theory was raised. One possibility is that plaintiffs may use the informal custom theory as a "catch-all" when the municipal liability allegations are vague or ill-defined. This result is discussed further in Part III.B.[102] Table 6 depicts the frequency of each type of *Monell* theory with the corresponding element satisfaction rates.

*Table 6. Type of* Monell *Theory, by Element Satisfaction*

| *Monell* Theory | # of Theories | At Least One Element Missed | All Elements Satisfied |
|---|---|---|---|
| Written Policy | 3 (2.2%) | 1 (33.3%) | 2 (66.7%) |
| Policymaker | 11 (8.0%) | 5 (45.5%) | 6 (54.5%) |
| Informal Custom | 53 (38.7%) | 33 (62.3%) | 20 (37.7%) |
| Failure to Train | 34 (24.8%) | 7 (20.6%) | 27 (79.4%) |
| Failure to Supervise | 30 (21.9%) | 7 (23.3%) | 23 (76.7%) |
| Failure to Screen | 6 (4.4%) | 1 (16.7%) | 5 (83.3%) |
| **Total Theories** | **137 (100%)** | **54 (39.4%)** | **83 (60.6%)** |

Of the 137 *Monell* theories raised across the seventy-five complaints submitted by legal counsel, only 60.6% of the theories were fully satisfied. In the remaining 39.4% of theories, plaintiffs failed to satisfy at least one element— meaning that their efforts to litigate that theory were doomed from the beginning. That is, plaintiffs *should not* have prevailed on over one-third of the theories they raised.

Our research also allowed us to identify patterns in how plaintiffs pled specific theories and elements. We note two common omissions here. Of the seventy-five complaints, fifty-three raised the informal custom theory, yet only

---

[102]  *See infra* notes 107–39.

twenty-one (39.6%) satisfied the "widespread" element by asserting a pattern of incidents beyond the plaintiff's own case.[103] Table 7 summarizes these data.

**Table 7. Rate of "Widespread" Element Satisfaction in Cases That Raised an Informal Custom Theory**

| Element Satisfaction | # of Theories |
| --- | --- |
| Missed "Widespread" Element | 32 (60.4%) |
| Satisfied "Widespread" Element | 21 (39.6%) |
| **Total Theories** | **53 (100.0%)** |

Additionally, among the seventy-five cases, thirty-five attempted to plead one or more municipal failure theories, for a total of seventy municipal failure theories. Among these seventy theories, thirteen (18.6%) failed to satisfy the "deliberate indifference" element, which requires plaintiffs to state that the "municipality was deliberately indifferent to [the] constitutional rights injured."[104] Table 8 depicts these data.[105]

---

[103]  *See supra* Table 1; *infra* Appendix A: Coding Protocol. The Supreme Court has made clear that to establish municipal liability for a constitutional violation, plaintiffs must show that the relevant pattern, practice, or custom was a "widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a 'custom or usage' with the force of law.'" City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988) (quoting Adickes v. S.H. Kress & Co., 398 U.S. 144, 167–68 (1970)).

[104]  *See infra* Table 8.

[105]  These data were aggregated across the three municipal failure theories, as individually the theories did not have significant differences from the aggregate. Failure to train theories (thirty-four total) missed the "deliberate indifference" element in six complaints (17.6%) and satisfied it in twenty-eight complaints (82.4%). Failure to supervise theories (thirty total) missed the element in six complaints (20.0%) and satisfied it in twenty-four complaints (80.0%). Finally, failure to screen theories (six total) missed the element in one complaint (16.7%) and satisfied it in five complaints (83.3%). Across these three individual theories, the deviation from the aggregate never exceeded more than 1.9%.

*Table 8. Rate of "Deliberate Indifference" Element Satisfaction in Cases That Raised a Municipal Failure Theory*

| Element Satisfaction | # of Theories |
| --- | --- |
| Missed "Deliberate Indifference" Element | 13 (18.6%) |
| Satisfied "Deliberate Indifference" Element | 57 (81.4%) |
| **Total Theories** | **70 (100.0%)** |

Finally, we coded for whether counsel had civil rights expertise. This coding allowed us to analyze whether lawyers with civil rights experience are more successful at satisfying theories of *Monell* liability.[106] Of the seventy-five cases in which plaintiffs were represented by legal counsel, fifty-three complaints (70.7%) were prepared by at least one attorney with civil rights expertise. The remaining twenty-two complaints (29.3%) were prepared by attorneys without civil rights expertise.

We identified significant differences in the complaints filed by lawyers with civil rights expertise compared to those filed by lawyers without civil rights expertise. For example, of the fifty-three complaints prepared by attorneys with civil rights expertise, seventeen (32.1%) fully satisfied all theories the plaintiffs raised in the complaint. In contrast, of the twenty-two complaints prepared by attorneys without civil rights expertise, only four (18.2%) successfully satisfied all elements of each theory raised. Table 9 compares the rates of theory satisfaction for attorneys with and without civil rights expertise.

---

[106]  *See supra* note 92.

***Table 9. Attorney Civil Rights Expertise, by Rate of Theory Satisfaction***

| Civil Rights Expertise | # of Cases | All Theories Satisfied | Mixed Satisfaction | No Theories Satisfied |
|---|---|---|---|---|
| Yes | 53 (70.7%) | 17 (32.1%) | 13 (24.5%) | 23 (43.4%) |
| No | 22 (29.3%) | 4 (18.2%) | 4 (18.2%) | 14 (63.6%) |
| **Total Cases** | **75 (100.0%)** | **21 (28.0%)** | **17 (22.7%)** | **37 (49.3%)** |

Our data are consistent with our initial hypothesis that civil rights expertise would result in higher element satisfaction rates. When plaintiffs were represented by counsel with civil rights expertise, they were more successful at satisfying the elements of each *Monell* theory. Plaintiffs who were represented by at least one attorney with civil rights expertise successfully satisfied all the elements of at least one theory of *Monell* liability 56.6% of the time, as compared to only 36.4% of plaintiffs whose counsel had no civil rights expertise. The disparity between complaints drafted by lawyers who had civil rights expertise and those drafted by lawyers who did not suggests that such expertise makes a qualitative difference in the complaints filed on behalf of a plaintiff. But while attorneys with civil rights expertise were more successful at satisfying theories than those without, the overall rate of theory satisfaction was still low: less than one in three complaints authored by at least one attorney with civil rights expertise satisfied all the elements of every theory attempted in the complaint.

## B.  *Qualitative Data*

Consistent with prior work,[107] our research shows that plaintiffs usually lose municipal liability claims. Both courts and commentators have commented on the challenges of the *Monell* standard,[108] and in many well-pled cases with egregious facts, courts have nonetheless ruled for the defendant.[109] However,

---

[107]  *See, e.g.*, Schwartz, *Municipal Immunity*, *supra* note 8, at 19–20, 27 (finding, in analysis of 1,183 police misconduct lawsuits, that only three municipal liability claims resulted in a verdict for plaintiff; one was reversed on appeal and two settled after trial).

[108]  *See* cases cited *supra* note 1 (collecting commentary).

[109]  *See, e.g.*, Kobrick v. Stevens, 763 Fed. Appx. 216, 220–21 (3d Cir. 2019) (holding that a school district is not liable for failing to appropriately respond to an alleged sexual relationship between a teacher and student);

EMORY LAW JOURNAL                        [Vol. 73:801

our data suggest another factor contributing to plaintiffs' lack of success: a significant percentage of complaints contain pleading failures that would automatically preclude the complaint from surviving a motion to dismiss.[110] The norm in municipal liability complaints, for both pro se and represented plaintiffs, was to leave out basic elements of *Monell* theories.[111] It was the exception for complaints to clearly identify one or more theories of municipal liability and then satisfy all the elements of that theory.[112]

We frequently encountered complaints that vaguely alleged that a municipality was liable under § 1983 due to its "policies, procedures, and practices," or similar phrasings.[113] Such complaints often attributed the plaintiff's injuries to such policies or practices without any elaboration as to

---

Hu v. City of New York, 927 F.3d 81, 104–07 (2d Cir. 2019) (holding that a municipality is not liable for Department of Building's selective enforcement of building codes against Asian-owned businesses); Waller v. City & Cnty. of Denver, 932 F.3d 1277, 1290–91 (10th Cir. 2019) (holding that the municipality is not liable for a deputy sheriff throwing defendant into glass wall unprovoked); Perkins v. Hastings, 915 F.3d 512, 523 (8th Cir. 2019) (holding that a municipality is not liable for a police officer with multiple prior disciplinary incidents shooting and killing a fifteen-year-old).

[110]  *See, e.g.*, Complaint at 6–7, Webb v. Town of St. Joseph, No. 12-02644, 2017 WL 916407 (W.D. La. Mar. 7, 2017) (plaintiff pled no specific *Monell* theory); Complaint at 20–22, Arsan v. Keller, No. 17-00121, 2018 WL 3933706 (S.D. Ohio Aug. 16, 2018) (plaintiff only satisfied one element of the failure to train and failure to supervise claims that he raised, omitting both the deliberate indifference and the causation elements of those claims); Third Amended Complaint at 79–98, McNeil v. Cmty. Proba. Servs., LLC, No. 18-00033, 2019 WL 633012 (M.D. Tenn. Feb. 14, 2019) (plaintiff filed 115-page complaint including ten widespread practice claims, none of which alleged that the practice or custom was widespread); Complaint at 3, 6–9, Jones v. Cnty. of Suffolk, No. 15-0111, 2018 WL 2023477 (E.D.N.Y. May 1, 2018) (plaintiff only alludes to *Monell* theories in facts and parties); Complaint at 8, Mason v. Izzo, No. 15-00738, 2016 WL 7428225 (D. Nev. Dec. 22, 2016) (plaintiff missed at least one element in each of three *Monell* claims).

[111]  *See* complaints cited *supra* note 110.

[112]  *See, e.g.*, Complaint at 12–19, Capra v. Knapp, No. 215-3215, 2018 WL 2332251 (D.N.J. May 23, 2018) (plaintiff alleges every element of informal custom, failure to train, failure to supervise, and failure to screen); First Amended Complaint at 47–51, Hu v. City of New York, 2018 WL 1247381 (E.D.N.Y Mar. 9, 2018) (No. 17-2348), 2017 WL 6817325 (plaintiff alleges every element of policymaker and informal custom theories); Amended Complaint at 5–7, Holman v. Wexford Health Sources, Inc., No. 14-01439, 2019 WL 13193936 (C.D. Ill., Dec. 10, 2018) (plaintiff alleges every element of informal custom, failure to train, and failure to supervise); Amended Complaint at 14–18, Perez v. City of Sweetwater, No. 16-24267, 2018 WL 1628999 (S.D. Fla. Jan. 8, 2018) (plaintiff alleges every element of informal custom, failure to train, failure to supervise, and failure to screen).

[113]  Amended Complaint for Damages at 26–27, Wilson v. Longview Sch. Dist., 2018 WL 11189273 (W.D. Wash. March 21, 2018) (No. 15-05863), 2016 WL 10935208 (plaintiff fails to describe "policies, procedures, or practices" alleged); Complaint at 3, Rodriguez v. Milwaukee Cnty., No. 16-00130, 2018 WL 10638047 (E.D. Wis. Feb. 5, 2018) (No. 15-010157) (plaintiff alleges in facts section that employees acted per "official policies, procedures, customs, or practices" without elaboration); Amended Complaint at 26–27, Waters v. Madson, No. 17-00935, 2017 WL 6403099 (D. Minn. Dec. 14, 2017) (plaintiff alleges "unconstitutional policy, practice, custom, usage, or modus operandi" without further description); Second Amended Complaint in Jones v. Eder, *supra* note 84, at 31 (plaintiff alleges "policy, procedure, practice, custom, protocol, or ratification" but only discusses municipal failures).

what these policies state or whether they are written or informal.[114] This phenomenon presented a challenge for our coding: it was sometimes unclear whether a plaintiff meant to allege a formal policy but failed to point to any such policy, or whether the plaintiff meant to proceed under an informal custom theory but neglected to state that the informal custom they alleged was widespread, a necessary element of such a theory.[115] For lack of a better option, when a complaint did not explicitly state that a policy was written, we coded it as an attempt at pleading the informal custom theory since it did not fall into the other categories. But the numerous deficient articulations of the informal custom theory suggest that many plaintiffs' attorneys use the theory as a catch-all when they either do not have facts to support another theory of liability or simply do not know that there *are* different theories of liability. Although these are somewhat different problems, the result of a generic statement of "policies, procedures, and practices" is that the plaintiff did not satisfy any recognized theory of liability.

In our research, the most frequently omitted element in a municipal liability claim was the "widespread" element of the informal custom theory.[116] The Supreme Court has repeatedly articulated the "widespread" element,[117] and the federal appellate courts have emphasized hundreds of times that the "widespread" element is the "pivotal requirement" of an informal custom

---

[114] *See* complaints cited *supra* note 113.

[115] *See supra* notes 113–14 and accompanying text.

[116] *See, e.g.*, Complaint at 7–9, Barnes v. City of Centralia, No. 17-01366, 2019 WL 8405353 (S.D. Ill. Jan. 29, 2019); Amended Complaint in Young v. City of Chester, *supra* note 84; Amended Complaint at 33–39, Red Zone 12 LLC v. City of Columbus, No. 17-00250, 2018 WL 1401069 (S.D. Ohio Mar. 20, 2018); Complaint at 4–6, Wilson v. Obaisi, No. 16-08446, 2017 WL 461689 (N.D. Ill. Feb. 3, 2017); Amended Complaint at 3–9, Meier v. City of St. Louis, No. 16-1549, 2018 WL 10397036 (E.D. Mo. Feb. 21, 2018).

[117] Connick v. Thompson, 563 U.S. 51, 61 (2011) (stating that municipal liability may result from "practices so persistent and widespread as to practically have the force of law"); Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 404 (1997) ("An act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law."). Although *Monell* itself does not directly state that an informal custom must be widespread to establish liability, it does state:

> Congress included customs and usages [in the text of § 1983] because of the persistent and widespread discriminatory practices of state officials. . . . Although not authorized by written law, such practices of state officials could well be so permanent and well settled as to constitute a 'custom or usage' with the force of law.

Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978) (alteration in original) (quoting Adickes v. S.H. Kress & Co., 398 U.S. 144, 167–68 (1970)).

claim.[118] Yet despite the lenient standard we adopted to determine whether the complaint satisfied the "widespread" element, 60.4% of represented plaintiffs bringing an informal custom claim did not allege a municipality's pattern, practice, or custom to be widespread.[119]

Other pleading failures were common as well. In municipal failure claims, 18.6% of represented plaintiffs failed to satisfy the element of a municipality's deliberate indifference to constitutional rights.[120] This error is especially puzzling because *Canton*—the first Supreme Court case in which a majority of the justices agreed that a municipal failure could establish liability—explicitly states that the degree of fault required in such a claim is deliberate indifference.[121] And since *Canton*, the Supreme Court and federal appellate courts have since reiterated in thousands of cases that deliberate indifference is the requisite degree of fault that a plaintiff must establish in any municipal failure claim.[122]

In some complaints, plaintiffs failed even to acknowledge the *existence* of the policy or custom requirement for liability under *Monell*. In such complaints, the plaintiffs' claim amounts to an attempt to establish liability on the basis of respondeat superior despite the Court's blatant rejection of respondeat superior as a basis for liability.[123] This pleading failure occurred much more frequently

---

[118]    Hildreth v. Butler, 960 F.3d 420, 426 (7th Cir. 2020); *see also, e.g.*, NINTH CIRCUIT MANUAL OF MODEL JURY INSTRUCTIONS: CIVIL 139 (2007) (specifying that "'[p]ractice or custom' means any permanent, widespread, well-settled practice or custom that constitutes a standard operating procedure of the defendant").

[119]    *See supra* Table 7.

[120]    Amended Complaint at 15–16, Kimm v. Brannan, No. 14-01966, 2015 WL 5855919 (D. Ariz. Oct. 8, 2015); Second Amended Complaint at 8–11, Birch-Min v. Middlesex Cnty. Bd. of Soc. Servs., No. 14-00476, 2017 WL 1034371 (D.N.J. March 16, 2017); Complaint in Arsan v. Keller, *supra* note 110, at 20–22; Complaint at 10–11, Kelley v. O'Malley, No. 17-01599, 328 F. Supp. 3d 447 (W.D. Pa. 2018); Complaint and Jury Demand at 6–8, Baker v. City of Trenton, No. 16-12280, 2018 WL 9619323 (E.D. Mich. Sept. 24, 2018).

[121]    City of Canton v. Harris, 489 U.S. 378, 388 (1989) ("We hold today that the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact.").

[122]    *See Bd. of Cnty. Comm'rs*, 520 U.S. at 406–07; Forrest v. Parry, 930 F.3d 93, 106 (3d Cir. 2019); Ouza v. City of Dearborn Heights, 969 F.3d 265, 286–87 (6th Cir. 2020); Waller v. City & Cnty. of Denver, 932 F.3d 1277, 1284 (10th Cir. 2019). Some plaintiffs alleged a degree of fault similar to deliberate indifference, such as "gross negligence, deliberate, or intentional misconduct," Fourth Amended Complaint in Forrest v. Corzine, *supra* note 77, at 15, and "outrageous, deliberate acts and/or inaction," Complaint at 65, Guertin v. Michigan, No. 16-12412, 2017 WL 2418007 (E.D. Mich. June 5, 2017). Since the Supreme Court has so clearly stated that deliberate indifference is the applicable standard in failure claims, a lawyer runs an unnecessary risk by using a synonym rather than the established language.

[123]    *See Monell*, 436 U.S. at 691.

with pro se plaintiffs,[124] but a few represented plaintiffs also failed to identify a *Monell* theory and instead alleged general municipal liability for constitutional violations.[125] For example, in *Stringer v. Lincoln County Jail*, the plaintiff alleged that all defendants (Lincoln County Jail and two of its employees) caused him pain and suffering through "[d]efendants' actions and/or inactions."[126] The plaintiff identified no avenue through which Lincoln County Jail was liable for his injuries other than its employment of the officers who allegedly denied him medical care.[127] Similarly, in *Diarra v. City of New York*, the plaintiff claimed liability on the basis of the allegation that New York City acted through its officers "as agents and investigators" in violating the plaintiff's constitutional rights.[128]

Many plaintiffs also relied heavily on language at the beginning of every claim stating that the claim incorporated all preceding paragraphs.[129] While plaintiffs presumably think they are covering their bases by adopting this approach, we believe this is a risky strategy. Courts have explicitly denounced the practice of incorporating the entire complaint by reference, with one judge describing it as a judicial version of "where's Waldo" that forces a judge to scour the entire complaint for potentially relevant facts.[130] Failing to specify a key

---

[124] *See, e.g.*, Complaint, Garcia v. Armor Correctional Health Servs., Inc., No. 17-01075 (E.D. Wisc. Aug. 4, 2017); Verified Amended Civil Complaint, Swisher v. Porter Cnty. Sherriff's Dept., No. 10-00337, 2018 WL 1400889 (N.D. Ind. Mar. 20, 2018); Complaint Under the Civil Rights Act, Bertha v. Kane Cnty., No. 16-04982, 2018 WL 4073300 (N.D. Ill. Aug. 27, 2018); Third Amended Complaint, Washington v. Boder, No. 14-04972, 2016 WL 4157320 (E.D. Pa. Aug. 2, 2016); Complaint, Smith v. Siskiyou Cnty. Jail, No. 15-02534, 2017 WL 1079932 (E.D. Cal. Mar. 22, 2017).

[125] *See, e.g.*, Amended Complaint at 3, Stringer v. Lincoln Cnty. Jail, No. 16-01428 (D. Or. Oct. 13, 2017); First Amended Complaint at 6, 15, Diarra v. City of New York, No. 16-07075, 2018 WL 4538903 (S.D.N.Y. Sept. 20, 2018); Complaint, Bradley v. Vill. of Univ. Park, No. 15-08489, 2022 WL 18584991 (N.D. Ill. April 25, 2022).

[126] Amended Complaint in *Stringer*, *supra* note 125, at 3.

[127] *Id.*

[128] First Amended Complaint in *Diarra*, *supra* note 125, at 10.

[129] *See, e.g.*, Verified Complaint for Declaratory Relief and Injunction at 20, Calgaro v. St. Louis County, 2017 WL 2269500 (D. Minn. May 23, 2017) (No. 16-03919), 2016 WL 6828138 ("All of the above paragraphs are incorporated herein as if they were stated in their entirety.").

[130] Emmett Ripley Cox, *Thirty-Two Years on the Federal Bench: Some Things I Have Learned*, 66 FLA. L. REV. 1685, 1691 (2014) (criticizing shotgun pleadings). Other critiques are myriad. The Eleventh Circuit, for example, has explained:

> The most common type—by a long shot—is a complaint containing multiple counts where each count adopts the allegations of all preceding counts, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint. The next most common type . . . is a complaint that does not commit the mortal sin of re-alleging all preceding counts but is guilty of the venial sin of being replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action. The third type of shotgun pleading is one that commits

element in the claims—for example, the "widespread" element of the informal custom theory, or the "deliberate indifference" element of the municipal failure theory—forces a judge to do the extra work of combing through a lengthy fact section for these elements.[131] Yet in the complaints we analyzed, we found that even when plaintiffs identified specific theories of municipal liability and articulated most or all relevant elements, they sometimes only addressed those elements in the facts section or elsewhere outside of the claims.[132] Drafting a complaint in such a manner is a gamble: attorneys wager that their incorporation and re-allegation of "every preceding paragraph" will be sufficient to satisfy a potentially skeptical judge. And the stakes of the gamble are high: if a judge fails to locate a necessary element, or the judge adheres strictly to the view that elements must be alleged in the claims themselves, the whole complaint may be dismissed.[133]

Our research indicates that attorneys who worked at larger firms and attorneys with civil rights expertise generally filed better complaints than attorneys who worked in other settings.[134] But retaining an attorney—even one with civil rights expertise—did not insulate plaintiffs from filing a complaint with significant shortcomings. Of the seventy-five complaints in our dataset that were prepared by attorneys, fifty-three complaints, or 70.7%, were submitted by

---

the sin of not separating into a different count each cause of action or claim for relief. Fourth, and finally, there is the relatively rare sin of asserting multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against.

Weiland v. Palm Beach Cnty. Sheriff's Office, 792 F.3d 1313, 1321–23 (11th Cir. 2015).

[131]  Cox, *supra* note 130, at 1691.

[132]  *See, e.g.*, Complaint in Jones v. Cnty. of Suffolk, *supra* note 110, at 2–3 (alleging County's practice of nonconsensual searches in the parties section); Complaint in *Calagro*, *supra* note 129, at 30–32 (alleging, in the facts section, multiple county practices violated a parent's due process rights before termination of their parental rights in the facts); Complaint at 12, Ortiz v. Case, No. 16-00322, 2019 WL 1236413 (W.D.N.Y. March 18, 2019) (alleging, in the facts section, district attorney's customs, failure to supervise, and failure to train violated the plaintiff's constitutional rights in the facts section).

[133]  Placing elements outside the claims occasionally makes logical sense. For example, a plaintiff may find it natural to allege that a municipal employee is a policymaker in the parties section, especially if both the employee and municipality are named defendants. *See, e.g.*, Complaint at 2, Mohammed v. Westcare Found., Inc., No. 17-07492, 2018 WL 2388407 (N.D. Ill. May 25, 2018) (alleging policymaker liability in the parties section); Complaint at 2–3, Perkins v. Cnty. of Milwaukee, No. 18-00179, 2018 WL 6250611 (E.D. Wis. Nov. 29, 2018) (naming Milwaukee County decision-makers in parties). Or it may make sense for the plaintiff to state in the facts that a police officer violated their rights due to lack of proper training and supervision. *See, e.g.*, Second Amended Complaint for Damages at 9, Marlowe v. City and Cnty. of S.F., No. 16-00076, 2017 WL 5973505 (N.D. Cal. Jan. 10, 2017) (alleging County failed to train and supervise police personnel in facts); Amended Complaint in Perez v. City of Sweetwater, *supra* note 112, at 6 (alleging police officers were inadequately trained in facts). Nonetheless, it is a risky move.

[134]  *See supra* Table 9.

attorneys or firms with civil rights expertise.[135] The remaining twenty-two complaints (29.3%) were submitted by attorneys or firms without civil rights expertise. Some of these lawyers practice in areas adjacent to civil rights, such as employment law and criminal law.[136] Others practice in areas with little to no overlap with civil rights law, such as personal injury, business law, and even aviation law.[137] Though our methodology did not reveal why these attorneys chose to litigate civil rights cases, we speculate that some represented the plaintiff in a related case within their area of expertise, had a prior relationship with the plaintiff, or took the case pro bono. Unsurprisingly, attorneys with civil rights expertise were more likely to file complaints in which all the elements for which we coded were satisfied.[138] Yet even complaints filed by attorneys with civil rights expertise only satisfied all the theories they raised around one-third of the time.[139] Considering that these attorneys held themselves out as possessing civil rights expertise, at least through their online presence, this rate is troublingly low.

The data we have compiled paints a sobering picture of the quality of lawyering in municipal liability claims, at least at the complaint stage. And we again emphasize that our work errs on the side of optimism. We used a standard of element satisfaction that is lower than the plausibility pleading standard plaintiffs must satisfy to survive a motion to dismiss, and satisfying every element that we coded is necessary, but not sufficient, to survive a motion for

---

[135] *See supra* Table 9.

[136] *See, e.g.,* First Amended Complaint at 10, Berry v. Delaware Cnty. Sheriff's Off., No. 16-00296, 2019 WL 13255313 (S.D. Ohio Feb. 1, 2019) (Attorney Erica Ann Probst is an employment attorney. *Erica Ann Probst,* KSR LEGAL, https://ksrlegal.com/our-attorneys/erica-ann-probst/ (last visited Jan. 13, 2024)); Complaint at 7, Baloga v. Pittson Area Sch. Dist., No. 16-01039, 2018 WL 472443 (M.D. Pa. Jan. 1, 2018) (Attorney Cynthia Pollick is an employment attorney. *About Cynthia Pollick,* CYNTHIA POLLICK ON STRIKINGLY, https://cynthiapollick.mystrikingly.com (hard copy on file with journal)); First Amended Complaint at 17, Garza v. City of Donna, No. 16-00558, 2017 WL 6498392 (S.D. Tex. Dec. 18, 2017) (Attorney Manuel Guerra, III practices criminal defense. *Criminal Defense,* GUERRA LAW FIRM, PC, https://guerralawfirmpc.com/criminal-defense/ (last visited Jan. 13, 2024)); Amended Complaint in *Perez, supra* note 112, at 18 (Attorney Carolina Corona Jamiel practices in criminal defense. *Carolina Corona Jamiel,* CORONA LAW FIRM P.A., https://www.coronapa.com/attorney/jamiel-carolina-corona/ (last visited Jan. 13, 2024)).

[137] Complaint in *Ortiz, supra* note 132, at 19 (Attorney Wayne C. Felle practices in personal injury. *What We Do,* WAYNE FELLE LAW, https://waynefellelaw.com/what-we-do (last visited Jan. 13, 2024)); First Amended Complaint at 12, Walker v. Wexford Health Servs., Inc., No. 13-07237, 2017 WL 3453388 (N.D. Ill. Aug. 11, 2017) (Attorney Paula L. Wegman practices in aviation law. *Paula Wegman,* HINSHAW & CULBERTSON LLP, https://www.hinshawlaw.com/professionals-paula-wegman.html (last visited Jan. 13, 2024)); First Amended Complaint at 8, Williams v. Kelly, No. 15-08135, 2018 WL 1911820 (N.D. Ill. Apr. 23, 2018) (Attorney Robert S. Markin practices business and regulatory litigation. *Robert S. Markin,* CHICO & NUNES, P.C., http://www.chiconunes.com/attorneys/robert-markin.php (last visited Jan. 13, 2024)).

[138] *See supra* Table 9.

[139] *See supra* Table 9.

summary judgment or win a verdict at trial. The next Part considers the implications of these findings.

## IV. IMPLICATIONS

In this Part, we discuss the implications of our quantitative and qualitative findings for municipal liability litigation under *Monell*. Our data indicate that there is considerable room for improvement in the complaints filed by lawyers who litigate cases under § 1983—whether or not these lawyers specialize in civil rights litigation. In Part IV.A, we suggest explanations for the deficit in the quality of lawyers' pleadings. Although there are likely many overlapping contributing factors, we emphasize limitations on attorneys' fees as one important explanation. Then, in Part IV.B, we discuss potential mechanisms for improving the quality of pleadings. We first offer a road map for lawyers to improve their pleadings. We then identify how stakeholders in civil rights litigation can foster conditions for better pleading and litigation of municipal liability claims.

### A. The Causes of Pleading Failures

The duty of competence dictates the baseline level of representation an attorney must provide to a client. This ethical duty is captured by Rule 1.1 of the Model Rules of Professional Conduct, which provides that lawyers must represent their clients competently, with the "knowledge, skill, thoroughness and preparation reasonably necessary for the representation."[140] The comments to Rule 1.1 clarify that lawyers need not have prior experience in the relevant field of law to represent someone in a case, but if they lack experience, they must do the work to ensure that they can satisfy the duty of competence.[141]

A significant number of the complaints in our dataset fall short of this baseline duty of competence. While our research uncovered many excellent complaints, we also identified many complaints that did not satisfy the standards of doctrinal and technical expertise normally expected of lawyers.[142] Whether an attorney had civil rights expertise made some difference in the quality of

---

[140] MODEL RULES OF PRO. CONDUCT r. 1.1 (AM. BAR ASS'N 1983).

[141] *Id.* cmt. 2. A lawyer's prior experience, the complexity and nature of the case, and the extent of the lawyer's preparation and study influence whether a lawyer possesses the necessary knowledge and skills to represent a client in a matter. *Id.* cmt. 1. If an attorney lacks prior experience in an area of law, they can study to become competent and should seek associate counsel if necessary and feasible. *Id.* cmt. 2.

[142] *See supra* Table 9.

complaints,[143] but it did not guarantee a good complaint or even ensure that a complaint would satisfy the minimal standards we used in our coding.

Why does attorney performance so frequently fall below the standard of competence articulated in the Model Rules of Professional Conduct? One reason may be that applicable rules do not provide much disincentive for poor lawyering. There is little enforcement of the ethical duty of competence in civil litigation: for example, bar discipline predicated on a claim that a lawyer did not represent a client competently is relatively rare.[144] Though we do not know how many, if any, attorneys in our dataset faced disciplinary consequences, the abundance of pleading failures suggests that bad lawyering in civil rights cases largely goes unchecked by disciplinary sanctions. Contributing factors likely include the breadth and lack of specificity of Rule 1.1[145] and the infrequency of disciplinary complaints.[146] Clients often may not recognize deficient performance in their attorneys, and judges who witness poor performance may want to avoid the burden of initiating a complaint, especially if they believe a plaintiff's case is meritless anyway.[147] Client ignorance and judicial apathy or avoidance could similarly explain why attorneys are not motivated to improve their pleading quality by the possibility of other forms of penalty, such as malpractice lawsuits or Rule 11 sanctions.[148]

Despite the unlikelihood of ethical sanctions, one might think that attorneys' fees nonetheless provide sufficient incentive for lawyers to represent their clients competently. Unless a representation is on an hourly basis, which is not the norm

---

[143] *See supra* Table 9. For example, our research revealed that 32.1% of complaints drafted by lawyers with civil rights expertise satisfied all the elements of every theory they raised, compared with only 18.2% of complaints drafted by lawyers without such expertise. *See supra* Table 9.

[144] *See, e.g.*, John P. Higgins, *Attorney (In)Competence and Discipline*, 57 IND. L. REV. (Sept. 25, 2014), https://indianalawreview.com/2014/09/25/attorney-incompetence-and-discipline/ (an attorney from the Indiana Supreme Court Disciplinary Commission found that, in Indiana, "from 1993 to 2014, an imprecise search returned only 23 cases where an attorney was found to have violated Rule 1.1"); OFFICE GEN. COUNS. OKLA. BAR ASS'N, ANNUAL REPORT OF THE PROFESSIONAL RESPONSIBILITY COMMISSION 10 (Feb. 1, 2022), https://www.okbar.org/wp-content/uploads/2022/02/2022-02-01-PRC-Report.pdf (finding in Oklahoma, only 10 out of 192 formal grievances opened by the Office of the General Counsel in 2021 were based on incompetence); Moss, *supra* note 65, at 107 (finding in over 100 employment discrimination cases with inadequate plaintiff briefs, not one judge referred the plaintiff's attorney to the bar for discipline).

[145] *Cf.* Bennett L. Gershman, *A Penal Colony for Bad Lawyers*, 69 MERCER L. REV. 743, 746, 751 (2018).

[146] *See* Moss, *supra* note 65, at 105.

[147] *See id.* at 95, 105–06.

[148] *See* FED. R. CIV. P. 11(b)–(c). Though a typical failure to state a claim is not an adequate basis for a malpractice lawsuit or Rule 11 sanctions, many complaints we reviewed indicated attorneys were woefully inadequate in researching law, investigating facts, and drafting per the Federal Rules of Civil Procedure.

in civil rights litigation,[149] a lawyer will not get paid unless they win. Perhaps to state the obvious, winning generally requires skillful litigating.[150]

The availability of attorneys' fees may play a critical role in shaping the quality of litigation under § 1983. Attorneys' fees for victories in § 1983 litigation are available under 42 U.S.C. § 1988, which Congress enacted in 1976 in order to ensure that constitutional rights are adequately enforced.[151] Yet the Supreme Court has gradually narrowed the availability of attorneys' fees under 42 U.S.C. § 1988. In *Evans v. Jeff D.*, decided just eight years after § 1988 became law, the Court held that a court may approve a settlement conditioned on a waiver of attorneys' fees.[152] The Court has also excluded from eligibility for fees situations in which the plaintiff's lawsuit catalyzes a favorable change in the defendant's conduct[153] and situations in which the lawyer best represents their client by pursuing administrative avenues rather than § 1983 litigation and attains a favorable result in that administrative proceeding.[154]

These restrictive decisions have attracted a great deal of criticism from both courts and commentators,[155] and many believe they have limited lawyers'

---

[149] *See, e.g.*, Mark R. Brown, *A Primer on the Law of Attorneys Fees Under § 1988*, 37 URB. LAW. 663, 664 (2005) (describing how § 1988 prompted a rise in contingency fee arrangements).

[150] One might also expect that plaintiffs' lawyers who litigate civil rights issues would have incentives to do a good job even aside from the motivation supplied by fees. For example, their emotional investment in their clients, sense of professional responsibility, and desire to move the law in what they view as the right direction.

[151] *See* Karlan, *supra* note 24, at 205–06 ("[M]ost civil rights plaintiffs are unable to afford counsel and without a fees statute, the available counsel would be limited to attorneys willing to represent them pro bono. Second, the absence of statutory fees might skew attorneys' selection of cases: they might concentrate on cases involving the possibility of large damages awards and the attendant contingent fee, and forego cases which involve only equitable relief or where the right, while important, is not easily translated into a large damages award for the named plaintiffs. But this latter group of cases—especially those involving structural injunctive relief—often do the most to vindicate important societal interests.").

[152] 475 U.S. 717, 742–43 (1986).

[153] *See* Buckhannon Bd. & Care Home v. West Virginia Dep't of Health & Human Resources, 532 U.S. 598, 600 (2001) (holding that lawsuit bringing about voluntary change in defendant's conduct does not mean that plaintiff is a "prevailing party" within the meaning of § 1988, and therefore attorneys' fees are not available).

[154] N.C. Dept. of Transp. v. Crest St. Cmty. Council, Inc., 479 U.S. 6, 11–12 (1986). In *Crest St.*, a community group took a complaint about a proposed highway through a Black neighborhood in North Carolina to the U.S. Department of Transportation, which, after investigation, advised the North Carolina Department of Transportation that there was "reasonable cause" to believe that the proposed highway location would violate Title VI of the Civil Rights Act of 1964. *Id.* at 8–9. The dispute lasted more than five years and the lawyer for the community group spent more than 1,000 hours on the project. *Id.* at 10. Although the Court acknowledged that "[t]he result of this diligent labor was both substantial and concrete," it held that § 1988(b) authorized fees only in an "action or proceeding to enforce" the listed civil rights laws. *Id.* at 6, 10–11.

[155] Karlan, *supra* note 24, at 205–06 (suggesting that limitations on fees under § 1988 "skew[s] attorneys' selection of cases" by providing incentives to "concentrate on cases involving the possibility of large damages awards and the attendant contingent fee" instead of "cases which involve only equitable relief or where the right,

willingness to represent civil rights plaintiffs—particularly in cases where the expected damages are low or the plaintiff is seeking only injunctive relief.[156]

The Court's narrowing of § 1988 suggests one possible explanation for why so many lawyers fall below the duty of competence. Some experienced and skilled civil rights litigators may not take § 1983 cases at all given the unpredictability of attorneys' fees, while others may decline to take § 1983 cases unless they believe that the case will involve high damages and fees.[157] Perhaps the result is that, after skilled and experienced attorneys have declined to represent an individual, the individual may end up with a less skilled and experienced attorney who does not realize what they are getting into. Such attorneys may not grasp what differentiates civil rights cases from other types of civil litigation, or the poor quality of representation they provide in civil rights cases may simply be their typical performance.

Research has not tested whether the Court's limitations on § 1988 reduced the quality of representation in civil rights litigation. Yet some evidence is consistent with this explanation. In interviews with lawyers inexperienced in civil rights litigation, Joanna Schwartz found that many believed such cases to be similar to personal injury cases, failing to appreciate the different standards, obstacles, risks, and rewards in civil rights cases prior to taking on those cases.[158] These cases often ended in dismissal, prompting some lawyers to abandon civil rights litigation altogether, while others committed to further study of civil rights law.[159] Much more extensive study of this issue is needed. But if experienced lawyers have indeed shifted their practice away from § 1983, it would suggest the worrisome conclusion that a significant number of civil rights complaints may be drafted either by lawyers who are not experienced in civil rights litigation or by lawyers who believe themselves to be skilled in such litigation but fail to recognize the deficiencies in their own knowledge and performance.

---

while important, is not easily translated into a large damages award for the named plaintiffs."); Reingold, *supra* note 62, at 21 (expressing concern that Supreme Court's § 1988 decisions have encouraged plaintiffs to treat cases vindicating constitutional rights like any other tort cases); *see also* Julie Davies, *Federal Civil Rights Practice in the 1990's: The Dichotomy Between Reality and Theory*, 48 HASTINGS L.J. 197, 261–67 (1997) (concluding, from thirty five interviews with plaintiffs' civil rights lawyers, that lawyers generally think of civil rights cases similarly to other tort cases unless the potential damages are high).

[156] *See, e.g.*, Karlan, *supra* note 24, at 205–08 (describing effect of decisions limiting damages and fee availability); Reingold, *supra* note 62, at 30–31.

[157] Reingold, *supra* note 62, at 28–29; Schwartz, *Civil Rights Without Representation, supra* note 61, at 700.

[158] Schwartz, *Civil Rights Without Representation, supra* note 61, at 660–61.

[159] *Id.* at 661.

EMORY LAW JOURNAL                    [Vol. 73:801

Another possibility is that, even if an experienced and skilled attorney agrees to accept a § 1983 case, they may be disinclined to spend as much time and effort on municipal liability claims as they do on other claims. Such a lawyer may believe that the odds are low of recovering significant attorneys' fees for a claim of municipality liability—even in a case that, overall, offers a reasonably high likelihood of success on the merits and reasonably high potential damages.[160] Perhaps the conventional wisdom that municipal liability claims are difficult to win may encourage plaintiffs' attorneys to focus their efforts on other claims in the complaint, such as claims of liability against individual government officers or state statutory and tort claims.[161] Liability claims against individual officers may seem like they offer a greater rate of return. For example, the factual predicate for these claims may be easier to research, given that the plaintiffs generally know the details of their interactions with a government official such as a police officer or a jail guard, but not whether or to what extent municipal policies influenced the nature of that interaction.[162] Given that many individual government officials are indemnified by their employers, litigators may believe that it does not really matter whether they prevail on a municipal liability claim or a claim against an individual government official. Although we and other scholars have documented compelling reasons that individual liability is not a substitute for municipal liability, these reasons may not provide sufficient incentives for lawyers making calculated judgments about how to spend their time.[163]

## B. Preventing Pleading Failures

The *Monell* doctrine is notoriously difficult for plaintiffs to satisfy, and many judges and commentators agree that it is in need of major reform.[164] Yet pleading failures make it difficult to pinpoint the exact role that *Monell* plays in civil rights litigation: when complaints are poorly drafted, one cannot say for certain whether the *Monell* standard or the quality of the complaint is to blame when the case is dismissed. Preventing pleading failures, therefore, is critical to assessing the role of *Monell* in civil rights litigation.

---

[160] Schwartz, *Municipal Immunity*, *supra* note 8, at 1212 (high rate of voluntarily dismissing *Monell* claims).

[161] *See id.* (explaining that claims against individual officers are more likely to succeed than *Monell* claims).

[162] *Id.* at 1216.

[163] Leong, *Civil Rights Liability for Bad Hiring*, *supra* note 28, at 59; Schwartz, *Civil Rights Without Representation*, *supra* note 61, at 658–59.

[164] *See, e.g.*, Dawson, *supra* note 59, at 498, 514; *see also supra* Part I.B.

Fortunately, pleading failures are not inevitable. In this section, we discuss measures that could improve the quality of municipal liability claims in cases brought under 42 U.S.C. § 1983. Part IV.B.1 offers straightforward recommendations that lawyers may follow to avoid pleading failures. Part IV.B.2 turns to the structural conditions that lead to pleading failures and describes several avenues that would likely improve the quality of pleading in claims of municipal liability.

### 1. How Lawyers Can Avoid Pleading Failures

We emphatically support attorneys from all practice areas taking § 1983 cases: there is a vast need for civil rights representation, and a lawyer from any background can help to meet this need so long as they have the resources to litigate their case in keeping with Rule 1.1. With that said, attorneys without prior civil rights litigation experience should be mindful that § 1983 litigation is doctrinally complicated and time intensive.[165] Lawyers venturing into civil rights litigation for the first time must carve out time to research the complexities of the *Monell* doctrine, investigate facts prior to initiating litigation, and, when necessary, consult more experienced civil rights lawyers. A *Monell* claim is a considerable undertaking, particularly for an attorney who has not handled one previously.

For lawyers who do venture into § 1983 litigation, our research suggests two ways in which a significant number of complaints currently fall short and could be improved. First, plaintiffs should select appropriate theories; and second, they should plead all the elements of each theory in the claims section of their complaints.

Appropriate theory selection begins with diligent fact investigation. Plausibly alleging a *Monell* theory can be quite difficult at the complaint stage, prior to discovery,[166] and it is understandable that some plaintiffs' lawyers are unable to do so. But plaintiffs' lawyers should use the tools at their disposal to gather enough pre-discovery facts to articulate a reasonable *Monell* theory and survive dismissal. For example, if a client was bitten by a police dog, the lawyer may find evidence of a widespread pattern of similar incidents through searching news articles and court cases. An attorney whose client's child was wrongfully

---

[165] MODEL RULES OF PRO. CONDUCT r. 1.1, cmt. 5 (AM. BAR ASS'N 1983) (stating matters of greater complexity and higher stakes require greater preparation).

[166] *See, e.g.*, Dawson, *supra* note 59, at 520 (explaining that plaintiffs often do not know enough relevant facts to plausibly allege a policy or custom prior to discovery).

removed by a child welfare agency may research the agency's policies through internet searches or an open records request. Such investigations may provide attorneys with enough facts to plausibly connect municipal policies, customs, or failures to their clients' injuries from the start of a case, building a solid foundation prior to discovery.

Critically, plaintiffs' attorneys must then select appropriate *Monell* theories for the facts they confront.[167] Even a plaintiff armed with facts that clearly establish municipal liability will come up empty-handed if their lawyer attempts to squeeze those facts into an ill-fitting theory. For example, lawyers should think carefully about whether the facts of their case support a failure to *train* or a failure to *supervise*—while the former is far more commonly pled,[168] the latter is often a better fit for situations where the alleged violation is egregious.[169] Training cannot prevent someone from being a bad person, but supervision may prevent the bad person from doing bad things.

Focusing on failures of training rather than failures of supervision may be tempting to a plaintiff because there is more case law available.[170] In an instructive example from disability law, Nicole Buonocore Porter describes a phenomenon in which plaintiffs reject more apt theories in favor of more common and established ones. Porter analyzed over two hundred erroneously decided disability cases, finding that disability attorneys often argue for disability through impairment of a major life activity instead of impairment of a major bodily function, even when the latter better fits the facts.[171] Congress's

---

[167] *Cf.* Blue v. Dist. of Columbia, 811 F.3d 14, 20 (D.C. Cir. 2015) ("Section 1983 plaintiffs have several ways to allege a municipal policy, each with its own elements. If the plaintiff fails to identify the type of municipal policy at issue, the court would be unable to determine, as required by [pleading requirements under current Supreme Court precedent] whether the plaintiff had provided plausible support for her claim.").

[168] The theory is the first municipal failure theory recognized by the Supreme Court in *Canton v. Harris* and the most frequently adjudicated by the Supreme Court. *See* Connick v. Thompson, 563 U.S. 51, 61 (2011) (adjudicating claim of failure to train); Canton v. Harris, 489 U.S. 378, 380 (1989) (concluding that municipality may be held liability on the basis of failure to train); Oklahoma City v. Tuttle, 471 U.S. 808, 810 (1985) (considering claim of municipal liability on the basis of failure to train). It also seems to be the default failure theory for plaintiffs who believe a municipality's inaction caused their constitutional injury. *See* Leong, *Municipal Failures*, *supra* note 27, at 368 (showing, at the appellate level, that 97% of cases claiming municipal liability do so via the failure to train theory; the failure to supervise theory appears in only 46% of cases claiming municipal liability and, with one exception, was always alleged along with the failure to train theory). The issue with its popularity among plaintiffs is that, sometimes quite obviously, it does not always fit the facts.

[169] For a discussion of the failure-to-supervise theory, see Leong, *Municipal Failures*, *supra* note 27, at 369–86.

[170] *See* sources cited *supra* note 168.

[171] *See* Porter, *supra* note 12, at 401 ("For instance, someone who has diabetes might, because she correctly monitors her disease through checking her blood sugar and eating properly, not be able to claim that she is

addition of impairment of a major bodily function as an avenue for disability relief in 2008 was monumental; but it has been vastly underutilized by plaintiffs, perhaps because they perceive the more traditional theory as less risky.[172] The disability context thus offers a valuable lesson for § 1983 litigators to embrace newer or underutilized legal theories if they fit the facts. Less litigated but promising theories, such as failure to supervise, will not expand if no one is properly raising them.

Once a plaintiffs' lawyer has selected appropriate theories, they should then plead each theory as a separate avenue for recovery in the claims section of the complaint,[173] ensuring that they articulate each element along with supporting facts.[174] When a plaintiff broadly alleges a "policy, practice, [or] custom" without elaboration or supporting facts, the court is forced to guess whether the plaintiff alleges that the policy is written, established through custom, or the product of a final policymaker decision.[175] A plaintiff who alleges a "failure to train and supervise" invites the court to assess one theory instead of two, decreasing their odds of a favorable outcome.[176] While plaintiffs cannot control a court's method of deliberation or construction of the law, they can improve the likelihood that a court will consider *Monell* theories in a manner favorable to them.[177]

---

substantially limited in a major life activity, if we were limited to this list of major life activities: 'Caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, sitting, reaching, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, interacting with others, and working.' But diabetes does substantially impair a person's endocrine system. Relying on the major bodily function of the endocrine system is a much easier and more straightforward way of proving that a person with diabetes is disabled." (internal citation omitted)).

[172] *Id.* at 400–01.

[173] *See* Cox, *supra* note 130, at 1691.

[174] *Commencing    a    Federal    Lawsuit:    Drafting    the    Complaint*, WESTLAW, https://us.practicallaw.thomsonreuters.com/5-506-8600 (last visited Jan. 13, 2024) ("Counsel should carefully research all possible claims against the defendant and ensure that they properly draft and support each element of every claim with sufficient factual allegations.").

[175] *See, e.g.*, Amended Complaint in Waters v. Madson, *supra* note 113, at 26 (plaintiff alleged "unconstitutional policy, practice, custom, usage, or modus operandi" without further description); Waters v. Madson, 921 F.3d 725, 743 (8th Cir. 2019) (affirmed the dismissal of the *Monell* claims since the plaintiff did not link an official policy or custom to the constitutional violation).

[176] *See* Leong, *Municipal Failures*, *supra* note 27, at 382 (noting phenomenon of pleading failure to train and failure to supervise together).

[177] For example, in *Mason v. Las Vegas Metro. Police Dep't*, the court only acknowledges a failure to train claim. 754 Fed. Appx. 559, 562 (9th Cir. 2019). In the complaint, the plaintiff raised failure to train and failure to supervise theories but emphasized the failure to train theory. Complaint in Mason v. Izzo, *supra* note 110, at 8. In contrast, in *Estate of Roman v. City of Newark*, the court acknowledges failure to train and failure to supervise as separate theories. 914 F.3d 789, 800 (3d Cir. 2019). In their Second Amended Complaint, the plaintiff raised both failure to train and failure to supervise theories. Second Amended Complaint at 5–6, Roman

Articulating every element of a theory, along with supporting facts, is critical to plausibly stating a claim.[178] Our research has identified two elements that are particularly neglected: the widespread element of the informal custom theory[179] and the "deliberate indifference" element common to municipal failure theories.[180] Attorneys should take particular care to articulate both of these elements clearly as well as all others from the relevant Supreme Court case law.

Lastly, plaintiffs' attorneys should articulate every theory with its elements and supporting facts, or at least a clear reference to the paragraphs containing the supporting facts,[181] in the claims section of the complaint. When plaintiffs state the elements of a theory somewhere other than the claims, they gamble that the court will take the time to find each element in various parts of the complaint and apply them to the correct claim.[182] This task is sometimes easy, especially when a complaint is brief or only involves one claim.[183] But one-claim complaints are not the norm, and courts regularly denounce pleadings that "reincorporate and reallege" every paragraph.[184] Laying out the elements of a theory in the claims is an unburdensome way to guarantee that the court and defense see every element of a claim and, more strategically, to keep the plaintiff on the court's good side. Even if the court is willing to find a claim with scattered elements sufficient, it will likely be more amenable to a plaintiff if it does not have to do the plaintiff's job.

### 2. *A Roadmap for Structural Reform*

This section takes a step back from instances of pleading failures in individual complaints and considers the structural issues that contribute to pleading failures. Although a detailed analysis of every potential contributing factor and the interactions among them is beyond the scope of this Article, we briefly discuss three contributing factors and sketch the contours of some remedial measures for each one: (1) inaccessibility of counsel; (2) unskilled

---

v. City of Newark, No. 16-1110, 2017 WL 436251 (D.N.J. Jan. 31, 2017). Though the plaintiff frequently mentioned both theories in the same sentence, the plaintiff elaborated on each theory with relevant facts. *Id.*

[178]   Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555–56 (2007); Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009).

[179]   *See supra* Table 7.

[180]   *See supra* Table 8.

[181]   FED. R. CIV. P. 11(c).

[182]   Leong, *Civil Rights Liability for Bad Hiring*, *supra* note 28, at 53–54.

[183]   *See, e.g.*, Complaint, Griggs v. Chickasaw Cnty., 2017 WL 3217095 (N.D. Miss. July 28, 2017) (No. 16-00013), 2016 WL 10391134 (plaintiff appears to only raise official policy theory).

[184]   *See* Cox, *supra* note 130, at 1691.

advocacy by plaintiffs' lawyers; and (3) challenges presented by the *Monell* doctrine itself.

In a perfect world, every plaintiff would have access to skilled counsel for every non-frivolous claim they wish to bring. The reality, however, is that we are far from this perfect world. First, many plaintiffs proceeded pro se—in our dataset, 33 out of 108, or 30.6%.[185] Some plaintiffs may have chosen to represent themselves.[186] But others likely tried but did not succeed in securing counsel for a range of reasons, including lack of resources, inability to devote time and resources to searching for an attorney, and lack of available counsel.[187] Some failures to secure counsel may have resulted from the plaintiff's claim itself: perhaps some claims were deemed too unlikely to succeed or economically infeasible for any lawyer to accept them.[188] Given these obstacles, securing an attorney requires much of plaintiffs before a lawsuit even begins.

One measure that may improve the quality of representation in § 1983 cases is to help prospective plaintiffs more easily identify attorneys with skill and expertise in civil rights litigation. To a plaintiff without the time, resources, or legal knowledge to extensively research many different attorneys, selecting a civil rights attorney to litigate claims under § 1983, including municipal liability claims, may be governed by the luck of the draw.[189] If state bar databases, along with privately maintained databases,[190] included listings that helped plaintiffs identify which lawyers have handled many cases like theirs, plaintiffs might be more likely to identify lawyers who can successfully represent them.

Of course, identifying a lawyer with the right skill set is only part of the battle. As we discussed in Part III.A, that lawyer also must have both the bandwidth and the economic means to take the case. Promoting better compensation for attorneys with skill and expertise in § 1983 litigation will help assist plaintiffs in securing the assistance of counsel. Scholars have suggested

---

[185] *See supra* Table 4.

[186] *Cf.* Mark C. Milton, *Why Fools Choose to be Fools: A Look at What Compels Indigent Criminal Defendants to Choose Self-Representation*, 54 ST. LOUIS U. L.J. 385, 387 (2009) (suggesting, in the criminal context, "most indigent defendants make the decision [to represent themselves] as a last resort to escape their feelings of helplessness" and that "[d]eficiencies in the criminal justice system, both real and perceived, foster the desire and understandable necessity for many indigent criminal defendants to represent themselves").

[187] *See* Schwartz, *Civil Rights Without Representation, supra* note 61, at 650.

[188] *See id.* (quoting civil rights lawyer describing case selection process: "[I]s there blood on the street? If not, then why are we doing it?").

[189] *See* Moss, *supra* note 65, at 95.

[190] We inspected many of these databases in our coding of civil rights lawyer expertise. *See supra* note 92 (listing several well-known databases).

EMORY LAW JOURNAL                        [Vol. 73:801

ways of contracting around judicial limitations on § 1988 through retainer agreements, with the goal of making it more economically feasible for attorneys to accept representation of plaintiffs in § 1983 matters, but available evidence suggests that these measures have often fallen short.[191] Encouraging law firms to expand their pro bono practices to include more § 1983 cases is another possibility,[192] as is promoting private funding of public interest groups such as the American Civil Liberties Union that already successfully litigate § 1983 cases. Another possibility would be to promote public financing of at least some § 1983 cases: one could imagine a Legal Services Corporation-like, publicly funded entity that takes on some § 1983 cases every year,[193] or one that takes the Federal Public Defender as its model.[194] While § 1983 is said to have deputized civil rights plaintiffs as private attorneys general, perhaps it would improve outcomes for plaintiffs if such private attorneys general received some public funding.

These suggestions notwithstanding, some plaintiffs will still likely not be able to secure counsel, at least not in the immediate future. This reality counsels in favor of measures that will help pro se plaintiffs litigate on their own behalf more effectively. We recommend making available in courts, public libraries, prison libraries, law school websites, and other accessible spaces a simple guide to § 1983 litigation geared to non-lawyers. Such a guide should describe the stages of litigation and their purpose, list the basic elements of individual and

---

[191] *See, e.g.*, Reingold, *supra* note 62, at 21–29 (summarizing efforts to create a retainer agreement consistent with *Evans v. Jeff D.* but concluding that "[t]he dried-up market strongly suggests that contract-cures for the *Evans* problem were unreliable or unsavory enough that few lawyers wanted to use them"). The Shriver Center on Poverty Law has stated that "[c]lients who are educated on the importance of the case and kept well informed throughout the litigation" are less likely to agree to waive attorneys' fees. FEDERAL PRACTICE MANUAL FOR LEGAL AID ATTORNEYS § 9.4 (Jeffrey S. Gutman ed., 2004) (with updates online at http://federalpracticemanual.org).

[192] This approach is promising because it can potentially deploy ambitious, public-minded junior attorneys at large firms with significant resources to represent victims of civil rights violations. The law firm also wins: it secures training experience for its associate and potentially good publicity for the firm. Our data suggest that this is not already happening with great frequency: no large law firms exclusively represented plaintiffs in our dataset. *See supra* Table 3 and accompanying text; *see also* Samuel R. Bagenstos, *Mandatory Pro Bono and Private Attorneys General*, 101 NW. U. L. REV. COLLOQUY 182, 184 ("'[M]ost civil rights litigation is not brought by institutional litigators or by large firms engaging in pro bono activity,' but by individual lawyers who are trying to make a living." (quoting Stewart J. Schwab & Theodore Eisenberg, *Explaining Constitutional Tort Litigation: The Influence of the Attorney Fees Statute and the Government as Defendant*, 73 CORNELL L. REV. 719, 768 (1988)).

[193] *Who We Are*, LEGAL SERVS. CORP., https://www.lsc.gov/about-lsc/who-we-are#pt-16 (last visited Jan. 13, 2024).

[194] *Defender Services*, U.S. CTS. https://www.uscourts.gov/services-forms/defender-services (last visited Jan. 13, 2024).

entity liability claims, and caution plaintiffs against the common pleading failures we have highlighted throughout this article.[195] In a similar vein, some jurisdictions deploy a form that helps pro se plaintiffs provide the information a court needs to adjudicate their cases.[196] If such measures can help pro se plaintiffs improve their pleadings so as to stand a chance of surviving a motion to dismiss, their odds of attracting a lawyer to represent them increase significantly.

In addition to improving the incentives for highly skilled lawyers to take more § 1983 cases, advocates for strong civil rights enforcement may also wish to consider how to help lawyers who are already litigating *Monell* claims do so more effectively. The many pleading failures on display in the complaints in our dataset suggest an urgent need to consider measures during and after law school to improve the quality of lawyering in this area.[197]

While some measures will be easier to implement in the short- and medium-term than others, we think that advocates would benefit from pausing to think about what an *ideal* program to train lawyers to litigate *Monell* claims effectively might look like and then working backward to consider what measures might be most feasible to implement. Imagine, for example, a credentialing program that lawyers must complete prior to accepting a client with a § 1983 claim or to file a § 1983 claim in court. Such a program could begin as early as law school and could include required law school coursework, a civil rights-specific supplemental bar exam, a required apprenticeship with a civil rights attorney (ideally subsidized by the state for both the senior and apprentice attorney), and a minimum number of hours that an attorney must spend working on § 1983 cases before filing one on their own.[198] Such a program would have to be carefully tailored so as not to discourage prospective civil rights attorneys and perhaps divert them to a less effort-intensive practice area. But even if the overall number of attorneys litigating § 1983 cases declines or remains constant, it is a good tradeoff so long as the number of attorneys *successfully* litigating § 1983 cases increases.

---

[195] *See supra* Part IV.A.2.

[196] *See, e.g.,* Complaint, Grogg v. State, No. 15-00299, 2019 WL 386973 (6th Cir. Jan. 7, 2019) (plaintiff used form for prisoner civil rights complaints in Tennessee); Complaint, Heard v. Shicker, No. 14-01027, 2015 WL 9948255 (C.D. Ill. Mar. 11, 2015) (plaintiff used form for prisoner complaints in Illinois); Complaint, Ellis v. Corizon, Inc., No. 17-00536, 2018 WL 9943486 (D. Ariz. Sept. 14, 2018) (plaintiff used form for prisoner complaints in Arizona).

[197] *See generally* Porter, *supra* note 12, at 410–11 (concluding that more education of lawyers is needed in the area of ADAAA litigation).

[198] *See* Leong, *Civil Rights Liability for Bad Hiring, supra* note 28, at 58.

Short of such a comprehensive program, more modest efforts to improve the quality of § 1983 litigation might begin as early as law school.[199] Some law schools already offer a certificate in constitutional rights and remedies that requires students to take classes such as Constitutional Litigation and Federal Courts.[200] While students are unlikely to emerge from such a certificate program having the elements of each theory of *Monell* liability permanently at their fingertips, they are far more likely to know there *are* several theories, they must articulate one of these specific theories,[201] and prior to filing a complaint they should investigate facts supporting the elements of any theory they raise.[202] We can also consider continuing legal education and similar training. In the area of disability discrimination, where academics have similarly noted the poor quality of lawyering,[203] stakeholders have created a post-graduate education program that they are working to implement.[204] Something similar might also benefit civil rights plaintiffs by helping their lawyers litigate *Monell* claims more effectively.[205]

Finally, while we have directed criticism at lawyers who draft complaints containing pleading failures, it is important to remember that the Supreme Court is to blame for what Professor Karen Blum has called the "maze" of *Monell*.[206] Had the Court permitted respondeat superior liability parallel to the private sector rather than requiring a showing of policy or custom, none of the pleading failures we have documented would automatically doom a plaintiff's case.[207] While many commentators have proposed alternatives to *Monell*'s policy or custom requirement—and we could discuss in the abstract how these proposed modifications might pave the way for lawyers who struggle to navigate

---

[199] *Id.*

[200] *See, e.g.*, *University of Denver Constitutional Rights and Remedies Program (CRRP): Certificate Requirements*, UNIV. DENVER, https://www.law.du.edu/sites/default/files/2022-04/CRRP_Advising%20Form_Revised%20April%202022.pdf (last visited Jan. 13, 2024).

[201] *See, e.g.*, Blue v. Dist. of Columbia, 811 F.3d 14, 20 (D.C. Cir. 2015) ("Section 1983 plaintiffs have several ways to allege a municipal policy, each with its own elements. If the plaintiff fails to identify the type of municipal policy at issue, the court would be unable to determine, as required by [pleading requirements under current Supreme Court precedent] whether the plaintiff had provided plausible support for her claim.").

[202] *See supra* Part IV.B.1; *see also* Leong, *Civil Rights Liability for Bad Hiring*, *supra* note 28, at 53.

[203] *See* Porter, *supra* note 12, at 398–402.

[204] *See* Kevin Barry et. al., *Pleading Disability After the ADAAA*, 31 HOFSTRA J. OF LAB. & EMP. 1, 3 (2013); *The ADA Project*, http://www.adalawproject.org/ (last visited Jan. 13, 2024).

[205] We note, however, that several well-regarded programs covering aspects of § 1983 litigation already exist. *See, e.g.*, *39th Annual Section 1983 Civil Rights Litigation*, PRACTICING L. INST., https://www.pli.edu/programs/S/section-1983-civil-rights-litigation (last visited Jan. 13, 2024). We suspect, therefore, that availability of such programs is not the only, or primary, issue.

[206] Blum, *supra* note 1, at 913–14.

[207] Monell v. Dept. of Soc. Servs., 436 U.S. 658, 694–95 (1978).

*Monell*—the Supreme Court seems unlikely to modify *Monell*. Indeed, if anything, the Court's recent cases suggest an inclination to make it more difficult for plaintiffs to recover against municipalities.[208]

Ultimately, the struggles of lawyers litigating municipal liability cases indicate that civil rights advocates may further their cause more effectively by looking beyond *Monell*—and perhaps beyond § 1983 litigation itself. For example, scholars have recently suggested the value of litigating constitutional harms under state analogs to § 1983, state statutory remedies, and state tort remedies.[209] As one of us (Leong) has elsewhere explained, each of these approaches has some drawbacks.[210] Still, to the extent that *Monell* litigation remains fruitless even if lawyers' pleadings improve, civil rights advocates may benefit from looking elsewhere to protect constitutional rights in court.[211]

## CONCLUSION

Our Article has documented pervasive pleading failures among plaintiffs' complaints, demonstrating through detailed analysis of these litigation documents how such failures sometimes guarantee a loss for plaintiffs. Such failures have great doctrinal and strategic significance. Yet it is important to remember that the imperative to litigate well is also a moral one. Any attorney has a moral duty to represent each client with thoroughness and tenacity, but this responsibility is heightened when a client has lost something substantial, such as their liberty, or has suffered a profound violation of dignity or privacy. Civil rights plaintiffs, especially those who have suffered deprivations of their constitutional rights, often fit this mold. Some have been sexually abused by teachers,[212] thrown against courtroom walls,[213] or forced to cope with a family member's murder.[214] When such a plaintiff hires a lawyer, the relationship is often more than transactional—the plaintiff is placing their hopes of justice and accountability in that lawyer. Pleading failures and other shortcomings in § 1983 lawyering not only undermine a plaintiff's chances of success; they also reinforce the structures that injured the plaintiff in the first place. By improving

---

[208] *See, e.g.*, Connick v. Thompson, 563 U.S. 51 (2011) (foreclosing municipal liability against prosecutor's office on theory of failure to train when only one violation resulted from deficient training).

[209] Reinert et al., *New Federalism*, *supra* note 1, at 769–74.

[210] Leong, *Civil Rights Liability for Bad Hiring*, *supra* note 28, at 62.

[211] *Id.* at 11.

[212] *See* Kobrick v. Stevens, 763 Fed. Appx. 216, 218 (3d Cir. 2019).

[213] *See* Waller v. City & Cnty. of Denver, 932 F.3d 1277, 1280–81 (10th Cir. 2019).

[214] *See* Stewart v. City of Memphis, 788 Fed. Appx. 341, 342 (6th Cir. 2019).

EMORY LAW JOURNAL [Vol. 73:801

the quality of lawyering in civil rights cases, however, we take the first step in breaking the cycle of constitutional harm.

### APPENDIX A: CODING PROTOCOL

*To explain our methodology and assist future researchers, this Appendix provides representative examples for the phrases and terminology we accepted as sufficient to "satisfy" each element of the six* Monell *theories. Each exemplar is drawn from a case in our dataset and includes the corresponding citation to the district court case and complaint that was coded. The list of elements described in this Appendix corresponds with Table 1 in this Article.*[215]

**Written Policy Elements:**

| Formal written policy or legislative enactment |
| --- |
| "The [Municipal] Ordinance applied or threatened to be applied is an unconstitutional abridgement of Plaintiff's affirmative rights to freedom of speech."[216] |
| "[T]he City ratified the labeling of Ordinance 125054 as the "Carl Haglund Law" by publishing that Ordinance 125054 was called the "Carl Haglund Law" on the City's own website (and other publications and emails), as well as by holding protest rallies against Haglund paid for with public funds and repeatedly allowing [defendants] and other various City officials to repeatedly refer to Ordinance 125054 as the "Carl Haglund Law."[217] *(authors' note: plaintiff's name is Carl Haglund)* |
| "The Township is segregating single/separated/divorced/widowed persons into rooming Houses only and not allowing them to rent in 1-2 Family Homes not because of the dwelling's layout but because the people who live there are single. This is Marital/Union Status Discrimination against these persons by the Township. In the enforcement of their Ordinance 197.7, they are forcing landowners to discriminate."[218] |

---

[215] Throughout Appendix A, we have omitted ellipses in quotations where doing so would improve ease of reading and would not alter the substantive meaning of the quotation.

[216] Second Amended Complaint at 8, Spiegel v. McClintic, No. 16-09357 (N.D. Ill. Nov. 10, 2016).

[217] Second Amended Complaint at 21–22, Haglund v. Sawant, No. 17-1614, 2018 WL 2216154 (W.D. Wash. May 15, 2018).

[218] Complaint at 17–18, Heine v. Dir. of Codes & Standards, No. 15-08210, 2017 WL 3981135 (D.N.J. Sept. 11, 2017).

| Execution of official policy caused constitutional violation |
|---|
| "[T]he Ordinance as applied or threatened to be applied also impose[s] unjustifiable restrictions on the exercise of protected constitutional rights [and] violates the Equal Protection Clause of the 14th [A]mendment [to the] United States Constitution by denying Plaintiff free speech rights allowed to others in similar situations."[219] |
| "Defendants treated Plaintiff Carl Haglund different from other similarly situated landlords in violation of the Equal Protection guarantee by the Fourteenth Amendment to the United States Constitution by calling Carl Haglund out as a "slumlord" and naming a City ordinance after him (the "Carl Haglund Law"), but not calling out any of the other similarly situated landlords in Seattle for the same or similar treatment."[220] |
| "The Municipalities have passed Ordinances that are unconstitutional or are unconstitutionally enforced. An example of this is [municipal Defendant's] recent passage of Ordinance 0-121304. The enforcements are based on vague standards much of which are irrelevant to the municipality."[221] |

**Policymaker Elements:**

| Individual with policymaking authority |
|---|
| "The District Attorney personally and/or through his authorized delegates, at all relevant times had final authority, and constituted a City policymaker for whom the City is liable, with respect to such conduct."[222] |
| "The City, by its officials and agencies, including Defendant who is Commissioner of [Department of Buildings], appointed by the Mayor of the City pursuant to New York City Charter § 641, is vested with discretion as a policymaker by custom, by title, and by law establishes policies, procedures, customs and/or practices for the same."[223] |

---

[219]  Second Amended Complaint in *Spiegel, supra* 216, at 9.
[220]  Second Amended Complaint in *Haglund, supra* 217, at 22.
[221]  Complaint in *Heine, supra* 218, at 20–21.
[222]  First Amended Complaint at 76, Bellamy v. City of New York, 2017 WL 2189528 (E.D.N.Y. May 17, 2017) (No. 12-01025), 2014 WL 12810162.
[223]  Amended Complaint in Hu v. City of New York, *supra* note 112, at 47–48.

| |
|---|
| "Each of the actions set forth in this Second Amended complaint was taken pursuant to a custom, policy, or decision made by a governmental official with final policymaking authority."[224] |
| **Made decision in official capacity** |
| "[T]here were at least 65 instances in which the Appellate Division alerted the final policy makers that misconduct [occurred]. [Defendant] as policymaker failed to take any steps to protect against the constitutional harm."[225] |
| "The City and [Defendant], developed and maintained policies, procedures, customs and/or practices exhibiting indifference to the constitutional rights of citizens."[226] |
| "This policy to punish and silence [Plaintiff] for his public criticism of the C[ity], its elected officials, and key employees was designed and carried out by the C[ity] as a governmental entity, and by the individual C[ity] policy makers at the highest level."[227] |
| **Official decision caused constitutional violation** |
| "As a direct and proximate result of the [policymaker's] deliberate indifference to custom and practice that caused the unconstitutional deprivation of defendant[']s rights."[228] |
| "The City and [Defendant] so deprived Plaintiffs of their constitutional and statutory rights as a matter of official municipal policy, misapplication of policy and/or custom so pervasive and widespread as to practically have the force of law."[229] |
| "As a result of the C[ity]'s campaign to harass, retaliate and punish, [plaintiff] has been deprived of both substantive and procedural due process guaranteed under the Fourteenth Amendment of the Constitution of the United States of America."[230] |

---

[224] Second Amended Complaint at 11, Lozman v. City of Riviera Beach, No. 08-80134, 2014 WL 12692766 (S.D. Fla. May 2, 2014).

[225] First Amended Complaint in *Bellamy, supra* note 222, at 77.

[226] Amended Complaint in *Hu, supra* note 112, at 48.

[227] Second Amended Complaint in *Lozman, supra* note 224, at 11.

[228] First Amended Complaint in *Bellamy, supra* note 222, at 78.

[229] Amended Complaint in *Hu, supra* note 112, at 49.

[230] Second Amended Complaint in *Lozman, supra* note 224, at 11.

EMORY LAW JOURNAL                    [Vol. 73:801

**Informal Custom Elements:**

| Pattern, practice, custom, or informal policy alleged |
|---|
| "A pattern or practice exists where the municipality has: (a) an official policy that is unconstitutional; (b) a custom or pattern of constitutional violations. At the time of the unconstitutional search of [Plaintiff's] apartment, [municipal Defendant] had a custom or pattern of unconstitutional searches and consequent false arrests."[231] |
| "Defendant [Municipality] developed, ratified, enforced, and continue[s] to enforce an official county policy and/or longstanding custom."[232] |
| "Pursuant to the County Defendants' persistent, widespread custom and unofficial policy, County Defendants and its employees denied adequate discharge planning to Plaintiffs with reckless disregard for their constitutional rights."[233] |
| **Widespread recurring practice is so permanent and settled that it constitutes formal policy** |
| "[Municipal Defendant's] custom or pattern of unconstitutional searches plausibly perpetuated a presumed tolerance of unconstitutional searches by police officers and the 'continued official tolerance facilitate[d] similar unlawful actions in the future.'"[234] |
| "[Municipal] Defendants developed, ratified, enforced, and continues to enforce the official county policy and/or longstanding custom with a reckless and callous disregard for the constitutional rights of citizens."[235] |
| "This persistent, widespread practice of denying adequate discharge planning was so pervasive that County officials with policy-making authority tacitly authorized the policy, had actual or constructive knowledge of the widespread custom and unofficial policy, and failed to do anything to end the unconstitutional custom and unofficial policy."[236] |

---

[231]  Second Amended Complaint in Roman v. City of Newark, *supra* note 177, at 5.

[232]  First Amended Complaint at 21, Robinson v. Hunt Cnty., No. 17-00513 (N.D. Tex. Apr. 20, 2017).

[233]  Complaint and Jury Demand at 29, Charles v. Cnty. of Orange, No. 16-05527, 2017 WL 4402576 (S.D.N.Y. Sept. 29, 2017).

[234]  Second Amended Complaint in *Roman*, *supra* note 177, at 6.

[235]  First Amended Complaint in *Robinson*, *supra* note 232, at 23.

[236]  Complaint and Jury Demand in *Charles*, *supra* note 233, at 29.

| Adhering to that practice caused constitutional violation |
| --- |
| "[Municipal Defendant's] custom or pattern of unconstitutional searches and consequent false arrests proximately caused the unconstitutional injury to [defendant]."[237] |
| "Defendant [Municipality's] enforced and ongoing official county policy and/or longstanding custom of removing and censoring speech, as alleged herein, constitutes (1) an impermissible viewpoint-based restriction on speech in violation of the First and Fourteenth Amendments to the United States Constitution; and (2) a violation of banned individuals' due process rights under the Fourteenth Amendment to the United States Constitution."[238] |
| "By reason of [widespread custom and unofficial policy,] County Defendants deprived Plaintiffs of the rights, immunities, and privileges guaranteed to every person in the United States, in violation of 42 U.S.C. § 1983, including but not limited to rights guaranteed by the Fourteenth Amendment of the United States Constitution."[239] |

---

[237]   Second Amended Complaint in *Roman*, *supra* note 177, at 6.
[238]   First Amended Complaint in *Robinson*, *supra* note 232, at 21–22.
[239]   Complaint and Jury Demand in *Charles*, *supra* note 233, at 30.

**Failure-to-Train Elements:**

| Inadequate training of municipal employees |
|---|
| "The City fail[ed] to adequately hire and train its officers."[240] |
| "County cannot begin to honor the People's Fourth Amendment rights to remain secure in their houses against unreasonable searches and seizures because it has: [a.] failed to the train its peace officers that the conduct herein is constitutionally unacceptable."[241] |
| "City perpetuated this custom by: [e.] allowing LRPD officers with significant disciplinary histories to train and supervise [defendant]; [f.] failing to appreciate, address and act upon evidence of the training and skills deficiencies of [Defendant officers]."[242] |
| **Inadequate training caused constitutional injury** |
| "The City had a duty under the United States Constitution to adequately and properly train and supervise its officers, which duty included having an established and defined policy regarding the parameters of a citizen's constitutional rights, proscribing conduct by police officers and officials which violated the constitutional rights of the citizens."[243] |
| "The County's failures to adequately train, supervise, and/or discipline are: [d.] the moving force behind Defendants' collective deprivations of Plaintiffs' civil rights under color of law."[244] |
| "The custom [of inadequate training] was the moving force behind the violations of [Plaintiff's] constitutional rights and proximately caused [Plaintiff's] personal injuries, great pain and death."[245] |

---

[240]  Amended Complaint in Perez v. City of Sweetwater, *supra* note 112, at 15.
[241]  Second Amended Complaint in Jones v. Eder, *supra* note 84, at 32.
[242]  Complaint in Perkins v. Cnty. of Milwaukee, *supra* note 133, at 28.
[243]  Amended Complaint in *Perez*, *supra* note 112, at 15.
[244]  Second Amended Complaint in *Eder*, *supra* note 84, at 33.
[245]  Complaint in *Perkins*, *supra* note 133, at 29.

| Municipality was deliberately indifferent to constitutional rights injured |
|---|
| "The City['s] failure to implement a more thorough training program upon hiring new officers and continued training for veteran officers show a deliberate indifference to [Plaintiffs'] rights."[246] |
| "The County's failures to adequately train, supervise, and/or discipline are: [a.] deliberately indifferent to the People's rights to remain free from unreasonable searches despite the obvious, known, and highly predictable dangers created by such failures; [c.] deliberately indifferent to the known, obvious, and highly predictable consequences that result when peace officers are not properly trained, supervised, or disciplined."[247] |
| "City knowingly, and with reckless and deliberate indifference to the constitutional rights of the citizens, failed to adequately train, supervise, and discipline LRPD officers."[248] |

**Failure-to-Supervise Elements:**

| Inadequate supervision of municipal employees |
|---|
| "In subjecting Plaintiff to these violations, [Municipal] Defendants, as state actors, failed to investigate Defendant Stevens' conduct, failed to adequately supervise Defendant Stevens."[249] |
| "Acting under color of law pursuant to official policy, practice, or custom, [Municipal Defendant] failed to supervise, control, and discipline on a continuing basis."[250] |
| "[N]eed for more or different training, supervision, investigation, or discipline in the areas of: the failure to train, supervise[,] discipline all officers regarding their jurisdiction and authority to detain, arrest and initiate prosecution in matters where Officers have no such jurisdiction or authority."[251] |

---

[246]  Amended Complaint in *Perez*, *supra* note 112, at 17.

[247]  Second Amended Complaint in *Eder*, *supra* note 84, at 33.

[248]  Complaint in *Perkins*, *supra* note 133, at 27–28.

[249]  Complaint at 21, Kobrick v. Stevens, No. 13-02865, 2017 WL 3839945 (M.D. Pa. Sept. 1, 2017).

[250]  Second Amended Complaint at 6, Estate of Kamal v. Twp. of Irvington, No. 15-08008 (D.N.J. Mar. 9, 2018).

[251]  Amended Complaint in Young v. City of Chester, *supra* note 84, at 9.

EMORY LAW JOURNAL [Vol. 73:801

| **Inadequate supervision caused constitutional injury** |
|---|
| "Defendant School District fail[ed] to adequately supervise and train school district employees with regard to maintaining, preserving and protecting students from violations of the right to personal security and bodily integrity."[252] |
| "[Defendant] Township failed to effectively screen, hire, train, supervise, and discipline their police officers[,] thereby permitting and allowing the defendant police officers to be in a position to cause the death of [Plaintiff] and violate his federal and state constitutional rights."[253] |
| "The violation of Plaintiff's constitutional rights were directly caused by the action and/or inaction of Defendant City['s] need for more or different training, supervision, investigation or discipline."[254] |
| **Municipality was deliberately indifferent to constitutional rights injured** |
| "In so doing [municipal Defendant] manifested a deliberate indifference to the adverse effect of Defendant Stevens' misconduct and the effect of same upon students, including Plaintiff."[255] |
| "Defendant Township had power to prevent or aid in preventing the commission of said wrongs, could have done so by reasonable diligence, and intentionally, knowingly, recklessly and/or with deliberate indifference failed to do so."[256] |
| "Defendant City [was] deliberately indifferent to the need for more or different training, supervision, investigation or discipline."[257] |

---

[252]  Complaint in *Kobrick*, *supra* note 249, at 21.
[253]  Second Amended Complaint in *Kamal*, *supra* note 250, at 8.
[254]  Amended Complaint in *Young*, *supra* note 84, at 8–9.
[255]  Complaint in *Kobrick*, *supra* note 249, at 21.
[256]  Second Amended Complaint in *Kamal*, *supra* note 250, at 8.
[257]  Amended Complaint in *Young*, *supra* note 84, at 9.

**Failure-to-Screen Elements:**

| Inadequate screening of candidates |
|---|
| "City is liable for the death of [Plaintiff] and all attending damages by the wrongful and/or negligent hiring and retention"; "Defendant has a history of aggression. Defendant City violated the civil rights of decedent through its policies, lack of policies, and/or customs of hiring."[258] |
| "Doe Defendants were, at relevant times, supervisory personnel at the [municipal] P.D. with oversight responsibility for Defendant Police Officers and were responsible for the hiring of Defendant Police Officers who coerced, fabricated, and intimidated [Plaintiff] into making a confession."[259] |
| "Defendant City was responsible for implementing the rules and regulations in regard to hiring, retaining, [and] screening [municipal] police officers."[260] |
| **Inadequate screening caused constitutional injury** |
| "As a direct and proximate result of the actions and omissions of the Defendants, [Plaintiff] was killed and his rights under the Fourth Amendment of the U.S. Constitution were violated."[261] |
| "These Defendants tacitly authorized and acted in the hiring[,] thereby causing the violation of [Plaintiff's] constitutional rights including his loss of liberty, happiness and an ability to pursue a livelihood."[262] |
| "The deliberate indifference of the Defendant City violated the constitutional rights of its citizenry, including the Plaintiff, for which 42 U.S.C. § 1983 provides the appropriate remedies."[263] |
| **Municipality was deliberately indifferent to constitutional rights injured** |
| "[T]he City violated the civil rights of decedent in that they were deliberately indifferent to the rights of decedent and others through their hiring, firing and retention of officers."[264] |

---

[258]  Complaint in *Stewart*, *supra* note 76, at 17, 22.
[259]  Complaint and Jury Demand at 10, Sander v. City of Dickinson, No. 15-00072 (D.N.D. June 8, 2015).
[260]  Complaint in Capra v. Knapp, *supra* note 112, at 13.
[261]  Complaint in *Stewart*, *supra* note 76, at 15.
[262]  Complaint and Jury Demand in *Sander*, *supra* note 259, at 10.
[263]  Complaint in *Capra*, *supra* note 112, at 15.
[264]  Complaint in *Stewart*, *supra* note 76, at 20.

"These Defendants tacitly authorized and acted with reckless disregard and deliberate indifference in the hiring."[265]

"Defendant City was deliberately indifferent [when it] hired and retained Defendants when Defendant City knew, or in the exercise of reasonable care should have known, of the disposition of Defendants to engage in such unlawful conduct including excessive force and the unlawful conduct complained of herein."[266]

---

[265]  Complaint and Jury Demand in *Sander*, *supra* note 259, at 10.
[266]  Complaint in *Capra*, *supra* note 112, at 14.

APPENDIX B: MUNICIPAL LIABILITY COMPLAINTS

| Case | Appellate Citation | Document Coded | Written Policy Elements | Policymaker Elements | Informal Custom Elements | Failure to Train Elements | Failure to Screen Elements | Failure to Supervise Elements | Element Satisfaction Across All Monell Theories | Legal Representation | Civil Rights Expertise |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Bradley v. Village of University Park, Illinois | 929 F.3d 875 (7th Cir. 2019) | Original Complaint | | | | | | | None | Small Firm | Y |
| Bellamy v. City of New York | 914 F.3d 727 (2d Cir. 2019) | Original Complaint | | All Satisfied | All Satisfied | | | | All | Solo/Solo | Y/Y |
| J.K.J. v. Polk County | 928 F.3d 576 (7th Cir. 2019) | Second Amended Complaint | | | (1) and (3) Only | All Satisfied | | All Satisfied | Mix | Medium Firm | N |
| Kobrick v. Stevens | 763 Fed.Appx. 216 (3d Cir. 2019) / 2019 WL 950333 | Original Complaint | | | (1) and (3) Only | All Satisfied | | All Satisfied | Mix | Medium Firm | N |

| Case | Appellate Citation | Document Coded | Written Policy Elements | Policymaker Elements | Informal Custom Elements | Failure to Train Elements | Failure to Screen Elements | Failure to Supervise Elements | Element Satisfaction Across All *Monell* Theories | Legal Representation | Civil Rights Expertise |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Estate of Kamal by and through Kamal v. Township of Irvington | 790 Fed.Appx. 395 (3d Cir. 2019) / 2019 WL 5681350 | Second Amended Complaint | | | All Satisfied | All Satisfied | | All Satisfied | All | Solo | N |
| Ruiz-Cortez v. City of Chicago | 931 F.3d 592 (7th Cir. 2019) | Third Amended Complaint | | | All Satisfied | | | All Satisfied | All | Small/Small | Y/Y |
| Deferio v. City of Syracuse | 770 Fed.Appx. 587 (2d Cir. 2019) / 2019 WL 2062307 | Original Complaint | | | All Satisfied | | | | All | Public/Public | Y/Y |
| Valentin v. City of Rochester | 783 Fed.Appx. 97 (2d Cir. 2019) / 2019 WL 5802328 | First Amended Complaint | | | (1) and (3) Only | | | | None | Pro Se | N |

| Case | Appellate Citation | Document Coded | Written Policy Elements | Policymaker Elements | Informal Custom Elements | Failure to Train Elements | Failure to Screen Elements | Failure to Supervise Elements | Element Satisfaction Across All *Monell* Theories | Legal Representation | Civil Rights Expertise |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Rayfield v. City of Grand Rapids, Michigan | 768 Fed.Appx. 495 (6th Cir. 2019) / 2019 WL 1601770 | First Amended Complaint | | | | All Satisfied | | | All | Small Firm | Y |
| Kimble v. Kingston City School District | 792 Fed.Appx. 80 (2d Cir. 2019) / 2019 WL 6320337 | | | | | | | | None | Small Firm | Y |
| Barrow v. City of Hillview, Kentucky | 775 Fed.Appx. 801 (6th Cir. 2019) / 2019 WL 2323797 | First Amended Complaint | | | | | | | None | Small firm | Y |
| Berry v. Delaware County Sheriff's Office | 796 Fed.Appx. 857 (6th Cir. 2019) / 2019 WL 6005661 | First Amended Complaint | | | (1) and (3) Only | All Satisfied | | | Mix | Small Firm | N |

| Case | Appellate Citation | Document Coded | Written Policy Elements | Policymaker Elements | Informal Custom Elements | Failure to Train Elements | Failure to Screen Elements | Failure to Supervise Elements | Element Satisfaction Across All *Monell* Theories | Legal Representation | Civil Rights Expertise |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Freeman v. Metropolitan Water Reclamation District of Greater Chicago | 927 F.3d 961 (7th Cir. 2019) | Third Amended Complaint | | | | | | | None | Pro Se | N |
| Jackson v. City of Cleveland | 925 F.3d 793 (6th Cir. 2019) | Third Amended Complaint | All Satisfied | | (2) and (3) Only | All Satisfied | | | Mix | Medium/ Medium | Y/Y |
| Garcia v. Armor Correctional Health Service, Inc. | 788 Fed.Appx. 393 (7th Cir. 2019) / 2019 WL 6954348 | Original Complaint | | | | | | | None | Pro Se | N |
| Hu v. City of New York | 927 F.3d 81 (2d Cir. 2019) | First Amended Complaint | | All Satisfied | All Satisfied | | | | All | Small Firm | Y |

| Case | Appellate Citation | Document Coded | Written Policy Elements | Policymaker Elements | Informal Custom Elements | Failure to Train Elements | Failure to Screen Elements | Failure to Supervise Elements | Element Satisfaction Across All *Monell* Theories | Legal Representation | Civil Rights Expertise |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Webb v. Town of Saint Joseph | 925 F.3d 209 (5th Cir. 2019) | Original Complaint | | | | | | | None | Small Firm | Y |
| Kimm v. Brannan | 779 Fed.Appx. 439 (9th Cir. 2019) / 2019 WL 2524298 | First Amended Complaint | | All Satisfied | (1) and (3) Only | (1) and (2) Only | | (1) and (2) Only | Mix | Small Firm | Y |
| Baloga v. Pittston Area School District | 927 F.3d 742 (3d Circ. 2019) | Original Complaint | | | | | | | None | Solo | N |
| Randolph v. East Baton Rouge Parish School System | 774 Fed.Appx. 861 (5th Cir. 2019) / 2019 WL 2246149 | First Amended Complaint | | | (1) and (3) Only | | | | None | Public Interest | Y |

| Case | Appellate Citation | Document Coded | Written Policy Elements | Policymaker Elements | Informal Custom Elements | Failure to Train Elements | Failure to Screen Elements | Failure to Supervise Elements | Element Satisfaction Across All Monell Theories | Legal Representation | Civil Rights Expertise |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Young v. City of Chester, PA | 764 Fed.Appx. 262 / 2019 WL 1422630 | First Amended Complaint | | | (1) and (3) Only | All Satisfied | | All Satisfied | Mix | Solo | Y |
| Burger v. County of Macon | 942 F.3d 372 (7th Cir. 2019) | First Amended Complaint | | (3) Only - Official decision caused constitutional violation | | | | | None | Small Firm | N |
| McCray v. Patrolman N.A. Caparco | 761 Fed.Appx. 27 (2d. Cir 2019) / 2019 WL 409430 | Second Amended Complaint | | | | (1) and (3) Only | | (1) and (3) Only | None | Pro Se | N |
| Regains v. City of Chicago | 918 F.3d 529 (7th Cir. 2019) | Second Amended Complaint | | | All Satisfied | | | | All | Small/Small | Y/Y |

| Case | Appellate Citation | Document Coded | Written Policy Elements | Policymaker Elements | Informal Custom Elements | Failure to Train Elements | Failure to Screen Elements | Failure to Supervise Elements | Element Satisfaction Across All *Monell* Theories | Legal Representation | Civil Rights Expertise |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Red Zone 12 LLC v. City of Columbus | 758 Fed.Appx. 508 (6th Cir. 2019) / 2019 WL 852294 | First Amended Complaint | (2) Only - Execution of policy caused constitutional violation | | (1) and (3) Only | | | | None | Solo | N |
| Stewart v. City of Memphis, Tennessee | 788 Fed.Appx. 341 (6th Cir. 2019) / 2019 WL 5096074 | Original Complaint | | | All Satisfied | All Satisfied | All Satisfied | All Satisfied | All | Small/Solo | Y/Y |
| Levy v. Marion County Sheriff | 940 F.3d 1002 (7th Cir. 2019) | Original Complaint | | | (1) and (3) Only | | | | None | Medium Firm | Y |
| K. E. C. by and through Gonzalez v. County of Kern | 788 Fed.Appx. 506 (9th Cir. 2019) / 2019 WL 6903298 | First Amended Complaint | | | (1) and (3) Only | | | | None | Solo | Y |

| Case | Appellate Citation | Document Coded | Written Policy Elements | Policymaker Elements | Informal Custom Elements | Failure to Train Elements | Failure to Screen Elements | Failure to Supervise Elements | Element Satisfaction Across All Monell Theories | Legal Representation | Civil Rights Expertise |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Jones v. Eder | 778 Fed.Appx. 327 (5th Cir. 2019) / 2019 WL 4854325 | Second Amended Complaint | | | (1) and (3) Only | All Satisfied | | All Satisfied | Mix | Small Firm | Y |
| Hoffmann v. Lassen County | 772 Fed.Appx. 597 (9th Cir. 2019) / 2019 WL 2897511 | Original Complaint | | | | All Satisfied | | | All | Pro Se | N |
| Sander v. City of Dickinson, North Dakota | 773 Fed.Appx. 331 (8th Cir. 2019) / 2019 WL 3061206 | Original Complaint | | | All Satisfied | All Satisfied | All Satisfied | All Satisfied | All | Small Firm | Y |
| Birch-Min v. Middlesex County Board of Social Services | 761 Fed.Appx. 118 (3d Cir. 2019) / 2019 WL 312283 | Second Amended Complaint | | | (1) and (3) Only | (1) and (2) Only | | (1) and (2) Only | None | Solo | N |

| Case | Appellate Citation | Document Coded | Written Policy Elements | Policymaker Elements | Informal Custom Elements | Failure to Train Elements | Failure to Screen Elements | Failure to Supervise Elements | Element Satisfaction Across All *Monell* Theories | Legal Representation | Civil Rights Expertise |
|---|---|---|---|---|---|---|---|---|---|---|---|
| S.R. Nehad v. Browder | 929 F.3d 1125 (9th Cir. 2019) | Second Amended Complaint | | | (1) and (3) Only | | | | None | Medium/Small | Y/Y |
| Jackson v. Bloomfield Police Department | 764 Fed.Appx. 557 (7th Cir. 2019) / 2019 WL 1777245 | Original Complaint | | | | | | | None | Pro Se | N |
| Thomas v. City of Philadelphia | 779 Fed.Appx. 99 (3d Cir. 2019) / 2019 WL 2564438 | First Amended Complaint | | | | | | | None | Small Firm | N |
| Hart v. City of Philadelphia | 779 Fed. Appx. 121 (3d Cir. 2019) / 2019 WL 2537731 | Second Amended Complaint | | | (1) and (3) Only | | | | None | Pro Se | N |

| Case | Appellate Citation | Document Coded | Written Policy Elements | Policymaker Elements | Informal Custom Elements | Failure to Train Elements | Failure to Screen Elements | Failure to Supervise Elements | Element Satisfaction Across All *Monell* Theories | Legal Representation | Civil Rights Expertise |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Spiegel v. McClintic | 916 F.3d 611 (7th Cir. 2019) | Second Amended Complaint | All Satisfied | | | | | | All | Pro Se | N |
| Hsin v. City of New York | 779 Fed. Appx. 12 (2d Cir. 2019) / 2019 WL 2465439 | First Amended Complaint | | | All Satisfied | All Satisfied | | All Satisfied | All | Small Firm | Y |
| Dale v. Agresta | 771 Fed. Appx. 659 (7th Cir. 2019) / 2019 WL 2355017 | Third Amended Complaint | | | (1) and (3) Only | All Satisfied | | All Satisfied | Mix | Pro Se | N |
| Smith v. Township of Clinton | 791 Fed. Appx. 363 (3d Cir. 2019) / 2019 WL 5787958 | Original Complaint | | | (1) and (3) Only | All Satisfied | | All Satisfied | Mix | Solo | Y |

| Case | Appellate Citation | Document Coded | Written Policy Elements | Policymaker Elements | Informal Custom Elements | Failure to Train Elements | Failure to Screen Elements | Failure to Supervise Elements | Element Satisfaction Across All Monell Theories | Legal Representation | Civil Rights Expertise |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Wilson v. Longview School District | 775 Fed.Appx. 277 (9th Cir. 2019) / 2019 WL 2289414 | First Amended Complaint | | | (1) and (3) Only | All Satisfied | | All Satisfied | Mix | Solo/Medium | Y/Y |
| Robles v. Ciarletta | 797 Fed.Appx. 821 / 2019 WL 6977516 | First Amended Complaint | | | (1) and (3) Only | All Satisfied | All Satisfied | | Mix | Small/Solo | Y/Y |
| Waters v. Madson | 921 F.3d 725 (8th Cir. 2019) | First Amended Complaint | | | (1) and (3) Only | | | | None | Solo | Y |
| Perkins v. Milwaukee County | 781 Fed.Appx. 538 / 2019 WL 4024830 | Original Complaint | | | | | | | None | Small/Solo | Y/Y |

| Case | Appellate Citation | Document Coded | Written Policy Elements | Policymaker Elements | Informal Custom Elements | Failure to Train Elements | Failure to Screen Elements | Failure to Supervise Elements | Element Satisfaction Across All *Monell* Theories | Legal Representation | Civil Rights Expertise |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Nash v. Kenney | 784 Fed.Appx. 54 (3d Cir. 2019) / 2019 WL 4071946 | First Amended Complaint | | | (1) and (3) Only | | | | None | Pro Se | N |
| Harper v. County of Delaware | 779 Fed.Appx. 143 (3d Cir. 2019) / 2019 WL 3781687 | Original Complaint | | | (1) and (3) Only | All Satisfied | | All Satisfied | Mix | Pro Se | N |
| Mayfield v. Presbyterian Hospital Administration | 772 Fed.Appx. 680 (10th Cir. 2019) / 2019 WL 2323777 | First Amended Complaint | | | | | | | None | Pro Se | N |
| Ortiz v. Case | 782 Fed.Appx. 65 (2d Cir. 2019) / 2019 WL 5561213 | Original Complaint | | | | | | | None | Solo | N |

| Case | Appellate Citation | Document Coded | Written Policy Elements | Policymaker Elements | Informal Custom Elements | Failure to Train Elements | Failure to Screen Elements | Failure to Supervise Elements | Element Satisfaction Across All *Monell* Theories | Legal Representation | Civil Rights Expertise |
|------|--------------------|----------------|-------------------------|----------------------|--------------------------|---------------------------|----------------------------|-------------------------------|---------------------------------------------------|----------------------|------------------------|
| Hernandez v. United States | 939 F.3d 191 (2d Cir. 2019) | Second Amended Complaint | | | All Satisfied | All Satisfied | (1) and (2) Only | All Satisfied | Mix | Solo | Y |
| Heard v. Tilden | 774 Fed.Appx. 985 (7th Cir. 2019) / 2019 WL 2359428 | Original Complaint | | | (1) and (3) Only | | | | None | Pro Se | N |
| Arsan v. Keller | 784 Fed.Appx. 900 (6th Cir. 2019) / 2019 WL 3494330 | Original Complaint | | | | (1) Only - Inadequate training of municipal employees | | (1) Only - Inadequate supervision of municipal employees | None | Solo | N |
| Shay v. County of Los Angeles | 762 Fed.Appx. 416 (9th Cir. 2019) / 2019 WL 1057394 | First Amended Complaint | | | (1) and (3) Only | All Satisfied | | All Satisfied | Mix | Small/Solo | Y/Y |

Case 4:21-cv-00062-SHR   Document 201-5   Filed 04/24/26   Page 75 of 88

| Case | Appellate Citation | Document Coded | Written Policy Elements | Policymaker Elements | Informal Custom Elements | Failure to Train Elements | Failure to Screen Elements | Failure to Supervise Elements | Element Satisfaction Across All *Monell* Theories | Legal Representation | Civil Rights Expertise |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Orduno v. Pietrzak | 932 F.3d 710 (8th Cir. 2019) | Original Complaint | | | | | | | None | Small/Small | Y/Y |
| Diarra v. City of New York | 771 Fed.Appx. 69 (2d Cir. 2019) / 2019 WL 2560517 | First Amended Complaint | | | | | | | None | Solo | Y |
| Shimota v. Wegner | 759 Fed.Appx. 539 (8th Cir. 2019) / 2019 WL 1431077 | First Amended Complaint | | | | All Satisfied | | All Satisfied | All | Solo/Solo | Y/N |
| Stringer v. Lincoln County Jail | 788 Fed.Appx. 508 (9th Cir. 2019) / 2019 WL 6906612 | First Amended Complaint | | | | | | | None | Small Firm | N |

874 EMORY LAW JOURNAL [Vol. 73:801

| Case | Appellate Citation | Document Coded | Written Policy Elements | Policymaker Elements | Informal Custom Elements | Failure to Train Elements | Failure to Screen Elements | Failure to Supervise Elements | Element Satisfaction Across All Monell Theories | Legal Representation | Civil Rights Expertise |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Chinniah v. East Pennsboro Township | 761 Fed.Appx. 112 (3d Cir. 2019) / 2019 WL 326326 | First Amended Complaint | | (1) and (3) Only | All Satisfied | | | | Mix | Pro se | N |
| Rodriguez v. Milwaukee County | 756 Fed.Appx. 641 (7th Cir. 2019) / 2019 WL 1223024 | Original Complaint | | | (1) and (3) Only | | | | None | Solo | Y |
| Ellis v. Corizon Incorporated | 787 Fed.Appx. 453 (9th Cir. 2019) / 2019 WL 6817549 | Original Complaint | | | | | | | None | Pro Se | N |
| Meier v. City of St. Louis, Missouri | 934 F.3d 824 (8th Cir. 2019) | First Amended Complaint | | | (1) and (3) Only | | | | None | Small Firm | Y |

| Case | Appellate Citation | Document Coded | Written Policy Elements | Policymaker Elements | Informal Custom Elements | Failure to Train Elements | Failure to Screen Elements | Failure to Supervise Elements | Element Satisfaction Across All *Monell* Theories | Legal Representation | Civil Rights Expertise |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Calgaro v. St. Louis County | 919 F.3d 1054 (8th Cir. 2019) | Original Complaint | | | | | | | None | Small Firm | Y |
| Walker v. Wexford Health Sources, Inc. | 940 F.3d 954 (7th Cir. 2019) | First Amended Complaint | | | (1) and (3) Only | | | | None | Medium Firm | N |
| Charles v. Orange County | 925 F.3d 73 (2d Cir. 2019) | Original Complaint | | | All Satisfied | | | | All | Public/Large | Y/Y |
| Novotny v. City of Wauwatosa | 783 Fed.Appx. 623 (7th Cir. 2019) / 2019 WL 5691873 | Original Complaint | | | (1) and (3) Only | | | | None | Pro Se | N |

| Case | Appellate Citation | Document Coded | Written Policy Elements | Policymaker Elements | Informal Custom Elements | Failure to Train Elements | Failure to Screen Elements | Failure to Supervise Elements | Element Satisfaction Across All *Monell* Theories | Legal Representation | Civil Rights Expertise |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Forrest v. Parry | 930 F.3d 93 (3d Cir. 2019) | Fourth Amended Complaint | | | (1) and (3) Only | (1) and (2) Only | | (1) and (2) Only | None | Small Firm | N |
| Bonds v. University of Cincinnati Medical Center | 2019 WL 2323905 (6th Cir. 2019) | First Amended Complaint | | | | | | | None | Pro Se | N |
| McNeil v. Community Probation Services, LLC | 945 F.3d 991 (6th Cir. 2019) | Third Amended Complaint | | | (1) and (3) Only | | | | None | Public/Medium | Y/Y |
| Telzer v. Borough of Englewood Cliffs | 783 Fed.Appx. 253 (3d Cir. 2019) / 2019 WL 3776773 | First Amended Complaint | | | | (1) Only - Inadequate training of municipal employees | (1) Only - Inadequate screening of candidates | (1) Only - Inadequate supervision of municipal employees | None | Pro Se | N |

| Case | Appellate Citation | Document Coded | Written Policy Elements | Policymaker Elements | Informal Custom Elements | Failure to Train Elements | Failure to Screen Elements | Failure to Supervise Elements | Element Satisfaction Across All *Monell* Theories | Legal Representation | Civil Rights Expertise |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Webb v. County of Pima | 753 Fed.Appx. 498 (9th Cir. 2019) / 2019 WL 826570 | First Amended Complaint | | | (1) and (3) Only | | | | None | Pro Se | N |
| ICT Law and Technology Group PLLC v. SeaTree PLLC | 770 Fed.Appx. 875 (9th Cir. 2019) / 2019 WL 2267189 | First Amended Complaint | | | All Satisfied | | | | All | Solo | N |
| Smith v. Siskiyou County Jail | 778 Fed.Appx. 519 (9th Cir. 2019) / 2019 WL 4724581 | Original Complaint | | | | | | | None | Pro Se | N |
| Wilson v. Wexford Health Sources, Inc. | 932 F.3d 513 (7th Cir. 2019) | Original Complaint | | | (1) and (3) Only | | | | None | Solo | Y |

| Case | Appellate Citation | Document Coded | Written Policy Elements | Policymaker Elements | Informal Custom Elements | Failure to Train Elements | Failure to Screen Elements | Failure to Supervise Elements | Element Satisfaction Across All *Monell* Theories | Legal Representation | Civil Rights Expertise |
|------|-------------------|----------------|-------------------------|---------------------|--------------------------|---------------------------|----------------------------|-------------------------------|---------------------------------------------------|---------------------|------------------------|
| Perkins v. Hastings | 915 F.3d 512 (8th Cir. 2019) | Original Complaint | | | All Satisfied | All Satisfied | | All Satisfied | All | Medium Firm | Y |
| Murphy v. City of Tulsa | 950 F.3d 641 (10th Cir. 2019) | First Amended Complaint | | | (1) and (3) Only | All Satisfied | | All Satisfied | Mix | Solo/Small | Y/N |
| Doe v. Fort Zumwalt R-II School District | 920 F.3d 1184 (8th Cir. 2019) | | | | | (1) and (3) Only | | (1) and (3) Only | None | Solo/Small | N/N |
| Quintana v. Unknown Agents | 753 Fed.Appx. 332 (5th Cir. 2019) / 2019 WL 668502 | First Amended Complaint | | | (2) and (3) Only | All Satisfied | | | Mix | Pro Se | N |

| Case | Appellate Citation | Document Coded | Written Policy Elements | Policymaker Elements | Informal Custom Elements | Failure to Train Elements | Failure to Screen Elements | Failure to Supervise Elements | Element Satisfaction Across All *Monell* Theories | Legal Representation | Civil Rights Expertise |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Carter v. Coe | 769 Fed.Appx. 379 (7th Cir. 2019) / 2019 WL 1958668 | Original Complaint | | | | | | | None | Pro Se | N |
| Stewart v. Parkview Hospital | 940 F.3d 1013 (7th Cir. 2019) | Original Complaint | | | | | | | None | Pro Se | N |
| Williams v. Kelly | 777 Fed.Appx. 162 (7th Cir. 2019) / 2019 WL 4458385 | First Amended Complaint | | | (1) and (3) Only | | | | None | Medium Firm | N/N |
| Combier v. Portelos | 788 Fed.Appx. 774 (2d Cir. 2019) / 2019 WL 5061382 | Second Amended Complaint | | | (1) and (3) Only | | | | None | Pro Se | N |

Case 4:21-cv-00062-SHR Document 201-5 Filed 04/24/26 Page 82 of 88

| Case | Appellate Citation | Document Coded | Written Policy Elements | Policymaker Elements | Informal Custom Elements | Failure to Train Elements | Failure to Screen Elements | Failure to Supervise Elements | Element Satisfaction Across All *Monell* Theories | Legal Representation | Civil Rights Expertise |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Brown v. Racine County | 775 Fed.Appx. 256 (7th Cir. 2019) / 2019 WL 3938500 | Original Complaint | | | All Satisfied | | | | All | Pro Se | N |
| Wilson v. Hillsborough Township Construction Department | 779 Fed.Appx. 969 (3d Cir. 2019) / 2019 WL 3492427 | First Amended Complaint | | | (1) and (3) Only | | | | None | Pro Se | N |
| Pelmear v. O'Connor | 2019 WL 11678656 (6th Cir. Nov. 5, 2019) | Original Complaint | | | | | | | None | Pro Se/Pro Se | N/N |
| Lozman v. City of Riviera Beach | 793 Fed.Appx. 960 (11th Cir. 2019) / 2019 WL 6492481 | Second Amended Complaint | | All Satisfied | (1) Only - Pattern, practice, custom, or informal policy alleged | | | | Mix | Pro Se | N |

| Case | Appellate Citation | Document Coded | Written Policy Elements | Policymaker Elements | Informal Custom Elements | Failure to Train Elements | Failure to Screen Elements | Failure to Supervise Elements | Element Satisfaction Across All *Monell* Theories | Legal Representation | Civil Rights Expertise |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Grogg v. State | 2019 WL 386973 (6th Cir. January 7, 2019) | Original Complaint | | | | | | | None | Pro Se | N |
| Haglund v. Sawant | 781 Fed.Appx. 586 (9th Cir. 2019) / 2019 WL 3021791 | Second Amended Complaint | All Satisfied | All Satisfied | All Satisfied | | | | All | Medium/Solo | Y/N |
| Argentina v. Gillette | 778 Fed.Appx. 173 (3d Cir. 2019) / 2019 WL 2538020 | First Amended Complaint | | | | | | | None | Pro Se | N |
| Clark v. Thibodaux City | 787 Fed.Appx. 198 (5th Cir. 2019) / 2019 WL 4556413 | Original Complaint | | | | | | | None | Pro Se | N |

| Case | Appellate Citation | Document Coded | Written Policy Elements | Policymaker Elements | Informal Custom Elements | Failure to Train Elements | Failure to Screen Elements | Failure to Supervise Elements | Element Satisfaction Across All Monell Theories | Legal Representation | Civil Rights Expertise |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Mason v. Las Vegas Metropolitan Police Department | 754 Fed.Appx. 559 (9th Cir. 2019) / 2019 WL 141227 | Original Complaint | | | (1) and (3) Only | (1) and (2) Only | | (2) Only - Inadequate supervision caused constitutional injury | None | Solo | Y |
| Vartinelli v. Aramark Correctional Services, LLC | 796 Fed.Appx. 867 (6th Cir. 2019) / 2019 WL 6464958 | Original Complaint | | | (1) and (3) Only | All Satisfied | | | Mix | Small Firm | Y |
| Capra v. Knapp | 788 Fed.Appx. 864 (3d Cir. 2019) / 2019 WL 5063306 | Original Complaint | | | All Satisfied | All Satisfied | All Satisfied | All Satisfied | All | Small/Small | Y/Y |
| Heine v. Bureau Chief Division of Fire and Safety | 765 Fed.Appx. 816 (3d Cir. 2019) / 2019 WL 1167898 | Original Complaint | All Satisfied | | (1) and (3) Only | | | | Mix | Pro Se/Pro Se | N/N |

| Case | Appellate Citation | Document Coded | Written Policy Elements | Policymaker Elements | Informal Custom Elements | Failure to Train Elements | Failure to Screen Elements | Failure to Supervise Elements | Element Satisfaction Across All *Monell* Theories | Legal Representation | Civil Rights Expertise |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Mogard v. City of Milbank | 932 F.3d 1184 (8th Cir. 2019) | First Amended Complaint | | (3) Only - Official decision caused constitutional violation | | | | | None | Small Firm | Y |
| Garza v. City of Donna | 922 F.3d 626 (5th Cir. 2019) | First Amended Complaint | | (1) Only - Individual with policymaking authority | All Satisfied | All Satisfied | | All Satisfied | Mix | Solo | N |
| Perez v. City of Sweetwater | 770 Fed. Appx. 967 (11th Cir. 2019) / 2019 WL 1975992 | First Amended Complaint | | | All Satisfied | All Satisfied | All Satisfied | All Satisfied | All | Small Firm | N |
| Robinson v.Hunt County, Texas | 921 F.3d 440 (5th Cir. 2019) | First Amended Complaint | | All Satisfied | All Satisfied | | | | All | Solo/Small | Y/Y |

| Case | Appellate Citation | Document Coded | Written Policy Elements | Policymaker Elements | Informal Custom Elements | Failure to Train Elements | Failure to Screen Elements | Failure to Supervise Elements | Element Satisfaction Across All *Monell* Theories | Legal Representation | Civil Rights Expertise |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Waller v. City and County of Denver | 932 F.3d 1277 (10th Cir. 2019) | Second Amended Complaint | | | All Satisfied | All Satisfied | | All Satisfied | All | Small Firm | Y |
| Griggs v. Chickasaw County, Mississippi | 930 F.3d 696 (5th Cir. 2019) | Original Complaint | | (3) Only - Official decision caused constitutional violation | | | | | None | Small Firm | Y |
| Justice Network Inc. v. Craighead County | 931 F.3d 753 (8th Cir. 2019) | Original Complaint | | | (1) and (3) Only | (1) and (2) Only | | (1) and (2) Only | None | Small/Small | N/N |
| Johnson v. District of Columbia | 927 F.3d 539 (D.C. Cir. 2019) | First Amended Complaint | | | | | | | None | Pro Se | N |

| Case | Appellate Citation | Document Coded | Written Policy Elements | Policymaker Elements | Informal Custom Elements | Failure to Train Elements | Failure to Screen Elements | Failure to Supervise Elements | Element Satisfaction Across All *Monell* Theories | Legal Representation | Civil Rights Expertise |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Jackson v. Stair | 938 F.3d 966 (8th Cir. 2019) | | | | (1) and (3) Only | All Satisfied | | All Satisfied | Mix | Small/Solo | Y/N |
| Jackson v. Stair | 944 F.3d 704 (8th Cir. 2019) | | | | | | | | None | Small/Solo | Y/N |
| Cherry Knoll L.L.C.. V Jones | 922 F.3d 309 (5th Cir. 2019) | Second Amended Complaint | | All Satisfied | | | | | All | Small/Small | N/N |
| Gardner v. Evans | 920 F.3d 1038 (6th Cir. 2019) | First Amended Complaint | | | (1) and (3) Only | | | | None | Solo | Y |

| Case | Appellate Citation | Document Coded | Written Policy Elements | Policymaker Elements | Informal Custom Elements | Failure to Train Elements | Failure to Screen Elements | Failure to Supervise Elements | Element Satisfaction Across All *Monell* Theories | Legal Representation | Civil Rights Expertise |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Jordan v. Town of Waldoboro | 943 F.3d 532 (1st Cir. 2019) | Second Amended Complaint | | | (1) and (3) Only | All Satisfied | | All Satisfied | Mix | Small Firm | Y |
| Longoria Next Friend of M.L. v. San Benito Independent Consolidated School District | 942 F.3d 258 (5th Cir. 2019) | Original Complaint | | | | | | | None | Solo/Solo | N/N |
| Estate of Roman v. City of Newark | 914 F.3d 789 (3d Cir. 2019) | Second Amended Complaint | | | All Satisfied | All Satisfied | | All Satisfied | All | Small Firm | Y |
| Lewis v. City of Union City, Georgia | 934 F.3d 1169 (11th Cir. 2019) | Original Complaint | | (3) Only - Official decision caused constitutional violation | (1) and (3) Only | | | | None | Medium/Medium | Y/N |