# EXHIBIT G

# Law firm rates in 2026

The engine that powers value

In partnership with





# Executive summary

When it comes to the subject of rates, law firms have arguably never had it better. While businesses everywhere have struggled with inflation, supply chains, and market volatility over the last few years, law firms discovered they could raise rates they charge clients at historically rapid paces — and clients would pay, consistently, year after year, in a trajectory that defied inflation and has turned the last decade of conventional pricing wisdom on its head.

The secret sauce, firms have come to believe, was simple: Deliver more value per hour and you can charge more per hour. Law firms' investment in technology, particularly generative AI (GenAI) tools, would make lawyers so much more effective and efficient each year that the firms and clients could split the gains in value.

Indeed, efficiency initiatives, they believed, would eliminate waste; and premium talent would command premium rates. Every firm had its own formula for optimization — some maintaining ironclad realization discipline, others offering strategic discounts to win volume, while still others absorbing write-offs to preserve client relationships.

**The secret sauce, firms have come to believe, was simple: Deliver more value per hour and you can charge more per hour.**

Yet, many law firm leaders thought that surely one approach had to be superior, surely there was a best practice waiting to be discovered.

However, when we analyzed how hundreds of firms actually operate, we found something unexpected: Law firm rate and realization systems work like jet engines, with four distinct stages — intake, compression, combustion, and exhaust — that must operate in harmony. Standard rates flow through worked realization, then post-work realization before finally emerging as collected revenue that powers the next cycle. More surprisingly, many firms naturally cluster in different groupings based on their approach — yet despite radically different approaches to discounting and realization, almost all law firms ended up collecting roughly the same amount per hour. The market, it seems, has its own gravitational pull that drew everyone toward equilibrium regardless of their individual strategy.

This discovery would be merely academic if the weather forecast looked clear — but it's not, and that's making people nervous. The same firms pushing through record rate increases are watching their collection realization wobble in ways that feel uncomfortably familiar to anyone who survived the aftermath of the global financial crisis in 2008.

The GenAI investments that justified premium pricing now demand premium spending exactly when firms should be conserving cash. Further, clients are voting with their feet, shifting work downstream to lower-cost providers even as they pay higher rates to their primary firms. The warning lights aren't flashing red yet, but they're definitely amber — and these warnings are multiplying.

The firms that thrive in the coming environment — whether that's continued prosperity or economic reckoning — won't be those with the perfect strategy. They'll be those whose leaders understand the engine they've built well enough to reconfigure it in flight. Because when you're pushing systems to their limits and the horizon looks uncertain, the question isn't whether you have the optimal configuration, it's whether you understand your configuration well enough to keep the engine running when conditions change.

This report reveals not just how we got here, but what actually drives performance in legal pricing — and why everything firms think they know about rate strategy might be wrong at exactly the moment they need it to be right.

© 2025 Thomson Reuters

# The rate growth phenomenon

The legal market's rates-setting process has evolved from merely keeping pace with inflation to demonstrating remarkable pricing power that far exceeds base macroeconomic pressures. While inflation remained relatively contained between 2007 and 2019, averaging around 1.6%, law firms across all size segments consistently commanded rate increases that were double or triple the inflation rate through the end of the 2010s. This was not simply cost-of-living adjustments — it represented genuine pricing power driven by the specialized nature of the industry and relatively stable demand.

**FIGURE 1:**

## Worked rate growth vs. inflation





Y/Y percent change

All timekeepers. Billable time type; non-contingent matters.
PCE Inflation measure (as of June 2025) =  Personal Consumption Expenditures Excluding Food and Energy.

*Source: Thomson Reuters 2025*

The real story emerged during and after the pandemic, when inflation surged to 3.6% in 2021 and peaked at 5.2% in 2022. Law firms did not just match the increases — they accelerated past them, with rate growth averaging 2.3 percentage points above inflation across the post-2020 period. This represented a significant acceleration from the 2010-2019 period, when rate growth averaged just 1.5 percentage points above inflation — and this higher post-pandemic average held despite inflation briefly outpacing rate growth in 2022.

By 2024, inflation had moderated to 2.9%, yet rates continued their upward trajectory with growth reaching 6.5% across all segments. The acceleration has continued into 2025, in which early indicators show worked rate growth of 7.4% against inflation of just 2.8%. The Am Law 100 segment is pushing even further ahead at 9.4%, while the Am Second Hundred and Midsize firms follow similar trajectories, achieving 7.2% and 6.0% growth, respectively — more than double the inflation rate.

Importantly, this pricing dynamic is not exclusive to the market in the United States. Comparable trends have been observed in other regions, including the United Kingdom, Australia,[1] and New Zealand.[2]

1    *2025 Report on the State of the Australia Legal Market*; Thomson Reuters Institute (Aug. 25, 2025); *available at* https://www.thomsonreuters.com/en-us/posts/legal/australia-legal-market-2025.

2    *2025 Report on the State of the New Zealand Legal Market*; Thomson Reuters Institute (March 18, 2025); *available at* https://www.thomsonreuters.com/en-us/posts/legal/new-zealand-legal-market-report-2025.

© 2025 Thomson Reuters

**FIGURE 2:**

## Rates vs. demand dynamics

**Indexed change since 2006**



Source: Thomson Reuters 2025

Since 2006, law firms have fundamentally changed how they generate revenue due to two key factors. *One*, legal demand has remained relatively stable, fluctuating modestly around baseline levels even during major disruptors like the global financial crisis and the pandemic. By 2025, demand is only 6% higher than it was nearly 20 years ago. And *two*, worked rates have surged 122% since 2006, with especially sharp acceleration after 2019, with rates jumping from 61% above baseline to double that metric in just six years.

Could it be that the need for legal services only grew by 6% over these years? No, but the need for legal services on a billable hour basis was counteracted by efficiency improvements. Given the scale of growth most clients have seen in recent years, it's not surprising that the prices of legal services that protect and enable clients' revenues justify sky-high evaluations.

As a result of these two factors, fees worked have grown 139% over the past 20 years, and nearly all that growth stems from rate increases. Law firms in the aggregate have transitioned from volume-based growth to value-based growth, capturing more revenue from the same level of market activity. It would be a mistake however to assume that market activity has become completely divorced from pricing power.

**Thomson Reuters Institute Insights**

### Changing measures of productivity

Hours per lawyer has long been the industry's standard productivity measure. However, in light of both recent performance data and GenAI's transformative potential, this metric increasingly fails to capture the primary mechanisms driving firm performance over the last two decades.

As GenAI enables lawyers to deliver more legal services within each billable hour, firms must develop new measures of individual lawyer utilization. This isn't just an internal imperative—it's essential for demonstrating to clients that premium rates reflect enhanced value delivery, not simply the same service at a higher price point. Without evolved metrics that capture productivity gains, firms risk appearing to charge more for less, a dangerous proposition in a marketplace where their competition is striving to show clients they're getting more than ever.

© 2025 Thomson Reuters

# The demographics of rate growth

Rate increases were widespread across all regions within the US, with few major geographic exceptions. However, the strongest growth was concentrated in regions that have recently led in demand expansion. These regional hot spots continue to set the pace for rate acceleration, indicating that geographic demand trends remain a reliable predictor of pricing leverage.

FIGURE 3:
## Demographics of rate growth



Source: Thomson Reuters 2025

This trend isn't as true from a practice perspective. Premium-priced transactional practices, such as mergers & acquisitions and real estate, continue to experience the highest rate growth even during lower volume periods in recent history. Counter-cyclical practices such as litigation and labor/employment also showed nearly comparable growth, despite having outperformed in demand over the last few years. Currently, rate growth mirrors the practices in which demand is growing fastest, but recent history shows that overall demand performance to be a more reliable leading indicator of pricing power rather than looking at it on a by-practice basis. This is likely because many firms' rate increases follow an aligned structure, enabling stronger practices with higher demand to potentially lift lower performing practices.

Rate differentials across titles also remain significant, especially when other factors are weighed in. For example, non-equity partners in Top 50 law firms are seeing stronger rate growth compared to their peers in firms ranked 51–100, likely due to brand positioning and client tolerance for premium billing. Additionally, the gap between equity partners and associates continues to widen, especially in high-demand practices.

© 2025 Thomson Reuters

# Realization margin and cost factors

While typically worked rates are a great indicator of the market dynamics between firms and their clients, looking at just the headline worked rate growth figure can be misleading. Thus, when analyzing how rates drive revenue, we need to bring in realization figures against those worked rates. In our recent *Q2 2025 Law Firm Financial Index*, it was noted that firms saw an unseasonal downtick in realization in the second quarter compared to the first. While the timing of this movement is alarming (given that traditionally, realization improves throughout the year), firms have seen a long-term decline in realization, which has been consistent since 2021.

That means, even as firms struggle with declining realization, they continue to see a net benefit from the aggressive growth in worked rates compared to 2023. As realization becomes a larger component of the equation, we can see noticeable shifts in worked rates through the year as realization against standard rates climbs or falls. Law firms saw an example of this in 2025 when worked rates started in January with a 7.1% increase that accelerated to 7.4% by the end of the second quarter. However, given Q2's atypical fall in collections realization, the small acceleration in worked rates has been effectively neutralized.

This becomes particularly worrisome given the expense pressures that firms are dealing with and using as justifications for record high increases.

FIGURE 4:

## Expenses per lawyer growth

**Rolling 12-month change**



*Source: Thomson Reuters 2025*

Even as they rake in revenue through record year-over-year rate growth, law firms are seeing their own spending rise substantially. Direct costs[3] per lawyer full-time equivalent (FTE) are up 5.0% through Q2 on a rolling 12-month average, and overhead expenses aren't far behind at 4.4%. In other words, costs are rising nearly as much as rates.

3    For these purposes, *direct* expenses refer to those related to fee earners, primarily the compensation and benefits costs of lawyers and other timekeepers. Overhead (or indirect) expenses refer to all other expenses of the firm, including occupancy costs, administrative and staff compensation and benefits, technology costs, business development expenses, and more.

© 2025 Thomson Reuters

And, interestingly, there are some positives to that equation. First, investments in technology as well as higher-salaried, more experienced attorneys can help firms increase the value of their average billable hour. Second, higher costs may give firms additional cover with clients to continue pressing rate increases to some degree, although quantifying this is obviously very difficult.

On the negative side, of course, the continuation of higher costs carries potential problems. In the past, when law firms are in an intense growth mode like they are now, expenses can become *sticky* and hard to control. Revenue on the other hand can vanish seemingly overnight.

So far this year, the market's being buoyed by the current economic environment, but that may not always be the case, and we're already seeing some shifts — and even changes in the nature of those shifts.

FIGURE 5:

## What clients paid in rates

| | Company size by annual revenue | Partner | Of Counsel | Associate |
|---|---|---|---|---|
| **Average law firm worked rate increased by** **7.4%** **YTD: Q2 2025** | Under $500M | 2.3% | 0.0% | -2.0% |
| | $500M-$2B | -5.1% | -2.5% | -6.1% |
| | $2B-$10B | -4.5% | -6.6% | -5.3% |
| | $10B+ | -12.2% | -6.4% | -7.0% |

*Source: Thomson Reuters 2025*

While the average law firms' worked rate increased by 7.4% through Q2 2025, clients on average have seen their spending per hour decrease compared to the same period in Q2 2024. Indeed, the largest companies are seeing the most sizeable reduction in legal spend per working hour.

The may be happening because clients appear to be moving work to lower-cost law firms in order to save money. This pattern of shifting work downstream has been going on for several years, but recent data shows clients are becoming notably more aggressive on this point.

While the disparity between the worked rate increases reported by law firms and the actual paid rate results reported by clients has been small in past years, the gaps today are widening, suggesting an acceleration of the trend.

Indeed, the growth of this trend may signify that clients — especially larger ones — have found a way to respond to the ever-increasing rates being charged by some of the largest law firms.

© 2025 Thomson Reuters

**Thomson Reuters Institute Insights**

## Mobile demand – Everyone wins?

Over the last few years, shifts in demand demonstrate that legal market dynamics don't have to be a zero-sum game. Clients gain significant cost benefits by moving price-sensitive matters to lower-cost providers. Meanwhile, the scale of Am Law 100 firms means that even a 1% decline in their demand can translate into a 3% gain for Am Law Second Hundred or Midsize firms, fueling their growth.

Yet the largest firms benefit as well. By releasing more price-sensitive work, they create capacity to push rates higher on the complex, high-value matters that remain. When clients continue to engage Am Law 100 firms despite premium pricing, it signals that work is genuinely strategic— and firms can price it accordingly.

This dynamic creates natural opportunities for strategic partnerships between firms, clients, and alternative legal providers. By developing structured workflows that optimize where different types of work are performed, all parties can capture greater value from this market evolution.

© 2025 Thomson Reuters

# Pre-work vs. post-work realization: Building the firm's jet engine

This brings us to the question that's haunted law firm management for decades: *Is there a single superior rate strategy?* Not just tactics or best practices, but a fundamental alignment of rate setting, discounting, and realization principles that consistently outperforms, regardless of firm size, geography, or practice mix?

To start answering that question, we looked at how different firms emphasized different aspects of their rates and realization systems, then compared their overall firm performance to account for extraneous benefits and costs. What we found is certainly interesting and offers new insight, but to get there, we need to change the way we look at the problem. Imagine if firms' rates and realizations systems worked like a jet engine.

Even if you don't know how a jet engine works (and most people don't), once you understand the parallel, you'll never look at rate strategy the same way again.

FIGURE 6:

## Comparing the way a jet engine works to law firm billing



| Air intake | Compression | Combustion | Exhaust |
| Raw/standard rate increases | Worked/negotiated realization | Post-work realization | Collected revenue |

*Source: Thomson Reuters 2025*

### Stage 1: Intake — Standard rate increases

A jet engine starts by drawing in massive amounts of air through the front fan — about 1,200 pounds per second in modern engines. This isn't a gentle process; rather it's voracious consumption. The key is volume — the more air pulled in, the more potential power the engine has to work with.

Law firms operate much the same way with their standard rate increases. These rates are the raw material (or *air*, in our jet engine allegory) that feeds the entire system. Some law firms go all out on aggressive annual increases of up to 15% on their standard rate, while other firms in the very same segment may push more modest 3% to 5% increases.

© 2025 Thomson Reuters

Just like an engine can choke on too much air without proper downstream processing, aggressive rate increases without the infrastructure to process them just create turbulence and client resistance. Similarly, if firms are too cautious with their standard rate increases, it could take the air out of the rest of the system further down the line.

## Stage 2: Compression — Worked or negotiated realization

After the intake, the air rushing into the engine gets squeezed through a series of compressor blades, increasing pressure by up to 40 times. This is where potential energy gets concentrated — and without proper compression, the engine is just moving air around without purpose.

This is the critical moment within law firms in which the standard rates meet the compression chamber of client negotiations and market forces and the real-life pressures come to bear. Some firms run high-compression systems, maintaining worked realization as high as 95% through disciplined pricing committees and limited pre-matter discounting. Other firms operate low-compression models, immediately releasing pressure through aggressive alternative fee arrangements and volume discounts that can bring them down to a 75% to 80% realization.

FIGURE 7:

## Realization by title - YTD: June 2025



Source: Thomson Reuters 2025

This is where some of the more systematic considerations come into play that help balance the whole setup. Law firms tend to offer very few discounts on associate rates in early billing stages, with the average firm's worked realization against standard for associates being 91.5% — notably higher than partner rates that are currently in below 90%.

This occurs because many law firm leaders know that further down the line, associate work will be more likely to be written off — and that means associates need greater intake and compression (higher standard rates and worked realization) in order to compensate for inefficiencies in the post-work half of the system. Conversely, partners (especially equity partners) tend to offer heavier discounts in this pre-billing stage but are rarely written down to the same degree as associates in the post-work portion.

One potential reason for this occurs in the third stage.

© 2025 Thomson Reuters

### Stage 3: Combustion — Post-work realization

In an engine, the highly compressed air gets injected with fuel and ignited, creating controlled explosions — however, only about 25% of the air actually participates in this combustion. The rest acts as a cooling buffer to prevent the engine itself from melting.

In law firms, this is where strategy becomes execution. Some matters are resolved cleanly, collected at full worked rates, while other work requires write-downs, appeals, or relationship preservation discounts. Like that 75% of air that acts as a cooling system, some of this discounting might actually be protective. Firms that push for 100% post-work realization might generate maximum thrust from each transaction, but if they're not offering enough discounts, they risk client relationship damage — the equivalent of melting your engine. This may also be part of the reason why associates' rates are discounted so much compared to equity partners; these discounts act as the *cooling buffer*, protecting higher partner rates from discounting and mitigating client pushback.

FIGURE 8:

## Realization by practice - YTD: June 2025



Source: Thomson Reuters 2025

There is more to the equation than balancing pre-and-post work realization, however. Some practices simply run more efficiently across the system than others. For example, transactional practices such as real estate and M&A keep write-offs tightly controlled in both stages, while litigation, on the other hand, sees far more write-offs than other practices.

Neither approach is inherently wrong, but each requires different downstream handling — each its own engine setup, if you will — and this is where conventional wisdom about realization falls apart.

Our data reveals that firms aren't simply trying to maximize realization at every stage; they're making calculated tradeoffs throughout the system, using lower realization in one area to protect or enable higher performance in another.

© 2025 Thomson Reuters

The firms running high intake (aggressive rate increases) with low compression (heavy discounting) and poor combustion efficiency (write-downs) are like engines gulping air through broken compressors—lots of noise and heat, incredibly wasteful without the punch to make up for it. Conversely, exceptional compression with timid intake is equally flawed, like a precision engine starved of fuel—perfect efficiency, wasted potential. Ironically, each could excel by trading just a touch of their strength to shore up their weakness.

It's important to understand that you can't evaluate any single stage in isolation. The best realization strategy isn't about maximizing any single metric, rather it's about finding the right configuration for your firm's market position, client base, and strategic goals.

## Stage 4: Exhaust — Collected revenue

In the exhaust stage, the expanding gases blast out the back of the jet engine, creating thrust. But crucially, those gases also spin turbines on their way out, which power the compressor blades up front. It's a self-sustaining cycle in which output directly feeds back into the engine.

Similarly, what flows out as collected revenue in a law firm doesn't just represent the end of the process — it powers the beginning. Strong collection performance creates confidence for more aggressive standard rate increases next cycle. Weak collections undermine your ability to push your rates higher, creating a negative feedback loop that can spiral into declining performance. This feedback mechanism explains why some firms can sustain 8% to 10% annual standard rate increases while others struggle to push 3% to 4%.

As the old saying goes: *Nothing succeeds like success*. However, success isn't defined by year-end results alone, it depends on how efficiently the entire engine runs. Firms with strong collection discipline can reinvest that credibility into higher rates, while those with collection problems find themselves in a vicious cycle.

So, this leads us back to our initial question: *Is there a single superior rate strategy?* To find out, we turned to a much more in-depth analysis of the data to see how different firms with different strategies performed vis-à-vis one another.

## The flight path to better financial performance

We let firms group themselves naturally, based on two key relationships:[4] How much firms discount from their standard rates (compression efficiency); and how much they collect compared to what they work (combustion-to-exhaust efficiency).

The analysis revealed something fascinating: US firms have naturally clustered into three distinct configurations, represented by two large groups representing mainstream approaches, and one smaller group of outliers taking one strategy to its upper limits. Let's look at each configuration in turn.

---

4    To identify behavioral patterns among firms, an unsupervised learning model was applied using the k-means clustering algorithm. Because the model does not require predefined labels, it was able to explore the internal structure of the data and automatically determine that the optimal number of clusters and sort firms into each grouping.

© 2025 Thomson Reuters

FIGURE 9:
## Cluster analysis diagram



■ Average firm   ■ Discount more cluster   ■ Discount less cluster   ■ More write off & write down cluster

**Cluster grouping scatter plot**

**Realization value: by type and cluster YTD — June 2025**

*Source: Thomson Reuters 2025*

## Configuration 1: The high-bypass engine (Discount more strategy)

These firms intentionally release pressure early and often, starting with a higher standard rate but discounting early and often. In this way, they're operating like a high-bypass engine — extracting less energy as the engine runs but making up for it by starting the system with a whole lot of additional air.

Our data showed that these firms achieved better demand growth through the first half of 2025 than the average firm (1.9% growth compared to 1.0% for the average). While this sounds impressive, that higher demand barely translates to greater fees worked (these firms saw fees worked grow by 9.0% compared to the all-firm average of 8.4%). Further, these firms lagged significantly in productivity when measured in terms of hours per lawyer.

So, when you calculate fees worked per lawyer, these firms are running slightly *behind* the pack. It's like running your engine at higher RPMs but in a lower gear — you're seeing lots of activity but not necessarily moving as fast as you'd think.

© 2025 Thomson Reuters

FIGURE 10:

# KPIs & Rates for cluster analysis





Source: Thomson Reuters 2025

## Configuration 2: The high-compression engine (Discount less strategy)

These firms run their engines hot and tight, maintaining the highest worked vs. standard realization across all stages with minimal pressure loss throughout the system and demonstrating exceptional compression and clean combustion. Indeed, one may expect this precision-engineered system to climb higher—generating more through its efficiency. But market resistance keeps it cruising the same as everyone else, with demand growth sitting right at average (1.3% compared to the average of 1.0%) and fees worked similarly unremarkable.

Yet, these firms have earned the market position to run without compromise, maintaining rates with smaller discounts — however, this premium positioning doesn't translate to premium growth.

It's like flying a supersonic jet in commercial airspace. You've got the power to break away, but the traffic keeps you cruising at the same speed as everyone else.

## Configuration 3: The afterburner engine (More write-offs & write-downs)

These firms appear to experience a massive drop-off between their standard rates and their collected revenue, essentially injecting extra fuel into their exhaust stream and lighting it on fire. In fact, it's

© 2025 Thomson Reuters

similar to a fighter jet's afterburner, it's deliberately inefficient, burning through resources that could theoretically be conserved.

Somehow, it's working. Much like an afterburner, the strategy seems to be providing results. These firms were the only cluster to display noticeably higher demand growth than the average firm and also displayed superior productivity gains. They are creating pricing inefficiency for tactical advantage by accepting write-offs and write-downs (burning extra fuel) to generate relationship thrust and keep clients happy in order to maintain velocity in competitive situations.

Yet all those write-offs and write-downs, what they collect is almost exactly what everyone else collects. (Although we should note this is a smaller, more varied group with big differences in individual results. Clearly, some firms have mastered MiG Alley while others are getting burned badly.)

## The market forces its own balance

The most interesting conclusion from this grouping experiment is that despite their wildly different approaches, all three clusters of law firms ended up collecting between $553 and $580 per hour. And that's right in line with the all-firm average, despite some groups starting out with standard rates at nearly double that figure.

Three different engine configurations with three different strategies all ending up at the same destination. And that is most likely the result of market forces — client expectations, competitive pressures, economic realities, and more — acting as a gravitational pull, moving everyone toward a similar equilibrium regardless of the path they take to get there.

So, if everyone ends up in roughly the same place, does strategy even matter? Absolutely — but not in the way most firms think.

The choice isn't about finding the best configuration that outperforms all others, or adhering to industry dogma that assumes all engines run the same way. Rather, it's about choosing the approach that best fits your firm's culture, client relationships, and operational strengths. For example, a firm with strong project management and lean operations might thrive as a high-bypass engine; while a firm with premium brand position and disciplined partners might excel with a high-compression engine.

Of course, firms will likely find themselves in positions where changes may need to be made, where realization needs to be tightened and inefficiency addressed, but these adjustments must be made with full understanding of your specific engine configuration and how your system actually operates — and that means understanding what makes your firm different.

### Thomson Reuters Institute Insights

#### How to actually improve your firm's engine

Market forces may drive convergence, but that's an average—not a ceiling. Within any engine setup, leaders pull far ahead while others stall. The lesson isn't to accept limits but to keep refining your own design.

Start by benchmarking against true peers with similar configurations. Even high-bypass engines can pick up speed by improving realization, while firms running too tight often need more flexibility. Look for practical wins: smarter write-off strategies that protect client ties while enforcing discipline, or sharper value propositions that make rate increases credible. Above all, seek investments and service innovations that give clients clear reasons to reward you—not just follow market momentum.

© 2025 Thomson Reuters

# What actually makes firms different

Here's the thing about engines—clients can't see them. They don't know if the law firm they're hiring is running a high-bypass, a high-compression, or an afterburner configuration. They can't peer under the hood to admire the firm's compression ratios or realization rates. All they experience is the ride — and that raises a crucial question: If all these different engine configurations end up at the same destination, what makes clients choose one firm over another?

To answer this question, we analyzed Thomson Reuters Market Insights data, which draws from hundreds of structured interviews with general counsels about their law firm relationships and hiring decisions. The research examined both how these legal buyers value their current firms' services and what criteria they prioritize when engaging new counsel.

**Nearly two-thirds of clients say they believe law firms have successfully differentiated themselves from competitors.**

These findings revealed nearly two-thirds of clients say they believe law firms have successfully differentiated themselves from competitors. That's actually impressive — it means clients don't see law firms as just commodity providers. However, when you dig into what drives that differentiation compared to what makes firms favorable to work with, you discover something unexpected — many firms are winning on completely different metrics than those upon which they're competing.

## The relationship paradox

Responsiveness and historical relationships — the comfort food of law firm marketing — account for a hefty 23% of what makes firms favorable to clients, research shows. Indeed, it's the foundation for those 8% to 10% annual rate increases with existing clients who grumble but pay.

However, those same relationship factors that keep firms favorable with their clients contribute only 9% to actual differentiation from competitors.

That means a firm's existing relationships are its rate-increase insurance policy. These relationships insulate the firm from pricing pressure, allowing for those aggressive standard rate bumps. When a firm's lawyers pitch new business, that warm relationship story means nothing — a firm can't differentiate itself based on a relationship that doesn't exist yet.

In this case, the competitive landscape looks completely different. Client-focused service dominates *differentiation* while barely registering in *favorability*. Add to this the fact that factors such as proactivity and value for money contribute 14% to differentiation but only 7% to favorability.

© 2025 Thomson Reuters

FIGURE 11:

## Trusted vs. chosen

**What drives favorability vs. what drives differentiation?**

■ Drivers of differentiation    ■ Drivers of favorability



*Source: Thomson Reuters 2025*

That means those firms successfully commanding premium rates with new clients are the ones that have figured out how to demonstrate that they can address client needs differently. In fact, these firms may not even be competing on rates — they're shifting the entire conversation. They're showing up with solutions before problems fully form and making *value* about something other than the hourly rate.

This paradigm reveals why so many law firms still struggle with the tradeoff between growing their business and growing the rates. These firms are optimizing their engines for *existing client retention* by focusing on relationships and responsiveness; meanwhile, the market is rewarding those firms that gain *new client acquisition* through entirely different attributes, such as focusing on clients, being proactive, and demonstrating value.

To crack this code — growing both rates and market share — firm leaders have to run two games simultaneously: leveraging relationships for rate increases with existing clients while competing on capability, value, and a client-focused approach for new ones.

© 2025 Thomson Reuters

# Planning for an uncertain future

Even the best differentiation strategy, however, may mean nothing if the economic foundation it's built on falls away — and today, that foundation is showing some worrying stress fractures.

Of course, we've been here before. The global financial crisis that began in 2007 didn't just wobble the legal industry, it fundamentally rewrote the rules, ushering in, among other factors, an age of significantly more advanced general counsels that have changed the way the legal industry interacts with clients on a fundamental level.

Further, the legal market itself can be seen shifting significantly on a quarter-to-quarter basis. The first quarter of 2025 looked great, as demand came in strong and collection realization improved despite firms asking for record rate increases. Then firms saw a moderate decline in realization, a movement counter to what firms usually see at that time of year and a potential red flag. Suddenly everyone's recalculating their scenarios.

**In a recession, the optimal engine setting isn't about maximizing thrust, it's about whatever keeps the engine (and the firm) running.**

Clearly, the only certainty at this point is uncertainty. Scenarios for the general economy and the legal market in particular range from an optimistic case of stability to a moderate recession to a severe one that will test those finely tuned engines and client relationships that law firms have been building.

The realization strategies outlined in this report — high-bypass, high-compression, or afterburner — might need complete reconfiguration in real time. Indeed, firms may need to jump entirely from one to the other. In a recession, the optimal engine setting isn't about maximizing thrust, it's about whatever keeps the engine (and the firm) running.

It's also critical to remember that the same technology that's enabling firms to justify historic rate increases also is demanding historic investment levels. GenAI and other advanced technologies are table stakes for proving a firm can deliver more value than the firm down the street. However, those massive tech investments will need to generate returns that justify both the technology spend and the premium rates. It's not enough to have the tools — firms will need to prove their transformation is real.

## Readying the engines

Today, the legal industry stands at an inflection point. Firms have discovered unprecedented pricing power, pushing rates to heights that would have seemed unimaginable just five years ago. Yet our data analysis reveals a potentially unwelcome truth: The differentiation that matters most to clients isn't in a firm's realization strategy but in how it demonstrates value.

There's a paradox at play: The strong client relationships that justify higher rates rarely influence new business pitches. Meanwhile, the strategies that attract new clients often go unnoticed by existing ones. Add to this the uncertainty of the economic outlook and the rising costs of GenAI investments, and it's understandable that firm leaders may feel overwhelmed.

The dynamics discussed in this report matter regardless of what's around the corner. Understanding your firm's engine configuration and optimizing it for your own operations make sense in good times or bad. Indeed, that same self-awareness becomes the difference between controlled deceleration and catastrophe if the market turns. Those firms that thrived after the global financial crisis weren't

© 2025 Thomson Reuters

necessarily those with the best rates or highest realization, rather they were the ones that understood their own systems well enough to adjust quickly when they needed to. As is always the case, the smart money isn't on predicting the future — it's on building a system robust enough to handle whatever the future may bring.

Law firm leaders should choose their firm's engine configuration based on its true strengths and invest in the people and technology that justifies the firm's rates. Most importantly, they should accept that in a market forcing everyone toward equilibrium, sustainable advantage doesn't come from squeezing out another percentage point of realization — it comes from clarity about what your firm is, the clients it serves, and how it creates and demonstrate value.

### Methodology

Financial data for this report is sourced from *Thomson Reuters Financial Insights* and is based on reported results from 195 US-based law firms. Legal buyer sentiment data comes from *Thomson Reuters Market Insights*, which provides global intelligence based on annual interviews with approximately 2,500 legal buyers from organizations with revenues exceeding US $50 million. In addition, *Market Insights* conducted interviews with 2,246 Stand-out Lawyers as part of the *Stand-out Lawyers* survey in March 2025. This report was produced in collaboration with the True Value Partnering Institute.

© 2025 Thomson Reuters

## Thomson Reuters

Thomson Reuters is a leading provider of business information services. Our products include highly specialized information-enabled software and tools for legal, tax, accounting and compliance professionals combined with the world's most global news service – Reuters.

For more information on Thomson Reuters, visit **tr.com** and for the latest world news, **reuters.com**.

## Thomson Reuters Institute

The Thomson Reuters Institute brings together people from across the legal, corporate, tax & accounting and government communities to ignite conversation and debate, make sense of the latest events and trends and provide essential guidance on the opportunities and challenges facing their world today. As the dedicated thought leadership arm of Thomson Reuters, our content spans blog commentaries, industry-leading data sets, informed analyses, interviews with industry leaders, videos, podcasts, and world-class events that deliver keen insight into a dynamic business landscape.

Visit **thomsonreuters.com/institute** for more details.



## True Value Partnering Institute

The True Value Partnering Institute is dedicated to the learning, networking and professional advancement of law firm pricing and revenue assurance professionals who collectively take the lead in driving value. Members earn industry recognized Accreditations and are placed into Cohorts which "meet" virtually each month and are eligible to participate in cross-cohort groups that collectively explore specialty topics of interest. Members are also invited to the member-only Annual Meeting hosted every Spring in Miami.

Learn more at: **https://tvp-institute.com**.



© 2025 Thomson Reuters  10-25