# EXHIBIT  I



https://heinonline.org |holsupport@wshein.com



**CITATIONS:**

**Bluebook 22nd ed.**
Joanna C. Schwartz, Civil Rights without Representation, 64 WM. & MARY L. REV. 641 (2023).

**ALWD 7th ed.**
Joanna C. Schwartz, Civil Rights without Representation, 64 Wm. & Mary L. Rev. 641 (2023).

**APA 7th ed.**
Schwartz, J. C. (2023). Civil rights without representation. William & Mary Law Review, 64(3), 641-706.

**Chicago 18th ed.**
Schwartz, Joanna C. "Civil Rights without Representation." William & Mary Law Review 64, no. 3 (2023): 641-706. HeinOnline.

**McGill Guide 10th ed.**
Joanna C. Schwartz, "Civil Rights without Representation" (2023) 64:3 Wm & Mary L Rev 641.

**AGLC 4th ed.**
Joanna C. Schwartz, 'Civil Rights without Representation' (2023) 64(3) William & Mary Law Review 641

**MLA 9th ed.**
Schwartz, Joanna C. "Civil Rights without Representation." William & Mary Law Review, vol. 64, no. 3, February 2023, pp. 641-706. HeinOnline.

**OSCOLA 4th ed.**
Joanna C. Schwartz, 'Civil Rights without Representation' (2023) 64 Wm & Mary L Rev 641    Export To:

**Date Downloaded:**    Fri Apr 24 13:35:37 2026

**Source:** https://heinonline.org/HOL/Page?handle=hein.journals/wmlr64&id=663

**Terms, Conditions & Use of PDF Document:**
Please note, citations are provided as a general guideline. Users should consult their preferred citation format's style manual for proper formatting. Your use of this HeinOnline PDF indicates your acceptance of William S. Hein & Co., Inc. and HeinOnline's Terms & Conditions: https://help.heinonline.org/kb/terms-conditions/ . The search text of this PDF is generated from uncorrected OCR text. To obtain permission to use this article beyond the scope of your license, please use: https://www.copyright.com.

Please note: citations are provided as a general guideline. Users should consult their preferred citation format's style manual for proper citation formatting.

*HeinOnline is a product of William S. Hein & Co., Inc. | 2350 North Forest Road, Getzville, NY 14068*

# CIVIL RIGHTS WITHOUT REPRESENTATION

JOANNA C. SCHWARTZ[*]

## ABSTRACT

*Although much recent attention has been paid to qualified immunity, the biggest threat to civil rights enforcement is actually the lack of lawyers able and willing to represent people whose constitutional rights have been violated. There are small, tight-knit communities of civil rights lawyers with expertise and passion in the cities of the Great Migration, but few civil rights attorneys practice outside those urban areas. Limits on attorneys' ability to recover fees mean that even attorneys willing to take civil rights cases will have financial incentives to decline meritorious cases if they would be expensive to litigate or if the expected damage awards are low.*

*People who bring civil rights cases pro se are far less likely to succeed than those with lawyers. Most pro se cases are dismissed for failure to plead cognizable claims in their complaints or for failing to prosecute their claims—bases for dismissal that do not necessarily reflect on their underlying merits.*

*When a meritorious pro se civil rights case is dismissed, not only the named plaintiff is harmed. Losses in these cases have negative*

* Professor of Law, UCLA School of Law. I thank the faculty of William & Mary Law School for inviting me to give the 2022 Wythe Lecture and the editors of the Law Review for inviting me to publish the lecture as revised here. Deepest appreciation is due to Alex Baxter, Trent Taylor, Joshua Deleon, Javier Leiva, Frederick Marc Cooley, Frederick Marceles Cooley, Anthony Garrison, and Alfred Foy, whose insights and efforts inspired this Article. This Article benefitted greatly from comments on earlier drafts by Emma Andersson, Joseph Blocher, Karen Blum, Maureen Carroll, Andrew Hammond, Geoffrey King, Maggie Lemos, Darrell Miller, Melissa Nold, James Pfander, Sam Weiss, Tiffany Wright, Stephen Yeazell, the students in the Civil Rights Enforcement Colloquium at Duke Law School, and the attendees of the Wythe Lecture. Many thanks to Adam Swank for his truly superb research assistance, and the editors of the William & Mary Law Review for their excellent editorial assistance.

*downstream effects as well—frustrating future plaintiffs' ability to overcome qualified immunity, prove municipal liability, and establish entitlement to injunctive relief.*

*Civil rights enforcement depends on lawyers' willingness to bring cases on behalf of people whose rights have been violated. Unless and until more lawyers are willing to take these cases, abolishing qualified immunity and other proposed reforms will not achieve their intended aims. Any plan to restore the power and potential of § 1983 must include a blueprint to expand the number of lawyers who are bringing civil rights cases, expand the types of cases that they are bringing, and expand the locations where they are bringing them.*

2023]        CIVIL RIGHTS WITHOUT REPRESENTATION        643

TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 644
I. THE RIGHTEOUS CIVIL RIGHTS CASES LAWYERS WILL NOT
    TAKE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 652
    A. The False Promise of Fee Shifting. . . . . . . . . . . . . . . . . 653
    B. Private Attorneys' Case Selection Decisions . . . . . . . . . . 657
    C. Nonprofits' Case Selection Decisions. . . . . . . . . . . . . . . 662
II. PRO SE EXCEPTIONALISM . . . . . . . . . . . . . . . . . . . . . . . . . . 663
    A. Alex Baxter. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 664
    B. Trent Taylor. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 670
III. PRO SE REALISM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 675
    A. Pro Se Litigation in Five Districts . . . . . . . . . . . . . . . . 676
    B. Pro Se Litigation in Vallejo, California . . . . . . . . . . . . . 679
       1. Joshua Deleon . . . . . . . . . . . . . . . . . . . . . . . . . . 684
       2. Javier Leiva . . . . . . . . . . . . . . . . . . . . . . . . . . . . 685
       3. Frederick Marceles Cooley . . . . . . . . . . . . . . . . . . 687
       4. Anthony Garrison. . . . . . . . . . . . . . . . . . . . . . . . . 688
       5. Alfred Foy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 690
IV. HOW THE LACK OF LAWYERS UNDERMINES § 1983'S
    GOALS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 694
    A. Qualified Immunity. . . . . . . . . . . . . . . . . . . . . . . . . . . 695
    B. Municipal Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . 697
    C. Injunctive Relief. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 699
V. CIVIL RIGHTS REPRESENTATION REFORMS. . . . . . . . . . . . . . 700
CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 704

INTRODUCTION

In the first days of January 2014, a major arctic cold front moved through Tennessee, bringing snow and freezing temperatures. It was the coldest it had been in that part of the country for almost twenty years.[1] On the morning of January 8, 2014, Alex Baxter, a fifty-five-year-old Black man, woke up in the abandoned tool shed in Nashville where he had been sheltering for several days.[2] Snow and slush had soaked through his shoes and clothes, and he had the flu.[3] Baxter decided that he was going to burgle a house.[4] He knew someone who would buy anything that he stole, and he was determined to get enough money to rent a room, get better, and let the cold front pass.[5]

Someone called the police when they saw Baxter breaking into a neighbor's home.[6] When Baxter saw a police helicopter circling overhead, he hid in the basement of another unlocked house that he had burgled before.[7] Nashville officers Spencer Harris and Brad Bracey entered the basement of that house with their police dog, Iwo.[8] Officer Harris stood in front of Baxter.[9] Baxter raised his hands high in the air in surrender.[10] Both officers could see Baxter—he was sitting next to a window and there was plenty of light shining through.[11] But Officer Harris released Iwo anyway, and the dog's jaws locked onto Baxter, tattering the flesh of his armpit while his hands were in the air.[12] After letting Iwo attack

---

1. *January 5-7, 2014 Arctic Air & Snow*, NAT'L WEATHER SERV., https://www.weather.gov/ohx/20140105 [https://perma.cc/JA8N-52V3].

2. These facts are taken from the complaint in Alex Baxter's case and from a letter Baxter wrote to a journalist in 2019. *See* Letter from Alexander Baxter to Lawrence Hurley (July 24, 2019) (on file with author); Complaint at 1, Baxter v. Harris, No. 15-cv-00019 (M.D. Tenn. Jan. 7, 2015).

3. Letter from Alexander Baxter to Lawrence Hurley, *supra* note 2.

4. *See id.*

5. *Id.*

6. Baxter v. Bracey, 751 F. App'x 869, 870 (6th Cir. 2018).

7. *Id.*

8. *Id.*

9. *Id.*

10. Complaint, *supra* note 2, at 2.

11. *Id.*

12. *Id.* at 2-3.

Baxter for thirty or forty seconds, the officers called the dog off and arrested Baxter for burglary.[13] Baxter was taken to the hospital for emergency medical treatment and then was taken to jail.[14] The jail's nurse saw him every day for the next month for his injuries.[15]

Baxter brought a § 1983 lawsuit against the officers, arguing that they had violated his Fourth Amendment rights by releasing their police dog on him after he had surrendered and posed no threat.[16] The district court denied the officers qualified immunity, but in 2018, the Sixth Circuit reversed.[17] Qualified immunity protects police and other government officials from damages liability in § 1983 cases unless they violated "clearly established law."[18] In recent years, the Supreme Court has repeatedly chided lower courts that deny officers qualified immunity and reiterated the "long-standing principle that 'clearly established law' should not be defined 'at a high level of generality,'" and should instead "be 'particularized' to the facts of the case."[19] In *Baxter v. Bracey*, the Sixth Circuit demonstrated that it had heard the Supreme Court's message loud and clear. The Sixth Circuit had previously recognized that it clearly violates the Fourth Amendment for the police to use force against a suspect who has surrendered.[20] In fact, the Sixth Circuit had previously ruled that police violate the Fourth Amendment when they release a police dog on a person who has surrendered by lying down.[21] But, according to the panel that decided Baxter's case, that prior decision did not "clearly establish[ ]" that it is unconstitutional for officers to release their police dog on a person, such as Alex Baxter, who is seated with their hands in the air.[22]

After the Sixth Circuit issued its decision in *Baxter v. Bracey*, the case quickly became what *Time Magazine* called a "famous example"

---

13. Letter from Alexander Baxter to Lawrence Hurley, *supra* note 2.

14. *Id.*

15. *Id.*

16. *See generally* Complaint, *supra* note 2.

17. Baxter v. Bracey, 751 F. App'x 869, 870, 873 (6th Cir. 2018).

18. *See id.* at 871.

19. White v. Pauly, 137 S. Ct. 548, 552 (2017) (per curiam) (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 742 (2011); Anderson v. Creighton, 483 U.S. 635, 640 (1987)).

20. *See* Kidis v. Reid, 976 F.3d 708, 720 (6th Cir. 2020).

21. Campbell v. City of Springboro, 700 F.3d 779, 787, 789 (6th Cir. 2012).

22. *See Baxter*, 751 F. App'x at 872.

of all that is wrong with qualified immunity.[23] Legal scholars and organizations across the political and ideological spectrum submitted briefs to the Supreme Court, asking it to reinstate Baxter's claims and arguing that the Court should limit or abolish the doctrine.[24] Baxter's petition for review was one of several qualified immunity cases that the Supreme Court declined to hear in June 2020, in the midst of nationwide protests prompted by the murder of George Floyd.[25] But in *Baxter*, Justice Clarence Thomas chose to dissent and write his own opinion recounting the facts of Baxter's case and urging the Supreme Court to reconsider qualified immunity.[26] The Supreme Court's denial of certiorari and Justice Thomas's dissent in *Baxter* led to news articles describing what happened to Baxter as "truly outrageous" and criticizing qualified immunity doctrine as unjust.[27]

In November 2020, less than five months after the Supreme Court refused to hear Alex Baxter's case, the Court issued a decision in another case, *Taylor v. Riojas*, that has been hailed as a subtle but important shift in the Supreme Court's qualified immunity jurisprudence.[28]

In September 2013—three months before Nashville police officers ordered Iwo to attack Alex Baxter—Trent Taylor spent six days in cells in a Texas prison's psychiatric unit that were, in the words of

---

23. Madeleine Carlisle, *The Debate over Qualified Immunity Is at the Heart of Police Reform. Here's What to Know*, TIME (June 3, 2021, 6:35 PM), https://time.com/6061624/what-is-qualified-immunity/ [https://perma.cc/56HR-CQ7E].

24. *See* Brief of the Cato Institute as Amicus Curiae Supporting Petitioner, Baxter v. Bracey, 140 S. Ct. 1862 (2019) (No. 18-1287); Brief of Cross-Ideological Groups Dedicated to Ensuring Official Accountability, Restoring the Public's Trust in Law Enforcement, and Promoting the Rule of Law as Amici Curiae in Support of Petitioner, *Baxter*, 140 S. Ct. 1862 (No. 18-1287); Brief of Legal Scholars as Amici Curiae in Support of Petitioner, *Baxter*, 140 S. Ct. 1862 (No. 18-1287). I was among the seven signatories of the legal scholars' amicus brief.

25. Jay Schweikert, *The Supreme Court Won't Save Us from Qualified Immunity*, CATO INST.: CATO AT LIBERTY BLOG (Mar. 3, 2021, 4:58 PM), https://www.cato.org/blog/supreme-court-wont-save-us-quali fied-immunity [https://perma.cc/V6SF-FLKS].

26. *See Baxter*, 140 S. Ct. at 1862-65 (Thomas, J., dissenting).

27. *See* Roger Chesley, *Time for Qualified Immunity to Go*, VA. MERCURY (Aug. 28, 2020, 12:01 AM), https://www.virginiamercury.com/2020/08/28/time-for-qualified-immunity-to-go/ [https://perma.cc/RW7A-DE9D].

28. *See, e.g.*, Rui Kaneya, *The Supreme Court's Subtle Hint on Police Accountability*, CTR. FOR PUB. INTEGRITY (July 16, 2021), https://publicintegrity.org/inside-publici/newsletters/watchdog-newsletter/supreme-court-police-accountability-qualified-immunity/ [https://perma.cc/7QZ3-P8DA].

the Supreme Court, "shockingly unsanitary."[29] Taylor, a twenty-five-year-old white man, was first put, naked, in a cell with feces on every surface—the floor, the ceiling, the walls, and the windows.[30] Even the faucet that offered his only source of water was packed with feces.[31] When Taylor complained about the conditions in his cell, three corrections officers laughed at him, and one said Taylor was "going to have a long weekend."[32] Taylor did not eat or drink for four days for fear of contamination.[33]

Taylor was then moved—still naked—to a freezing cold cell, where a prison official said he hoped Taylor would "fucking freeze."[34] The cell had no bed or toilet—just a drain hole in the middle of the floor, clogged with raw sewage.[35] After holding his bladder for more than a day, Taylor relieved himself, the drain overflowed, and human waste spilled everywhere.[36] Taylor slept, naked, on the cell's sewage-covered floor.[37] After two days in the cold cell, Taylor was taken to the emergency room—he had a distended bladder from trying to hold his urine for so long, and had to be catheterized.[38]

Taylor sued, alleging that corrections officers had placed him in conditions of confinement that violated the Eighth Amendment.[39] The trial court granted the officers qualified immunity, and the Fifth Circuit Court of Appeals affirmed.[40] Although the Fifth Circuit assumed that the officers had violated Taylor's constitutional rights, it found that those rights were not clearly established.[41] The Fifth Circuit wrote that it was clear "that prisoners couldn't be housed in cells teeming with human waste for months on end," but—repeatedly citing the Supreme Court's qualified immunity decisions—concluded that it was not clearly established that holding

---

29. Taylor v. Riojas, 141 S. Ct. 52, 53 (2020) (per curiam).
30. *See* Complaint, Taylor v. Stevens, No. 14-cv-00149 (N.D. Tex. Sept. 2, 2014); Taylor v. Stevens, 946 F.3d 211, 218 (5th Cir. 2019), *vacated*, 141 S. Ct. 52.
31. *Taylor*, 946 F.3d at 218.
32. *Id.*
33. *Id.*
34. *Id.* at 218 n.9
35. *Id.* at 218-19.
36. *Id.* at 223.
37. *Id.*
38. *Id.* at 226.
39. *Id.* at 216.
40. *Id.* at 217, 227.
41. *Id.* at 222.

someone in filthy cells for just six days violated the Constitution.[42] Thus, the officers were entitled to qualified immunity.[43]

In a short, unsigned opinion issued on November 2, 2020, the Supreme Court granted certiorari, reversed the Fifth Circuit, and remanded *Taylor v. Riojas* back to the lower court.[44] "Confronted with the particularly egregious facts of this case," the unsigned opinion explained, "any reasonable officer should have realized that Taylor's conditions of confinement offended the Constitution."[45]

*The Atlantic*, *USA Today*, and the *Harvard Law Review*, along with a slew of other legal publications, journals, and podcasts, described and analyzed the Supreme Court's decision in *Taylor v. Riojas*.[46] The Court's decision in *Taylor*, allowing the plaintiff to overcome qualified immunity without a nearly identical case to "clearly establish" the law, was celebrated as an indication by the Supreme Court that it wishes to step away from its most robust descriptions of the doctrine's power.[47] And the case has played a significant role in the application of qualified immunity ever since: as of November 2, 2022, two years after the Supreme Court decided *Taylor*, the Court's decision had been cited in 236 court opinions and 336 trial and appellate briefs.

*Baxter v. Bracey* and *Taylor v. Riojas* are critically important decisions defining the contours of qualified immunity's protections and shaping public debate about the doctrine. But this Article focuses on another aspect of both cases that is equally, if not more, important to the future of civil rights enforcement yet is virtually always overlooked: Alex Baxter and Trent Taylor spent years searching, in vain, for lawyers willing to represent them.

---

42. *Id.*

43. *Id.* at 227.

44. Taylor v. Riojas, 141 S. Ct. 52, 54 (2020) (per curiam).

45. *Id.*

46. *See, e.g.*, Anya Bidwell & Patrick Jaicomo, *Lower Courts Take Notice: The Supreme Court Is Rethinking Qualified Immunity*, USA TODAY (Mar. 2, 2021, 8:59 AM), https://www.usatoday.com/story/opinion/2021/03/02/supreme-court-might-rethinking-qualified-immunity-column/4576549001 [https://perma.cc/7ETL-42KH]; Joanna Schwartz, *The Supreme Court Is Giving Lower Courts a Subtle Hint to Rein In Police Misconduct*, THE ATLANTIC (Mar. 4, 2021), https://www.theatlantic.com/ideas/archive/2021/03/the-supreme-courts-message-on-police-misconduct-is-changing/618193 [https://perma.cc/R2YC-UP7S]; *The Supreme Court, 2020 Term—Leading Case: Qualified Immunity—Hope Obviousness Standard—Taylor v. Riojas*, 135 HARV. L. REV. 421 (2021).

47. *See* Schwartz, *supra* note 46.

Both Alex Baxter and Trent Taylor filed their lawsuits pro se.[48] Both wrote to a dozen or more lawyers from jail; none would agree to take their cases.[49] Both Baxter and Taylor repeatedly asked the judges hearing their cases to appoint counsel; those requests were repeatedly denied.[50] Both men represented themselves in district court and on appeal.[51] Only when the Sixth Circuit ruled that the Nashville officers were entitled to qualified immunity in *Baxter v. Bracey* and the Fifth Circuit ruled the Texas corrections officers were entitled to qualified immunity in *Taylor v. Riojas* did the cases come to the attention of civil rights attorneys who agreed to represent Baxter and Taylor and fought mightily to get their cases heard by the Supreme Court.[52]

It may come as a surprise that no attorney was willing to represent Alex Baxter in a case that ultimately attracted so much national attention or to represent Trent Taylor in a case in which, according to the Supreme Court, "any reasonable officer should have realized that Taylor's conditions of confinement offended the Constitution."[53] Indeed, for decades, court decisions, legislative testimony, and newspaper articles have contained confident assertions that courthouses are filled to the brim with plaintiffs' attorneys desperate to make a dollar off someone else's misery, all too happy to file frivolous civil rights cases and squeeze a few bucks out of a cash-strapped city that would otherwise spend the money on its community center or library.[54] Surely many among these imagined crowds of eager civil rights attorneys should have been willing to take on Alex Baxter and Trent Taylor as clients.

---

48. *See infra* Parts II.A-B.

49. *See infra* Part I.

50. *See infra* Parts II.A-B.

51. *See infra* Parts II.A-B.

52. *See infra* Parts II.A-B.

53. Taylor v. Riojas, 141 S. Ct. 52, 54 (2020) (per curiam).

54. *See, e.g.,* Marc Galanter, *Lawyers in the Laboratory or, Can They Run Through Those Little Mazes?*, 4 GREEN BAG 251, 254 (2001) ("[T]he image of lawyers as a pestilential swarm has long been encoded in our culture."); *see also id.* (quoting Chief Justice Burger as warning, in 1977, that "unless we devise substitutes for courtroom processes—and do so quickly—we may well be on our way to a society overrun by hordes of lawyers, hungry as locusts, and brigades of judges in numbers never before contemplated"). For similarly colorful language employed to describe the "litigation explosion" more generally, see Marc Galanter, *Reading the Landscape of Disputes: What We Know and Don't Know (And Think We Know) About Our Allegedly Contentious and Litigious Society*, 31 UCLA L. REV. 4, 6-9 (1983).

But the civil rights bar bears scant resemblance to this popular narrative. There are small, tight-knit communities of civil rights lawyers with expertise and passion in the cities of the Great Migration—cities such as New York, Los Angeles, San Francisco, Chicago, and Philadelphia.[55] Yet few civil rights attorneys practice outside those urban areas, and civil rights attorneys are in particularly short supply in the South.[56] You can count on one hand the civil rights attorneys who regularly bring cases against the Houston Police Department and its officers—the fifth largest law enforcement agency in the country.[57]

Finding a lawyer who takes civil rights cases is only the first challenge; the next is convincing that attorney to represent you. I have interviewed dozens of civil rights attorneys who practice around the country, and most I spoke with turn down the vast majority of potential clients who come their way and only accept cases with horrific facts, serious injuries, irrefutable evidence, and sympathetic plaintiffs.[58] Attorneys' selectivity means that people with weak cases will have a hard time finding a lawyer.[59] But people whose constitutional rights have been violated may also be unable to find a lawyer if they live in a part of the country with few or no experienced civil rights attorneys; if no video evidence or credible witnesses support their claims; if they are unsympathetic for any reason, including if they have criminal records; or if they cannot prove substantial medical costs or other damages.[60]

When people cannot find lawyers to represent them, they can proceed pro se. But people who bring civil rights cases without lawyers are far less likely to succeed than those with lawyers.[61] Most pro se cases are dismissed for failure to plead cognizable claims in their complaints or for failing to prosecute their claims—bases for dismissal that do not necessarily reflect on the cases' underlying

---

55. *See* Joanna C. Schwartz, *Civil Rights Ecosystems*, 118 MICH. L. REV. 1539, 1578-79 (2020).

56. *See id.*

57. *See id.*

58. *See* Joanna C. Schwartz, *Qualified Immunity's Selection Effects*, 114 NW. U. L. REV. 1101, 1134 (2020).

59. *See id.* at 1133-34.

60. *See id.*

61. *Id.* at 1130.

merits.[62] Some of these pro se cases undoubtedly deserved their prompt dismissals and would have failed even had Thurgood Marshall been on the litigation teams. But, undoubtedly, some of these pro se cases failed because they were brought pro se and would have succeeded with seasoned counsel to help pursue the claims.

When a meritorious pro se civil rights case is dismissed, not only the named plaintiff is harmed. Losses in these cases have negative downstream effects as well. Successful lawsuits play multiple important roles in civil rights ecosystems: they can offer proof of "clearly established" law to overcome a qualified immunity defense, proof of a pattern or practice of unconstitutional violations to establish municipal liability, and proof of the likelihood of future harm that would merit injunctive relief.[63] If a person whose constitutional rights have been violated cannot find a lawyer and so is not successful in the lawsuit they bring, it is more difficult for the next plaintiff whose rights are violated in a similar way to succeed in their case, even if they are represented by counsel.[64]

Recently, much attention has been paid to qualified immunity and how limiting its power might advance § 1983's compensation and deterrence goals. The contempt directed at qualified immunity is well earned—the doctrine is nonsensical, unjust, and should be reformed or done away with altogether.[65] But if people such as Alex Baxter and Trent Taylor cannot find lawyers to represent them, we have an even bigger problem on our hands.

Civil rights enforcement depends on lawyers' willingness to bring cases on behalf of people whose constitutional rights have been violated. Unless and until more lawyers are willing to take these cases, reforms to qualified immunity will not achieve their intended aims. Any plan to restore the power and potential of § 1983 must include a blueprint to expand the number of lawyers who are

---

62. *See id.* at 1130, 1130 n.124.

63. For further discussion of civil rights ecosystems, see generally Schwartz, *supra* note 55.

64. *See id.* at 1550-52.

65. *See generally* Joanna C. Schwartz, *The Case Against Qualified Immunity*, 93 NOTRE DAME L. REV. 1797 (2018) (describing several reasons to amend or abolish the doctrine); Joanna C. Schwartz, *After Qualified Immunity*, 120 COLUM. L. REV. 309 (2020) (predicting how civil rights litigation would function were qualified immunity unavailable).

WILLIAM & MARY LAW REVIEW [Vol. 64:641

bringing civil rights cases, expand the types of cases that they are bringing, and expand the locations where seasoned civil rights attorneys are willing to file cases.[66]

## I. THE RIGHTEOUS CIVIL RIGHTS CASES LAWYERS WILL NOT TAKE

In a letter to me, Alex Baxter explained the efforts he took to find a lawyer after he was assaulted by Iwo and arrested, and the difficulties of doing so from jail. As he wrote:

> I went to the law library and wrote down the names and addresses of several popular law firms. I also wrote down the names and addresses [of] several attorneys whose names looked familiar. I had to keep the list short because I didn't have many stamps, but the total came to twelve in all. Getting to the library from my housing pod wasn't always easy. The prison was constantly going on lockdown for a killing or sticking or some other disturbance, so nonessential movement like going to the law library was restricted for weeks at a time. But each time I got a window I went, and it was during those times that I would write down as much information as I could.... Only two or three responded back with a polite message declining my request.[67]

Trent Taylor told me that he reached out to between twenty and fifty lawyers from the Texas prison where he was housed, seeking

---

66. I am far from the first to describe and decry the access to justice crisis—a crisis that impairs indigent peoples' abilities to protect their rights in other types of civil cases and in criminal cases. *See, e.g.*, Deborah L. Rhode, *Access to Justice*, 69 FORDHAM L. REV. 1785, 1786 (2001) (describing the access to justice crisis in multiple settings and its cause). But as Deborah Rhode observed in her 2001 article, "[a]ccess to justice is the subject for countless bar commissions, committees, conferences, and colloquia, but it is not a core concern in American policy decisions, constitutional jurisprudence, or law school curricula." *Id.* And, as hardly need be said, it should be. This Article takes up Rhode's call in part by examining the access to justice crisis's impact on § 1983 doctrine. Civil rights enforcement under § 1983 is not an area of the law that first comes to mind when thinking about the access to justice crisis given that prevailing parties are statutorily entitled to recover their fees, and for this reason is not the area in which the need for counsel is most acute. Yet, as this Article demonstrates, the lack of counsel in § 1983 cases has dire consequences for plaintiffs and for the civil rights ecosystem more broadly.

67. Letter from Alex Baxter to author (Apr. 3, 2021) (on file with author). Throughout this Article, quotes from letters and legal briefs filed by pro se plaintiffs have been edited to correct errors in spelling, punctuation, and grammar.

representation.[68] None would take his case.[69] Notes from some of the attorneys who responded to Taylor's request for counsel offered explanations for their hesitance. One wrote: "I am a sole practitioner currently. I simply do not have the time to take on your case filed in Lubbock, TX. These cases are very difficult and time consuming. I regret not being able to help you."[70] Another wrote: "[Texas Department of Criminal Justice] is hard to beat. It's represented by the AG's office that has 40 lawyers. Free world lawyers can't afford [inmate] cases. Takes too long, too expensive."[71]

Although *Baxter v. Bracey* and *Taylor v. Riojas* concern claims of clear constitutional abuse and play outsized roles in qualified immunity jurisprudence, every attorney Alex Baxter and Trent Taylor approached as their cases wound their way through district court and the court of appeals concluded that the cases' risks outweighed their likely rewards.[72] This says a great deal both about the challenges of litigating civil rights cases and about our system of paying lawyers who take them. Pamela Karlan has written that "[a]ttorney's fees are the fuel that drives the private attorney general engine."[73] But when it comes to § 1983 cases—and particularly § 1983 cases brought by prisoners challenging the conditions of their confinement—the private attorney general engine is not getting enough fuel, and the civil rights enforcement machine is stalling.

## A. The False Promise of Fee Shifting

Alex Baxter and Trent Taylor could not afford to pay lawyers to represent them; the same is true of most people who have had their constitutional rights violated. When the Supreme Court issued its 1961 decision in *Monroe v. Pape*, ruling that people whose rights

---

68. Telephone Interview with Trent Taylor (Apr. 14, 2021) (notes on file with author).
69. *Id.*
70. Motion for Appointment of Counsel, Taylor v. Stevens, No. 14-cv-00149 (N.D. Tex. Oct. 19, 2015).
71. Motion for Appointment of Counsel, *Taylor*, No. 14-cv-00149 (N.D. Tex. Sept. 2, 2014).
72. Telephone Interview with Trent Taylor, *supra* note 68; Letter from Alex Baxter to author, *supra* note 67.
73. Pamela S. Karlan, *Disarming the Private Attorney General*, 2003 U. ILL. L. REV. 183, 205.

were violated by government officials could sue under 42 U.S.C. § 1983, it did not say anything about who would pay plaintiffs' attorneys' fees in these cases.[74] Attorneys from the Chicago ACLU represented James Monroe and his family.[75] But there were far from enough nonprofit attorneys to represent everyone who brought § 1983 cases in the years after *Monroe*. Instead, most cases were brought by private attorneys on contingency—meaning that the lawyer and client agreed that the client would pay the lawyer a portion of any settlement or judgment that they won and would pay their lawyer nothing if they lost.[76]

Courts and Congress came to believe that the contingency fee model did not adequately support the vindication of people's constitutional rights. People with high-damages cases could likely find lawyers to represent them because a portion of the large awards anticipated in these cases would adequately compensate the lawyers for their time. But attorneys taking civil rights cases on contingency would be disinclined to accept cases involving constitutional violations with limited compensable damages. There would also be no way to pay lawyers in cases seeking purely injunctive relief, from which no contingency fee could be taken.

In 1976, to address these concerns, Congress enacted § 1988, which allowed "prevailing" plaintiffs in § 1983 cases to recover "reasonable" fees from the government defendant.[77] The House Report on § 1988 explained that it would "promote the enforcement of the ... civil rights acts, as Congress intended, and ... achieve

---

74. *See* 365 U.S. 167, 172, 184-85 (1961).

75. CHARLES R. EPP, THE RIGHTS REVOLUTION: LAWYERS, ACTIVISTS, AND SUPREME COURTS IN COMPARATIVE PERSPECTIVE 10 (1998).

76. *See, e.g.*, Samuel R. Bagenstos, *Mandatory Pro Bono and Private Attorneys General*, 101 NW. U. L. REV. COLLOQUOY 182, 184-85 (2007) (explaining that most civil rights litigation is brought "by individual lawyers who are trying to make a living"); Alison L. Patton, *The Endless Cycle of Abuse: Why 42 U.S.C. § 1983 Is Ineffective in Deterring Police Brutality*, 44 HASTINGS L.J. 753, 756-57 (1993) ("[M]ost [§ 1983] suits are taken on a contingency basis."); Paul D. Reingold, *Requiem for Section 1983*, 3 DUKE J. CONST. L. & PUB. POL'Y 1, 3-5 (2008) (describing typical fee arrangements in § 1983 cases); Stewart J. Schwab & Theodore Eisenberg, *Explaining Constitutional Tort Litigation: The Influence of the Attorney Fees Statute and the Government as Defendant*, 73 CORNELL L. REV. 719, 768-70 (1988) ("[M]ost civil rights litigation is not brought by institutional litigators or by large firms engaging in pro bono activity.").

77. 42 U.S.C. § 1988.

uniformity in those statutes and justice for all citizens."[78] In concept, this statute should have entitled plaintiffs' attorneys to recover their fees whenever their clients succeeded.[79] But the Supreme Court's crabbed interpretation of § 1988's provisions pulled the rug out from under this laudable goal.

In 1986, in *Evans v. Jeff D.*, the Supreme Court held that a defendant can offer to waive attorneys' fees as part of a settlement agreement.[80] Today, when plaintiffs recover money in § 1983 cases against the police, it is almost always through settlements, and those settlement agreements almost always waive lawyers' ability to recover attorneys' fees.[81] So, when plaintiffs' lawyers get paid, those payments are almost always limited to a portion of their clients' settlement awards—just as it has always been for contingency fee lawyers.[82] Defendants, particularly as trial nears, may offer larger settlements that take into account the likelihood that plaintiffs could win at trial and recover their attorneys' fees. But with *Evans*, the contingency fee system that Congress intended to avoid by enacting § 1988 is basically back in place.[83]

In 2001, the Supreme Court issued another decision, *Buckhannon Board & Care Home, Inc. v. West Virginia Department of Health and Human Resources*, that made cases seeking injunctive relief financially unappealing for contingency fee lawyers to bring.[84] Before *Buckhannon*, a plaintiff seeking injunctive relief was considered a prevailing party entitled to attorneys' fees so long as the defendant provided "some of the benefit sought" by the lawsuit and the suit was a "substantial" cause of defendant's change.[85] In *Buckhannon*, the Supreme Court held that when a plaintiff seeks

---

78. H.R. Rep. No. 94-1558, at 9 (1976).

79. *See* 42 U.S.C. § 1988.

80. 475 U.S. 717, 720 (1986).

81. My research suggests that plaintiffs win in § 1983 suits against the police in approximately 57.7 percent of cases. *See* Joanna C. Schwartz, *How Qualified Immunity Fails*, 127 YALE L.J. 2, 47 (2017). Of the 682 cases in which plaintiffs succeeded, just twelve were plaintiffs' verdicts after trial—just 1.7 percent of the cases in which plaintiffs were victorious, and 0.1 percent of all cases filed. *Id.* (Two of those twelve cases in which the plaintiff won at trial were subsequently settled).

82. *See id.*

83. *See* Reingold, *supra* note 76, at 18-21.

84. *See* 532 U.S. 598 (2001).

85. *Id.* at 627-28 (Ginsburg, J., dissenting).

injunctive relief in a § 1983 case and the defendant voluntarily makes the change that the plaintiff is seeking, the plaintiff is *not* entitled to attorneys' fees.[86] It is not enough that the court case was the "catalyst" for the defendant's reforms—there has to be a "judicially sanctioned change" of defendant's behavior.[87] The Court's decision in *Buckhannon* discourages lawyers from bringing cases seeking solely injunctive relief, for fear that defendants will make the changes sought by the plaintiff and plaintiff's counsel will be denied any fees for their efforts.[88]

In the rare event that a plaintiff goes to trial in a case seeking damages or injunctive relief and wins, § 1988 still entitles lawyers to their "reasonable" fees.[89] But "reasonable" attorneys' fees are unlikely to fully compensate attorneys for their time. Reasonable fees are calculated by multiplying a reasonable hourly fee with a reasonable number of hours spent litigating the case—what is referred to as the "lodestar."[90] But the Supreme Court has instructed lower courts to exclude unreasonable hours and reduce unreasonable rates. As it explained in *Hensley v. Eckerhart*:

> Cases may be overstaffed, and the skill and experience of lawyers vary widely. Counsel for the prevailing party should ... exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission.[91]

Whether a successful plaintiff's attorney has exercised proper billing judgment often turns into its own satellite litigation about how much the lawyer should be paid for each hour of work and how many hours they reasonably spent litigating the case, which can take months or years to resolve.[92] During those months and years,

---

86. *Id.* at 600 (majority opinion).
87. *Id.* at 605.
88. *See* Reingold, *supra* note 76, at 31-33.
89. 42 U.S.C. § 1988.
90. City of Riverside v. Rivera, 477 U.S. 561, 568 (1986) (plurality opinion).
91. 461 U.S. 424, 433-34 (1983).
92. *See* James K. Green & Barbara Kritchevsky, *Litigating Attorney's Fees: Running the Gauntlet*, 37 URB. LAW. 691, 713-14 (2005) ("Fee litigation can be as time-consuming and complex as that on the merits. It can be a second gauntlet through which plaintiffs must pass

2023]          CIVIL RIGHTS WITHOUT REPRESENTATION          657

the attorney will not get paid. And in the end, judges often give plaintiffs' attorneys' fees applications a haircut, either because they conclude that the lawyers could have done the work in less time, or that they have billed their time at too generous a rate, or both.

For cases brought by prisoners challenging the conditions of their confinement—such as Trent Taylor—the Prison Litigation Reform Act (PLRA) limits attorneys' fees even further.[93] The Supreme Court has held that attorneys' fees awards for nonprisoners need not be proportional to the amount the jury awarded.[94] But in cases covered by the PLRA, in contrast, attorneys' fees are limited to 150 percent of the jury's award, or 150 percent of the hourly rate for court-appointed counsel (which was $158 per hour in 2022).[95] These fees limitations are widely recognized to discourage attorneys from accepting meritorious cases on behalf of prisoners; after all, these restrictions kick in only once a prisoner has won their case.[96]

## B. Private Attorneys' Case Selection Decisions

When the Supreme Court decided *Evans*, the Court's six-Justice majority reasoned that allowing fee waivers in a settlement agreement would help advance the goals of § 1988—defendants, eager to avoid paying attorneys' fees, may give plaintiffs attractive settlement offers that advance civil rights protections.[97] Justices Brennan, Marshall, and Blackmun dissented, arguing that fee waivers would

---

to vindicate their constitutional rights.").

93. Note that these fees limitations did not apply to Alex Baxter; although he was incarcerated when he brought his case, Baxter was not challenging the conditions of his confinement. However, other aspects of the PLRA have been interpreted to apply to anyone incarcerated when they bring their case, regardless of the conduct challenged in their suit. *See infra* note 142 and accompanying text.

94. *See Rivera*, 477 U.S. at 574-76.

95. For the limits on attorneys' fees under the PLRA, see 42 U.S.C. § 1997e(d). For the hourly rate for court-appointed counsel, see 7 GUIDE TO JUDICIARY POLICY § 230.16 (2022).

96. *See generally, e.g.*, Eleanor Umphres, *150% Wrong: The Prison Litigation Reform Act and Attorney's Fees*, 56 AM. CRIM. L. REV. 261 (2019); Karen M. Klotz, Comment, *The Price of Civil Rights: The Prison Litigation Reform Act's Attorney's Fee-Cap Provision as a Violation of Equal Protection of the* Laws, 73 TEMPLE L. REV. 759 (2000); Walker Newell, *An Irrational Oversight: Applying the PLRA's Fee Restrictions to Collateral Prisoner Litigation*, 15 CUNY L. REV. 53 (2011).

97. Evans v. Jeff D., 475 U.S. 717, 741-42 (1986).

undermine the goals of § 1988.[98] Perhaps the plaintiffs in *Evans* would be pleased with the settlement they were offered, Justice Brennan explained in the dissenting opinion, but the lawyers representing them would be reluctant to take civil rights cases in the future, knowing that they might not get paid.[99] Other civil rights lawyers would take heed as well, resulting in less access to the courts for people whose rights have been violated.

In practice, *Evans* has done just what Justices Brennan, Marshall, and Blackmun feared. When Julie Davies interviewed thirty-five plaintiffs' attorneys in 1996 and 1997, she found that most evaluated § 1983 cases as they would any other contingency fee tort case.[100] This was also the experience of Paul Reingold, who directed Michigan Law School's Civil-Criminal Litigation Clinic from 1983-2018. As he explained,

> Before *Evans*, a law school clinic like mine could routinely refer good-liability/bad-damages fee-shifting cases to the private bar. After *Evans*, as the fallout from the case became apparent, we were unable to refer cases involving less than $100,000 in damages to the private bar. Today the private bar views an ordinary tort case and a civil rights case the same. Without good damages, the plaintiff will not be able to find a private lawyer to represent him (other than very rare *pro bono publico* representation).[101]

I reached the same conclusion when I interviewed thirty-five plaintiffs' civil rights attorneys across the country in 2018 and 2019.[102] Even when attorneys believe that a § 1983 case has merit, they have strong financial incentives to decline it if their portion of the expected settlement will not adequately compensate them for the

---

98. *Id.* at 755-58 (Brennan, J., dissenting).

99. *See id.*

100. *See* Julie Davies, *Federal Civil Rights Practice in the 1990's: The Dichotomy Between Reality and Theory*, 48 HASTINGS L.J. 197, 261-67 (1997).

101. Reingold, *supra* note 76, at 19 n.57.

102. *See generally* Schwartz, *supra* note 55. For another exploration of contingency fee attorneys' calculations of risk and reward in case selection, see HERBERT M. KRITZER, RISKS, REPUTATIONS, AND REWARDS: CONTINGENCY FEE LEGAL PRACTICE IN THE UNITED STATES 67-88 (2004).

time they anticipate spending on the case.[103] As one attorney explained to me:

> Obviously death cases or severe injury cases, I'm going to take a longer look at the case. But if it's a simple, like, they called me a name, or they used a derogatory term or—I spent—they kept me in the back of their car for four hours. I'm not going to take a case like that.[104]

As another explained: "[I]t sounds crass but we say, 'Well, is there blood on the street? Because if there isn't, why are we doing it?'"[105]

Even when the damages a potential client suffered were significant, attorneys I interviewed were reluctant to represent people who a judge or jury would not find sympathetic; lawyers feared judges and juries would award those people lower damages or no damages at all.[106] As a result, attorneys reported looking for cases with plaintiffs the judge and jury would find "likeable," "credible," and "articulate"[107]—criteria that may make attorneys less likely to represent people of color, LGBTQ+ people, people with mental illness, and members of other marginalized groups, who are the very people subject to disproportionate levels of unconstitutional policing.[108] Some of the attorneys I interviewed will not represent a person who

---

103. *See* Schwartz, *supra* note 58, at 1109-13. A few attorneys I interviewed accept low damages cases, expecting that they will go to trial and recover their reasonable fees when they win. I do not know how many lawyers take this approach, but they were in the distinct minority among the lawyers I interviewed.

104. *Id.* at 1136 (quoting S.D. Tex. Attorney D).

105. *Id.* (quoting M.D. Fla. Attorney E).

106. *Id.* at 1131.

107. *Id.* at 1134.

108. *See* ELIZABETH DAVIS, ANTHONY WHYDE & LYNN LANGTON, BUREAU OF JUST. STAT., U.S. DEP'T OF JUST., CONTACTS BETWEEN POLICE AND THE PUBLIC, 2015, at 4, 8, 16-17 (2018) (finding that Black residents were more likely to be stopped by police than white or Latinx residents, that Black and Latinx residents were more likely than white residents to have multiple contacts with police, and that police were twice as likely to threaten or use force against Black and Latinx residents than white residents); DORIS A. FULLER, H. RICHARD LAMB, MICHAEL BIASOTTI & JOHN SNOOK, TREATMENT ADVOC. CTR., OVERLOOKED IN THE UNDERCOUNTED: THE ROLE OF MENTAL ILLNESS IN FATAL LAW ENFORCEMENT ENCOUNTERS 1 (2015) (reporting evidence that the mentally ill make up a disproportionate number of people killed by police); CHRISTY MALLORY, AMIRA HASENBUSH & BRAD SEARS, THE WILLIAMS INST., DISCRIMINATION AND HARASSMENT BY LAW ENFORCEMENT OFFICERS IN THE LGBT COMMUNITY 4-11 (2015) (describing studies showing discrimination and harassment of LGBTQ+ communities by law enforcement).

was convicted of a crime in connection with the incident that is the basis for the civil rights case.[109] Some attorneys will not represent people who have *ever* been convicted of a crime for fear that a jury would rule against them or award minimal damages.[110]

If any of the lawyers Alex Baxter and Trent Taylor contacted seriously considered their requests for representation, those lawyers likely made some effort to weigh the financial risks and rewards of taking Baxter and Taylor on as clients. Although both Baxter and Taylor had suffered mightily, both had also been convicted of crimes.[111] Baxter was Black and houseless; Taylor was being held in the psychiatric unit of a Texas prison when his rights were violated.[112] Regardless of the merits of each case, many lawyers would have considered the potential rewards of taking on either case too low to justify the risks.

Lawyers who received Baxter's and Taylor's letters might well have declined their cases in favor of other § 1983 cases likely to be more remunerative or less risky: cases involving people who had not been convicted of a crime or suffered more catastrophic injuries; cases in which qualified immunity was less likely to be a stumbling block; and—in the case of Taylor—cases in which reasonable attorneys' fees were not capped by the PLRA.

Lawyers considering Baxter's and Taylor's requests might also have declined their cases in favor of other cases that did not allege civil rights violations. Most lawyers who bring § 1983 cases are jacks of many trades whose case dockets include personal injury, medical malpractice, criminal defense, or commercial litigation.[113] In fact, many lawyers I interviewed brought their first § 1983 case without appreciating the financial risk.[114] Someone came into their office with an infuriating story of unjust treatment at the hands of government, and they accepted that first case despite not really knowing how to litigate civil rights cases at all. These lawyers often reported thinking, at first, that litigating a civil rights case would be similar to any other personal injury case—comparable to a suit

---

109. Schwartz, *supra* note 58, at 1134.
110. *Id.* at 1134-35.
111. *See infra* Parts II.A-B.
112. Schwartz, *supra* note 58, at 1169-78.
113. *See generally id.*
114. *See id.* at 1148-50.

brought by a person who has been hit by a car. But they came to realize, quite quickly, that the risks are greater and the rewards are smaller in civil rights cases—it is more difficult to get information from the government, more difficult to prove a legal violation and overcome qualified immunity, more difficult to get to a jury, and more difficult to win.[115]

Lawyers often learn this lesson the hard way, by having their cases dismissed after investing thousands or tens of thousands of dollars' worth of their time pursuing them. And in the wake of these almost inevitable disappointments, lawyers go one of two ways. Some decide to focus on the kinds of cases they brought before that allow them more easily and reliably to make a living. Others dig in and commit themselves to understanding the intricacies of civil rights law and practice.[116] But they are likely to view civil rights cases as riskier prospects than non-civil-rights cases and are reluctant to accept a civil rights case unless it has the potential for a substantial damages award from which they can take their fee.[117]

Some lawyers I interviewed who have spent years litigating civil rights cases reported that they have reduced the number of § 1983 cases they accept in recent years because it is easier to make a living from other types of legal work.[118] An attorney from Florida used to bring only police misconduct cases but now brings dental malpractice cases with the hopes that "the dental stuff perhaps will pay some bills."[119] An attorney from Pennsylvania who used to focus on § 1983 cases now spends most of his time on personal injury and medical malpractice cases, which he considers "easier work that pays a lot more money."[120] If Baxter or Taylor reached out to lawyers in this frame of mind, their chances of finding representation would have been especially slim.

---

115. *See id.*
116. *See id.*
117. *See id.*
118. *See id.*
119. *Id.* at 1149 (quoting M.D. Fla. Attorney C).
120. *Id.* (quoting E.D. Pa. Attorney E).

WILLIAM & MARY LAW REVIEW [Vol. 64:641

## C. Nonprofits' Case Selection Decisions

A private attorney who declined to take Taylor's case suggested that he reach out to the Texas Civil Rights Project, a nonprofit based in Austin engaged in criminal justice, racial justice, voting rights, and election protection across Texas.[121] But the Texas Civil Rights Project declined Taylor's case as well, writing: "We are a small, non-profit organization and unfortunately can only provide legal services to fewer than 1% of the people who contact us. Although I am not deciding whether your case has merit, we do not have the resources at this time to represent you."[122] Nonprofits do not take cases on contingency and so are not constrained by the same financial considerations as private attorneys.[123] But, as the Texas Civil Rights Project's letter reflects, they have nowhere near the resources to accept all of the cases that come their way.[124] As a result, nonprofit attorneys must make their own assessment of risk and reward—they want to use their limited resources on cases most likely to achieve their organization's mission and will be reluctant to take a case that is especially expensive or a case they do not think they can win.[125] They also have financial reasons to take cases they can win: nonprofits are entitled to attorneys' fees under § 1988 if they prevail at trial,[126] and those fee awards can help support their work.

Private attorneys working pro bono can and do sometimes take § 1983 damages actions, as well. These attorneys, similar to non-profit attorneys, are not bound by the same financial considerations as contingency fee attorneys. But, also similar to nonprofit attorneys, there are nowhere near enough pro bono attorneys willing or

---

121. Motion for Appointment of Counsel, *supra* note 70.

122. *Id.*

123. *See* William H.J. Hubbard, *A Fresh Look at Plausibility Pleading*, 83 U. CHI. L. REV. 693, 713 (2016).

124. *See* Motion for Appointment of Counsel, *supra* note 70.

125. *See* Hubbard, *supra* note 123, at 713 ("To the extent that attorneys working on a pro bono basis and legal aid providers are oversubscribed—and they usually are—one should again expect these attorneys to screen cases on plausible merit before filing. Whether an attorney's motivation is maximizing profit or maximizing relief to deserving plaintiffs (or both), the incentive will be to select those cases with higher merit.").

126. *See* 42 U.S.C. § 1988.

able to fill the need for representation.[127] Moreover, firms large and successful enough to have robust pro bono practices tend to be located in the same large coastal and northern cities where the lion's share of civil rights attorneys are clustered.[128]

Section 1988 was intended to create financial incentives for lawyers to bring cases vindicating constitutional rights that are important, even if they are worth relatively little in the way of compensable damages.[129] But when the Supreme Court allowed defendants to waive attorneys' fees in settlement negotiations,[130] those financial incentives evaporated. Nonprofits and pro bono attorneys simply do not have the resources or person power to fill that void.

## II. PRO SE EXCEPTIONALISM

The way that civil rights lawyers are paid and the particular financial risks of representing people involved in the criminal justice system help explain why Alex Baxter and Trent Taylor were unable to find attorneys to represent them until they were poised to seek certiorari at the Supreme Court.[131]

---

127. *See, e.g.*, LEGAL SERVS. CORP., THE JUSTICE GAP: MEASURING THE UNMET CIVIL LEGAL NEEDS OF LOW-INCOME AMERICANS 6-7 (2017) ("86% of the civil legal problems reported by low-income Americans in the past year received inadequate or no legal help.... [a] lack of available resources accounts for the vast majority (85%-97%) of civil legal problems that LSC-funded organizations do not fully address.").

128. As Scott Cummings has explained:
> There is often talk of multiple pro bono "cultures," with cities such as Washington, D.C. praised for deeply ingrained pro bono traditions while others struggle to find their pro bono identities. Strong regional distinctions exist, with the northeast and California home to the vast majority of high-achieving pro bono firms. Pro bono looks different in large metropolitan areas with strong traditions of law firm pro bono and extensive public interest infrastructures than in smaller cities or rural areas, where there are few, if any, large firms and only a handful of underresourced legal services providers.

Scott L. Cummings, *The Politics of Pro Bono*, 52 UCLA L. REV. 1, 89 (2004) (footnotes omitted). Similar observations have been made about the geographic distribution of public interest and legal aid practices. *See generally, e.g.*, Catherine Albiston, Su Li & Laura Beth Nielson, *Public Interest Law Organizations and the Two-Tier System of Access to Justice in the United States*, 42 LAW & SOC. INQUIRY 990 (2017).

129. *See* H.R. Rep. No. 94-1558, at 9 (1976).

130. *See* Evans v. Jeff D., 475 U.S. 717, 730-32 (1986).

131. Presumably, Baxter and Taylor were able to find counsel at this stage both because attorneys around the country learned of their cases through the court of appeals' decisions and because the opportunity to appear before the Supreme Court shifted attorneys'

664                WILLIAM & MARY LAW REVIEW          [Vol. 64:641

In fact, the most remarkable thing about Alex Baxter and Trent Taylor is not that they could not find lawyers but that they got as far as they did litigating pro se. Before examining how most pro se cases fare, it is worth pausing to admire Alex Baxter's and Trent Taylor's extraordinary efforts against extraordinary odds.[132]

## A. Alex Baxter

Alex Baxter filed his lawsuit on January 7, 2015.[133] That same day, he filed a request that the judge appoint counsel in his case.[134] In support of this request, Baxter explained that there were no legal materials available to him at the jail:

> Unlike being in prison where there is access to extensive legal materials, and where there is information and examples to challenge a motion to dismiss or a motion for summary judgment, here in the jail access to legal materials is by policy restricted to challenges to your sentence or jail conditions. Access to previous and recent decisions, case citations or someone skilled to assist or advise to prosecute a civil case does not exist.[135]

---

risk/reward calculations.

132. A series of articles in a special issue in *UCLA Law Review Discourse* offers additional compelling descriptions of the challenges of representing oneself from prison, including, for example, Robin Bunley, *Making Bricks Without Straw: Legal Training for Female Jailhouse Lawyers in the Louisiana Penal System*, 68 UCLA L. REV. DISCOURSE 128 (2021); Kevin D. Sawyer, *Jailhouse Lawyering from the Beginning*, 68 UCLA L. REV. DISCOURSE 98 (2021); Rahsaan "New York" Thomas, *Barriers to Jailhouse Lawyering*, 68 UCLA L. REV. DISCOURSE 4 (2021); Michael Saavedra, *Bound by Law, Freed by Solidarity: Navigating California Prisons and Universities as a Jailhouse Lawyer*, 68 UCLA L. REV. DISCOURSE 36 (2021).

133. Complaint, *supra* note 2, at 1.

134. Motion by Letter for Appointment of Counsel, Baxter v. Harris, No. 15-cv-00019 (M.D. Tenn. Jan. 7, 2015). 28 U.S.C. § 1915(e)(1) states that a federal court "may request an attorney to represent any person unable to afford counsel." This provision does not actually empower a court to appoint counsel; instead, it authorizes judges to ask attorneys to represent people who would otherwise be pro se. *See* Mallard v. S.D. Iowa, 490 U.S. 296, 298 (1989). Litigants and judges often refer to these types of applications as requests for appointment of counsel. For the sake of simplicity they will be referred to in that manner throughout this Article.

135. Motion by Letter for Appointment of Counsel, *supra* note 134.

Baxter's request for counsel was denied.[136] The judge noted that appointment of counsel is limited to "exceptional circumstances" that did not exist in this case.[137]

When a person proceeding pro se does not have resources, they can petition the court to proceed in forma pauperis.[138] Baxter made this petition, and the judge granted his request,[139] meaning that the court served process on defendants and witnesses. Had Baxter not been in jail, the in forma pauperis designation would also have waived the $350 federal court filing fee.[140] But, thanks to the PLRA, anyone proceeding in forma pauperis from prison must still pay the filing fee.[141] Judges reviewing petitions to proceed in forma pauperis can also dismiss a case sua sponte if they conclude that the case is frivolous or fails to state a claim for relief.[142] The judge reviewing Baxter's complaint concluded that he had properly stated a claim.[143]

After the complaint was served on the officers, one moved to dismiss, arguing in part that Baxter had not alleged a constitutional violation and that the officer was entitled to qualified immunity.[144] As Baxter described it to me, in the motion "they threw everything at me including the kitchen sink, the toilet, the dog-house and the gopher's den."[145] Then Baxter had to figure out how to respond to all of the arguments in the motion. As he wrote to me, he learned how to draft a motion "by looking at examples of other motions I found

---

136. Order at 3, *Baxter*, No. 15-cv-00019 (M.D. Tenn. Jan. 21, 2015).

137. *Id.*

138. Note that when a person who is not a prisoner is afforded in forma pauperis status, they do not need to pay these fees. *See* 28 U.S.C. § 1915(b). For discussion of the ways that forma pauperis determinations are made in the federal courts and proposals for reform, see Andrew Hammond, *Pleading Poverty in Federal Court*, 128 YALE L.J. 1478 (2019).

139. Application to Proceed in Forma Pauperis with Supporting Documentation, *Baxter*, No. 15-cv-00019 (M.D. Tenn. Jan. 7, 2015); Order at 1, *Baxter*, No. 15-cv-00019 (M.D. Tenn. Jan. 21, 2015).

140. *See* 28 U.S.C. § 1915(b).

141. For a discussion of the application of the PLRA's filing fee provisions on cases filed by prisoners, see Newell, *supra* note 96, at 57-58. As Baxter wrote in a letter to a reporter, "$350 was an astronomical amount of money for a person in jail with no income at all. And the times my family sent me a little money for food and hygiene, the law punish[ed] them also by taking half of it away." Letter from Alexander Baxter to Lawrence Hurley, *supra* note 2.

142. *See* 28 U.S.C. § 1915(e)(2).

143. Order, *supra* note 136, at 2.

144. *See* Officer Brad Bracey's Motion for Judgment on the Pleadings Pursuant to Fed. R. Civ. P. 12(c), *Baxter*, No. 15-cv-00019 (M.D. Tenn. Mar. 25, 2015).

145. Letter from Alex Baxter to author, *supra* note 67.

in the library and flipping through the pages of different law books."[146] He continued,

> It got a little confusing at times, like the difference between state and federal courts, or the distinction between respondents and defendants, or how to word the title of the request in a motion. What I found out, however, is that was the easy part. I had to learn what to put in the body of the pleadings and how to sum it all up to make a meaningful opposition or a meaningful request.[147]

Despite these challenges, Baxter did file an opposition to the motion and also amended his complaint to remove a Doe defendant.[148] The officer then filed a motion to dismiss the amended complaint.[149]

The magistrate judge recommended that the defendant's motion to dismiss be denied, finding that Baxter's complaint alleged that his clearly established rights were violated.[150] The officer objected, arguing that Baxter had opposed the defendant's first motion to dismiss but had not filed a new opposition to the defendant's motion to dismiss the amended complaint—and that, therefore, the defendant's motion should be treated as unopposed.[151] The district court rejected the officer's argument and adopted the magistrate judge's report and recommendation.[152] Then the officer filed an interlocutory appeal to the Sixth Circuit, appealing the denial of qualified immunity.[153]

When the case got to appeal, Baxter wrote, "that's where it got interesting."[154]

---

146. *Id.*

147. *Id.*

148. *See* Plaintiff's Response in Opposition to Officer Brad Bracey's Motion for Judgment on the Pleadings and/or Motion to be Dismissed, *Baxter*, No. 15-cv-00019 (M.D. Tenn. Apr. 8, 2015); Amended Complaint, *Baxter*, No. 15-cv-00019 (M.D. Tenn. July 13, 2015).

149. *See* Officer Brad Bracey's Memorandum of Law in Support of His Motion to Dismiss Plaintiff's Amended Complaint, *Baxter*, No. 15-cv-00019 (M.D. Tenn. July 24, 2015).

150. Report and Recommendation at 4-5, *Baxter*, No. 15-cv-00019 (M.D. Tenn. Sept. 18, 2015).

151. Defendant's Objection to Report and Recommendation at 1, *Baxter*, No. 15-cv-00019 (M.D. Tenn. Sept. 30, 2015).

152. Order at 1, 3, *Baxter*, No. 15-cv-00019 (M.D. Tenn. Nov. 9, 2015).

153. *See* Docket, Baxter v. Harris, No. 15-6412 (6th Cir. Dec. 22, 2015).

154. Letter from Alex Baxter to author, *supra* note 67.

> I didn't know how to write an appeal. That was high-maintenance stuff to me. What I did was I waited until I got their appeal paperwork. Then, I wrote down the name of each section on a separate piece of paper. For example, I wrote down Introduction at the top of one piece of paper, Table of Contents at the top of another, and Table of Authorities on yet another, until I got to the Conclusion. Little did they know it they helped me outline my appeal. After that I filled each section with my version.[155]

Baxter filed a brief in opposition to the defendant's appeal and the Sixth Circuit affirmed the district court's decision without argument.[156] Baxter's case was sent back to the district court for discovery.[157]

On August 7, 2017, Baxter filed a second motion for appointment of counsel.[158] When Baxter first filed his case, he was in a county jail.[159] In the two-and-a-half years since, Baxter had pled guilty to the burglary that occasioned his arrest and assault by Iwo and had been moved to a state prison.[160] In a thirty-three page, handwritten letter, Baxter's renewed request for counsel described the challenges of pursuing discovery as a prisoner proceeding pro se. Baxter wrote:

> *The plaintiff is an incarcerated, pro se prisoner, and appointment of counsel is needed because the defendants are represented by two highly skilled, highly experienced, and highly trained attorneys....* [T]he Court has entered a scheduling order for the management of the case. Issues like *voir dire, motions in limine, jury questions, jury instructions* as well as *numerous others* are beyond the scope of plaintiff's ability....
>
> *Appointment of counsel is needed to locate, identify, and interview material witnesses.* Family members informed plaintiff that significant portions of the event were recorded and were posted on social media by several bystander/witnesses, and

---

155. *Id.*

156. Order at 4, *Baxter*, No. 15-6412 (6th Cir. Aug. 30, 2016).

157. *See id.*

158. Motion for Appointment of Counsel or in the Alternative Motion to be Held in Abeyance at 1, Baxter v. Harris, No. 15-cv-00019 (M.D. Tenn. Aug. 7, 2017).

159. *See* Letter from Alex Baxter to author, *supra* note 67.

160. *See id.*

appointment of counsel is needed to interview family members and to locate, identify, and interview any material witnesses....

*Appointment of counsel is needed because of extensive and excessive lockdowns at the prison.* The plaintiff moves the Court to appoint counsel because he is being subjected to extensive and excessive lockdowns at the Trousdale Turner Correctional Complex (TTCC).... A couple of lockdowns lasted for three or four days only, but most lasted for weeks at a time. During lockdowns at TTCC inmates are forced to remain seated on their bunks all day and all night, with the only break allowed being a short trip to use the restroom and back. Even the so-called "modified lockdowns" don't allow inmates access to the law library. With deadlines looming and trial now scheduled a few months away, it is impossible to prepare a competent case for the Court let alone present a meaningful case to the jury.[161]

Four days later, the trial court denied Baxter's request for counsel, explaining: "Baxter fails to show exceptional circumstances that would justify the appointment of counsel. He argues that he needs counsel to help him take discovery, understand legal jargon, and interview witnesses. But all pro se petitioners face these struggles—they are nothing exceptional."[162]

In August and September, Alex Baxter filed a slew of discovery requests with the judge: a motion for a protective order, a motion to compel discovery, a motion for leave to file written discovery, a motion to suspend the scheduling order and/or for an extension of time, a motion to strike his deposition testimony, and a request for blank subpoena forms.[163] Before the judge responded to any of these requests, both defendants moved for summary judgment, arguing that they were entitled to qualified immunity.[164] Baxter's forty-two page, handwritten opposition addressed the officers' legal arguments and argued that the defendants had withheld evidence that

---

161. Motion for Appointment of Counsel or in the Alternative Motion to be Held in Abeyance, *supra* note 158 (emphasis added).

162. Opinion and Order Denying Plaintiff's Motion for Appointment of Counsel, *Baxter*, No. 15-cv-00019 (M.D. Tenn. Aug. 11, 2017) (footnote omitted).

163. *See* Docket, *Baxter*, No. 15-cv-00019 (M.D. Tenn. Jan. 7, 2015).

164. Defendants Spencer Harris and Brad Bracey's Motion for Summary Judgment, *Baxter*, No. 15-cv-00019 (M.D. Tenn. Oct. 13, 2017).

would support his claims.[165] The district court denied defendants' motion for summary judgment, concluding that Baxter's deposition testimony created disputed issues of material fact about whether the officers used excessive force and whether they were entitled to qualified immunity.[166] The defendants appealed.[167]

On November 8, 2018, the Sixth Circuit reversed the district court, ruling that "the officers' conduct, whether constitutional, did not violate any clearly established right."[168] The Sixth Circuit recognized that Baxter had testified "he surrendered by raising his hands in the air before Harris released the dog."[169] The court recognized that this might show a constitutional violation but granted qualified immunity because "Baxter does not point us to any case law suggesting that raising his hands, on its own, is enough to put Harris on notice that a canine apprehension was unlawful in these circumstances."[170]

The Sixth Circuit's decision was unpublished but was included in *Short Circuit*, a weekly newsletter describing recent appellate decisions of interest circulated by the Institute for Justice.[171] An American Civil Liberties Union (ACLU) attorney read the decision, his legal team decided to pursue the case, and another ACLU attorney called Baxter at the prison where he was housed.[172] Baxter happily accepted the ACLU's offer of representation.[173] The ACLU of Washington, D.C., the ACLU of Tennessee, and the National ACLU together filed a petition for writ of certiorari in Alex Baxter's case with the Supreme Court on April 8, 2019.[174]

---

165. Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment, *Baxter*, No. 15-cv-00019 (M.D. Tenn. Nov. 15, 2017).

166. Opinion and Order Denying Defendants' Motion for Summary Judgment at 3, *Baxter*, No. 15-cv-00019 (M.D. Tenn. Jan. 22, 2018).

167. *See* Civil Appeal Statement of Parties and Issues, Baxter v. Bracey, No. 18-05102 (6th Cir. Feb. 16, 2018).

168. Baxter v. Bracey, 751 F. App'x 869, 870 (6th Cir. 2018).

169. *Id.* at 872.

170. *Id.*

171. *See* Email from Emma Andersson, Senior Staff Att'y, ACLU, to author (Jan. 22, 2021, 10:23 AM) (on file with author).

172. *Id.*

173. *Id.*

174. *See* Petition for a Writ of Certiorari, Baxter v. Bracey, No. 18-1287 (Apr. 8, 2019), 2019 WL 1569711.

670              WILLIAM & MARY LAW REVIEW          [Vol. 64:641

*B. Trent Taylor*

Trent Taylor filed his lawsuit on September 2, 2014, naming forty-seven corrections officers, officials, and nurses who worked at the Texas prison where he was being held and describing his claims in a forty-one page complaint.[175] That same day, he filed a motion requesting that the judge hearing his case appoint counsel.[176] Appended to Taylor's motion were letters from several attorneys who had declined to represent him.[177] The judge denied Taylor's request.[178]

On July 22, 2015, the defendants filed a motion to dismiss, arguing that Taylor's complaint did not allege constitutional violations and that the officers were entitled to qualified immunity.[179] In August, Taylor wrote to the judge, asking that defendants be ordered to provide him with the cases they cited in their brief and to order the prison to give him physical access to the law library.[180] As Taylor explained,

> Taylor is a G-5 offender who is not allowed to have access to the law library. He can only access cites through the cell delivery system which provides 3 case cites on Monday, Wednesday, or Friday. Yet these rules are not followed usually a G-5 offender will be lucky to get 6 cites a week.... The honorable attorney general cited around 150 case cites [in the motion to dismiss]. [A]t 6 per week it would take [Taylor] 25 weeks to research just a single motion.[181]

---

175. Complaint, Taylor v. Williams, No. 14-cv-00149 (N.D. Tex. Sept. 2, 2014).

176. Motion for Appointment of Counsel, *Taylor*, No. 14-cv-00149 (N.D. Tex. Sept. 2, 2014).

177. *Id.* at 2-4.

178. Order, *Taylor*, No. 14-cv-00149 (N.D. Tex. Sept. 29, 2014). The judge did grant Taylor's petition to proceed in forma pauperis and concluded that he had stated cognizable claims in his complaint.

179. Defendants Marion Williams and Ray Mitchell's Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(1) and Fed. R. Civ. P. 12(b)(6), *Taylor*, No. 14-cv-00149 (N.D. Tex. July 22, 2015).

180. Motion to Direct Defendants to Provide Plaintiff with Printed Copies of Case Cites in Which Plaintiff Has No Access To, and to Provide Plaintiff with Access to the Law Library, *Taylor*, No. 14-cv-00149 (N.D. Tex. Aug. 10, 2015) [hereinafter Motion to Direct Defendants].

181. *Id.* at 2-3. In Texas prisons, a General Population Level 5 offender has had prior disciplinary convictions or is "assaultive or aggressive in nature" and has significant limits on their freedoms—they are ineligible for contact visits, are limited in their recreation time, and are under closer supervision. TEX. DEP'T OF CRIM. JUST., UNIT CLASSIFICATION PROCEDURE

The judge gave Taylor an extra month to submit his response to the motion to dismiss but denied his requests for cases and more access to the law library.[182] Taylor timely submitted his opposition to the motion to dismiss and, that same day, renewed his request for counsel.[183] In his request, Taylor offered additional details about the challenges of conducting legal research in prison. As Taylor explained, the prison library had "the lexis computer system" for legal research, but

> [o]nly the clerks actually have access to the computer. Offenders who want to find a case or gain access to a case by title must have the complete cite to locate same. If the newspaper or article or other case has no such cite then the computer/clerks will not or cannot produce the case.[184]

And there was no other way to gather information about the cases, according to Taylor.[185] "Considering that the computers were supposedly an alternative to library books research, the books have been virtually eliminated."[186] Adding to Taylor's challenges was the nine-cites-per-week limit he described in his August letter and the strict way that it was interpreted.[187] He explained, "Taylor asked to see the Federal Rules of Civil Procedure book in which Taylor was told he may select a single rule for viewing or up to three rules which will count as Taylor's three cites for that day."[188]

The judge again denied Taylor's request for counsel.[189] The judge explained that Taylor was representing himself well enough without a lawyer. As the judge wrote,

---

(2005), https://www.aclu.org/sites/default/files/pdfs/capital/tdcj_unit_classification.pdf [https://perma.cc/XR67-CNBF]. They also, as Taylor's letter describes, have limited access to the law library.

182. Order Granting Motion, *Taylor*, No. 14-cv-00149 (N.D. Tex. Sept. 14, 2015).

183. Plaintiff's Reply in Opposition to Defendants Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(1) and Fed. R. Civ. P. 12(b)(6), *Taylor*, No. 14-cv-00149 (N.D. Tex. Oct. 19, 2015); Motion for Appointment of Counsel, *Taylor*, No. 14-cv-00149 (N.D. Tex. Oct. 19, 2015).

184. Motion for Appointment of Counsel, *supra* note 183, at 2.

185. *See id.*

186. *Id.*

187. Motion to Direct Defendants, *supra* note 180, at 2-3.

188. Motion for Appointment of Counsel, *supra* note 183, at 3.

189. Order Denying Motion at 2, *Taylor*, No. 14-cv-00149 (N.D. Tex. Dec. 8, 2015).

> Plaintiff argues that the facts and circumstances of this case meet the criteria [for the appointment of counsel]. He addresses each factor with reasoned arguments and cites a number of cases in support.... [T]he reasoning in Plaintiff's eight-page motion and in other documents he has filed in this action demonstrate [sic] that he is capable of adequately presenting and investigating his case.[190]

In March 2016, the court denied defendants' motion to dismiss in part, and the case headed to discovery.[191] Taylor again renewed his motion for appointment of counsel, focusing on the challenges of pursuing discovery as a pro se litigant, particularly in this case:

> This case has 11 defendants and multiple constitutional claims of deliberate indifference to plaintiff's health and safety and to his serious medical needs, excessive use of force, failure to supervise and or properly train, as well as other eighth and fourteenth amendment claims....
>
> The complexity of this case is monumental in that it will take months to years of attempting to locate the inmates that were housed in cell next to or across from Taylor. These witnesses could conceivably have been shipped to any of the other 100 units they had been shipped from prior to their mental illnesses. Clearly this form of discovery is not something that offenders could generally be expected to accomplish in under six months much less the 58 day deadline that has been set for discovery....
>
> Taylor is not familiar with the making and meetings of objections; nor the federal rules of evidence (additionally Taylor has no earthly idea how to properly conduct discovery) and without counsel may not properly be able to present an issue that can be preserved for appellate review....
>
> ....

---

190. *Id.* Note that the judge's reasoning seems to create a Catch-22: Taylor wrote a convincing application for the appointment of counsel, but the judge denied the request because the persuasiveness of the application was, in the judge's mind, proof that the Taylor did not need counsel.

191. Order at 4-5, *Taylor*, No. 14-cv-00149 (N.D. Tex. Mar. 29, 2016).

It is important to note that unlike many pro-se prisoner cases this one involves numerous witnesses who are mentally ill. So much so that they have been repeatedly housed in the Montford psychiatric prison setting. These inmates often are denied writing material or access to the same for their own protection, as such it will be difficult to get witness affidavits or depositions from them with-out counsel....

....

Last, consider that while almost anyone can get affidavits it is a serious battle to obtain depositions even from inmates. Because the Federal Rules of Civil Procedure require these depositions be done under the supervision under the officer of the courts, even written depositions are useless without an officer of the courts to approve them. While it is true that every TDCJ unit has a "notary public" which could sign off on these types of depositions but as discovery will show, always been resisted by the law library supervisor.... This makes obtaining and presenting depositions very difficult for pro-se litigants.[192]

Taylor's application for appointment of counsel was again denied.[193] The defendants moved for summary judgment, including more than one thousand pages of exhibits to support their motion.[194] Taylor's opposition to the summary judgment motion included a declaration he wrote and copies of his grievances and medical records.[195] The judge granted the officers qualified immunity on the claims about the cell conditions, finding that no prior case clearly established the unconstitutionality of those conditions.[196]

---

192. Motion for Appointment of Counsel at 3-5, *Taylor*, No. 14-cv-00149 (N.D. Tex. July 25, 2016).

193. Order at 2, *Taylor*, No. 14-cv-00149 (N.D. Tex. July 27, 2016).

194. *See* Motion for Summary Judgment, *Taylor*, No. 14-cv-00149 (N.D. Tex. Oct. 10, 2016).

195. *See* Order at 8, *Taylor*, No. 14-cv-00149 (N.D. Tex. Jan. 5, 2017).

196. *See id.* The judge denied summary judgment on a related excessive force claim—that a defendant had hit him in the testicles with a metal pipe. While his conditions of confinement claim was on appeal, Taylor represented himself at trial in the excessive force claim. The jury ruled that Taylor's Eighth Amendment rights had been violated but awarded him nothing in damages. *See* Court's Charge to the Jury and Jury Verdict, Taylor v. Williams, No. 14-cv-00149 (N.D. Tex. Mar. 6, 2017).

In February 2017, Taylor appealed the district court's grant of qualified immunity.[197] The defendants moved to dismiss the appeal, arguing that it was filed late.[198] The appeals court remanded the case back to the district court to determine whether the appeal was timely filed.[199] The district court ordered that the prison produce its outgoing mail logs, and those logs confirmed that Taylor had timely filed the appeal (although the prison postmarked it several days late).[200]

On December 20, 2019, the Fifth Circuit issued its decision affirming the grant of qualified immunity.[201] The court of appeals held that Taylor's Eighth Amendment rights had been violated, taking the facts in the light most favorable to him.[202] But, although it was clearly established that "prisoners couldn't be housed in cells teeming with human waste for months on end," the Fifth Circuit granted qualified immunity because it "hadn't previously held that a time period so short violated the Constitution."[203]

After the Fifth Circuit issued its opinion, several lawyers wrote Taylor offering to represent him.[204] One of these lawyers, the founder and Executive Director of a nonprofit named Rights Behind Bars, flew to Texas to meet with Taylor.[205] Rights Behind Bars filed a petition for rehearing en banc, which the Fifth Circuit denied.[206] On April 24, 2020, Rights Behind Bars and a team of lawyers from Orrick, Herrington & Sutcliffe filed a petition for certiorari with the Supreme Court on Taylor's behalf.[207]

* * *

---

197. *See* Notice of Intent to Appeal a Final Decision, *Taylor*, No. 14-cv-00149 (N.D. Tex. Feb. 27, 2017).

198. *See* Order of the United States Court of Appeals at 2, Taylor v. McDonald, No. 18-11572 (5th Cir. Jan. 28, 2019) (per curiam).

199. *Id.*

200. *See* Order, Taylor v. McDonald, No. 14-cv-00149 (N.D. Tex. Feb. 12, 2019).

201. Taylor v. Stevens, 946 F.3d 211, 227 (5th Cir. 2019).

202. *Id.* at 216-17, 222.

203. *Id.* at 222.

204. Telephone Interview with Trent Taylor, *supra* note 68.

205. *Id.*

206. Petition for Writ of Certiorari to the United States Court of Appeals for the Fifth Circuit, Taylor v. Riojas at 4, No. 19-1261 (5th Cir. Apr. 24, 2020).

207. *See id.*

Baxter's and Taylor's success litigating their § 1983 cases pro se should be applauded. But such success cannot be expected. Civil rights attorneys will tell you that the law is complicated and hard to master—that is why people are disinclined to take these cases unless the damages are significant.[208] For a person without a legal degree, the challenges of bringing § 1983 cases are exponentially greater, and these challenges reach the stratosphere for people in jail or prison as they try to prosecute their claims.[209] When I asked Baxter and Taylor about their successes litigating pro se, both told me that jailhouse lawyers had taken them under their wings, educated them about the law, and helped them draft their briefs and motions.[210] Without the assistance of counsel—jailhouse or free world—the challenges Baxter and Taylor described in their unsuccessful requests for appointment of counsel would be nearly impossible to overcome.

## III. Pro Se Realism

When people cannot find lawyers to represent them, things rarely turn out the way they did for Alex Baxter and Trent Taylor. Many people who cannot find a lawyer to represent them will decide not to file a case at all.[211] There is no way to know just how many such people there are, but available evidence indicates that only 1 percent of people who believe they have been mistreated by the police ever sue.[212] Some portion of those abandoned cases are almost

---

208. *See* Schwartz, *supra* note 58, at 1135.

209. Rhode, *supra* note 66, at 1804-05.

210. For descriptions and discussions of jailhouse lawyers, see, for example, Jessica Feierman, *"The Power of the Pen": Jailhouse Lawyers, Literacy, and Civic Engagement*, 41 Harv. C.R.-C.L. L. Rev. 369, 371-73 (2006) (defining jailhouse lawyers as "prisoners who assist other prisoners with legal work, with or without a fee," and describing the type of work jailhouse lawyers perform and the challenges they face); Julie B. Nobel, Note, *Ensuring Meaningful Jailhouse Legal Assistance: The Need for a Jailhouse Lawyer-Inmate Privilege*, 18 Cardozo L. Rev. 1569, 1573 (1997) ("There is no clear definition of a jailhouse lawyer, but several characteristics are essential to any definition: all jailhouse lawyers are incarcerated; most do not have a law degree or any formal legal training; and all claim to possess some legal knowledge and are sought out by other prisoners for this reason." (footnotes omitted)).

211. *See* Galanter, *supra* note 54, at 19.

212. Matthew R. Durose, Erica L. Smith & Patrick A. Langan, Bureau of Just. Stat., Contacts Between Police and the Public, 2005, at 8 (2007) (finding that the police had used force against 664,460 people, 86.9 percent of whom believed that the police acted

certainly abandoned because the person with the claim was unable to find counsel.

Others decide to represent themselves in court. Between 2000 and 2019, 1,017,043 pro se prisoner petitions and 204,661 pro se nonprisoner civil rights suits were filed in federal district courts.[213] Pro se plaintiffs infrequently get as far as did Baxter and Taylor.

## A. Pro Se Litigation in Five Districts

I reviewed the dockets of 1,183 police misconduct cases filed in five federal districts around the country—the Southern District of Texas, Middle District of Florida, Northern District of Ohio, Northern District of California, and Eastern District of Pennsylvania.[214] I found significant variation in the ways § 1983 cases were litigated

---

improperly, and just 7,416 (13.1 percent) of whom filed a lawsuit regarding the alleged misconduct). Note that this survey concerns only police uses of force. Each year, millions of people believe they are wrongfully stopped by the police while driving or walking. *See* ERIKA HARRELL & ELIZABETH DAVIS, BUREAU OF JUST. STAT., U.S. DEP'T OF JUST., CONTACTS BETWEEN POLICE AND THE PUBLIC, 2018—STATISTICAL TABLES 4, 11, 14 (2020). We do not know how often people who believe they have been mistreated by the police in ways that do not involve the use of force sue. For discussion of filing rates in other areas of the law and possible reasons that some grievances may never become filed lawsuits, see, for example, Galanter, *supra* note 54, at 13-18.

213. *See* U.S. CTS., JUST THE FACTS: TRENDS IN PRO SE CIVIL LITIGATION FROM 2000 TO 2019, (2021), https://www.uscourts.gov/news/2021/02/11/just-facts-trends-pro-se-civil-litigation-2000-2019#figures_map [https://perma.cc/7ZHA-RVEM]. There are more pro se prisoner petitions and civil rights actions than all other types of pro se filings combined in federal court, yet the access to justice crisis is much more acute in state courts where millions of people each year go to court in civil matters without the assistance of counsel. *See, e.g.,* Pamela K. Bookman & Colleen F. Shanahan, Essay, *A Tale of Two Civil Procedures,* 122 COLUM. L. REV. 1183 (2022); Jessica K. Steinberg, *Demand Side Reform in the Poor People's Court,* 47 CONN. L. REV. 741, 748-49 (2015). In 2021, the United States was ranked 126 out of 139 countries on "accessibility and affordability of civil justice." WORLD JUST. PROJECT, RULE OF LAW INDEX 2021 (2021), https://worldjusticeproject.org/sites/default/files/documents/WJP-INDEX-21.pdf [https://perma.cc/KNW6-9Y6T].

214. For extended discussion of this study's findings, see generally Schwartz, *supra* note 81. For a description of the study's methodology and the selection of districts, see *id.* at 19-25. Note that these cases do not concern the treatment of people while in prison—the subject of Trent Taylor's case—because this study was limited to cases brought against police officers and sheriffs' departments. *See id.* at 22. Some of the claims in these cases did, though, concern the treatment of people in jails staffed by sheriffs' deputies. *See id.* at 19-25. And some of these cases concerned police misconduct but were brought by people, similar to Alex Baxter, in jail or prison at the time of filing. *See id.*

across these five districts.[215] But in each district, pro se plaintiffs were far less likely to succeed than represented plaintiffs and far less likely to have their cases resolved on the merits.[216]

Of the 1,183 cases I hand coded, 910 (76.9 percent) had counsel at some point during the litigation, and 273 (23.1 percent) were pro se throughout.[217] Adopting a standard measure of litigation "success"— settlements/Rule 68 judgments, voluntary or stipulated dismissals, and plaintiff verdicts or split verdicts[218]—represented plaintiffs succeeded in 637 (70 percent) of cases and pro se plaintiffs succeeded in 45 (16.5 percent) of their cases.[219]

---

215. *See id.*

216. For similar results in a related context, see, for example, Eric Ruben & Joseph Blocher, *From Theory to Doctrine: An Empirical Analysis of the Right to Keep and Bear Arms After* Heller, 67 DUKE L.J. 1433, 1478-79 (2018) (finding a huge gap in success rates in post-*Heller* Second Amendment claims, with represented plaintiffs succeeding 21 percent of the time and pro se plaintiffs succeeding 2 percent of the time).

217. *See infra* Table 1. Variation across districts existed in the percentage of successful § 1983 cases filed that were pro se: in the Eastern District of Pennsylvania, 16.5 percent of cases filed were pro se, compared with 24.6 percent of cases filed in the Northern District of California, 23.8 percent of cases filed in the Northern District of Ohio, 34.2 percent of cases filed in the Middle District of Florida, and 20.6 percent of cases filed in the Southern District of Texas. *See* Joanna Schwartz, E.D. Pa. § 1983 Spreadsheets (last updated June 2018) (on file with author); Joanna Schwartz, N.D. Cal. § 1983 Spreadsheets (last updated June 2018) (on file with author); Joanna Schwartz, N.D. Ohio § 1983 Spreadsheets (last updated June 2018) (on file with author); Joanna Schwartz, M.D. Fla. § 1983 Spreadsheets (last updated June 2018) (on file with author); Joanna Schwartz, S.D. Tex. § 1983 Spreadsheets (last updated June 2018) (on file with author). Prisoners are far less likely to find counsel; between 2000 and 2019, 91 percent of prisoner petitions were filed pro se in federal courts. *See* U.S. CTS., *supra* note 213, at 2.

218. *See* Alexander A. Reinert, *Measuring the Success of* Bivens *Litigation and Its Consequences for the Individual Liability Model*, 62 STAN. L. REV. 809, 812 n.13 (2010) (describing this common definition of plaintiff "success" in similar studies).

219. *See infra* Table 1.

Table 1. Case Dispositions for Represented and Pro Se Plaintiffs in Five Federal Districts

| Disposition | Represented | Pro Se |
|---|---|---|
| Settlement/R.68 Judgment | 471 (51.8%) | 19 (6.9%) |
| Voluntary/stipulated dismissal | 157 (17.3%) | 25 (9.2%) |
| Sua sponte dismissal before Defendant responds | 13 (1.4%) | 113 (41.4%) |
| Dismissed as sanction/for failure to prosecute | 22 (2.4%) | 25 (9.2%) |
| Remanded to state court | 11 (1.2%) | 5 (1.8%) |
| Motion to dismiss granted | 41 (4.5%) | 52 (19%) |
| Summary judgment granted | 105 (11.5%) | 22 (8.1%) |
| Directed verdict for Defendant | 3 (0.3%) | 0 |
| Dismissed on appeal | 4 (0.4%) | 0 |
| Case open, stayed, or on appeal | 12 (1.3%) | 0 |
| Trial—plaintiff or split verdict | 9 (1%) | 1 (0.3%) |
| Trial—defense verdict | 57 (6.3%) | 10 (3.7%) |
| Other | 5 (0.5%) | 1 (0.3%) |
| **Total cases** | 910 | 273 |

The fact that counseled cases were four times more likely to be successful than pro se cases[220] is not a problem if counseled cases are four times more likely than pro se cases to be meritorious. In other words, if the pro se plaintiffs' cases that were dismissed were without merit, there is little to protest. If, on the other hand, pro se cases were meritorious but unsuccessful because the plaintiffs did not have lawyers' assistance, the system is not working as it should.

We know that the way civil rights attorneys are paid means that they have strong incentives to decline meritorious cases with low potential damages or high risks.[221] But we do not know how many of the 228 pro se plaintiffs in my five-district dataset whose cases were dismissed had meritorious claims. It is worth noting that more than 60 percent of the unsuccessful pro se cases (and more than 50 percent of all the pro se cases) were dismissed either sua sponte by the judge at the very outset of the case,[222] or for failure to

---

220. *See supra* Table 1.
221. *See* Schwartz, *supra* note 58, at 1131-38.
222. *See supra* Table 1; 28 U.S.C. § 1915(3). See *supra* note 144 and accompanying text for a description of this analysis in Alexander Baxter's case.

prosecute[223]— bases for dismissal that may say more about the pro se plaintiffs' limited resources and abilities to pursue their claims than about the underlying merits of those claims. But investigating the merits of each of these pro se cases would be exceedingly challenging, particularly given that most were dismissed without any discovery.[224]

To better appreciate the litigation challenges faced by pro se plaintiffs with meritorious claims, I decided to review pro se cases filed against a troubled police department with a well-documented history of abuses. The police department in Vallejo, California was an obvious contender.

## B. Pro Se Litigation in Vallejo, California

Vallejo, a city of about 120,000 people thirty miles north of San Francisco, has one of the deadliest police forces in the United States. Vallejo police officers killed nineteen people between 2010 and 2020.[225] That is more than thirteen people per hundred thousand Vallejo residents.[226] More people are shot by Vallejo police officers, per capita, than officers in any other city in Northern California.[227] More people are killed by Vallejo police officers, per capita, than by officers in all but one of the hundred largest law enforcement agencies in the United States.[228] Yet Vallejo police officers who shoot and kill are rarely punished, and often promoted.[229] And a clique of officers in the department actually celebrate these shootings by

---

223. *See supra* Table 1; Schwartz, *supra* note 81, at 47.

224. *See supra* Table 1; Schwartz, *supra* note 81, at 47.

225. *See* Sam Levin, *19 Dead in a Decade: The Small American City Where Violent Police Thrive*, THE GUARDIAN (June 13, 2020, 6:00 AM), https://theguardian.com/us-news/2020/jun/13/vallejo-california-police-violence-sean-monterrosa [https://perma.cc/DKA6-NEL5].

226. Stephen Stock, Robert Campos, Anthony Rutanashoodech, Mark Villarreal, Jeremy Carroll, Michael Horn & Jennifer Gonzalez, *Vallejo Police Have Highest Rate of Residents Shot Per Capita in Northern California; NBC Bay Area Probes Causes*, NBC BAY AREA (May 18, 2019, 4:17 PM), http://www.nbcbayarea.com/news/local/vallejo-police-highest-rate-of-residents-shot-per-capita-in-northern-california-nbc-bay-area-probes-causes/190344/ [https://perma.cc/459K-XC24].

227. *See id.*

228. *See* Shane Bauer, *How a Deadly Police Force Ruled a City*, NEW YORKER (Nov. 16, 2020), https://www.newyorker.com/magazine/2020/11/23/how-a-deadly-police-force-ruled-a-city [https://perma.cc/ZS6L-T3KN].

229. *See id.*

bending the tips of their badges, a practice that has been referred to as the "Badge of Honor."[230] Extensive profiles by national outlets, including *The New Yorker*, *The Guardian*, and CNN, and by local newspapers and news stations have detailed what *The New Yorker* described as an "ongoing litany of police killings" and "[t]he failure to hold police officers accountable."[231]

In Vallejo, as in the rest of the country, succeeding as a pro se plaintiff in a § 1983 police misconduct case is very difficult. By my count, eighty-five § 1983 lawsuits were filed against the City of Vallejo and its approximately 100 officers between 2010 and 2020.[232] Of those eighty-five cases, nine remain pending as of December 23, 2022. Of the seventy-six cases that have been resolved, thirty-five were litigated with counsel and forty-one were litigated pro se.[233]

Of the thirty-five counseled cases that were filed and resolved in my study period, thirty (85.7 percent) were settled and five (14.3 percent) were dismissed by the court.[234] The statistics are nearly reversed for the forty-one pro se cases: just five (12.2 percent) were settled, and thirty-five (85.4 percent) ended without any payment to the plaintiffs.[235] Moreover, four of the five successful pro se cases were brought or supported by a jailhouse lawyer (as were Baxter's and Taylor's cases).[236] So the chances of a pro se plaintiff succeeding

---

230. *See* Geoffrey King, *Vallejo Police Bend Badges to Mark Fatal Shootings*, OPEN VALLEJO (July 28, 2020), https://openvallejo.org/2020/07/28/vallejo-police-bend-badge-tips-to-mark-fatal-shootings/ [https://perma.cc/8QXA-X82Z].

231. Bauer, *supra* note 228; *see also, e.g.*, Breeanna Hare, *This California City Has a History of Police Using Deadly Force. Its First Black Police Chief Looks Toward Reform*, CNN (May 2, 2021, 10:12 PM), https://www.cnn.com/2021/05/02/us/vallejo-police-chief-united-shades-of-america/index.html [https://perma.cc/C33V-QSFT]; King, *supra* note 230; Levin, *supra* note 225; Stock et al., *supra* note 226.

232. I am not including in this count four cases that appear to be duplicate filings by four of the pro se plaintiffs.

233. *See infra* Table 2. These additional details are reflected in Joanna Schwartz, Vallejo Spreadsheet (last updated December 23, 2022) (on file with author).

234. *See infra* Table 2.

235. *See infra* Table 2. I have included voluntary dismissals in the unsuccessful outcomes for pro se plaintiffs here. Although voluntary dismissals are usually presumed to be plaintiff successes—indications that the case has settled—my review of the Vallejo dockets made clear that the two voluntary dismissals in pro se Vallejo cases were not settlements but, instead, decisions by the plaintiffs to abandon their claims.

236. Frederick Cooley, the jailhouse lawyer, was the named plaintiff in the most successful of these cases, which settled for $35,000. Email from Geoffrey King to author (Jan. 7, 2022, 8:45 PM) (on file with author). In his complaint, filed on March 6, 2012, Cooley alleged that during the course of his arrest, two Vallejo officers beat him with a flashlight while he was

2023]          CIVIL RIGHTS WITHOUT REPRESENTATION          681

without legal assistance are even slimmer than the raw data suggest.

Table 2. Case Dispositions for Represented and Pro Se Plaintiffs in Vallejo

| Disposition | Represented | Pro Se |
|---|---|---|
| Settlement | 30 (85.7%) | 5 (12.2%) |
| Screening dismissal by judge | 0 | 6 (14.6%) |
| Failure to prosecute | 0 | 25 (61%) |
| Voluntary dismissal | 0 | 2 (4.9%) |
| Case dismissed at MTD/SJ/trial | 5 (14.3%) | 2 (4.9%) |
| Unknown | 0 | 1 (2.4%) |
| Total | 35 (100%) | 41 (100%) |

Unsurprisingly, attorneys appear willing to accept cases against the Vallejo police department and its officers in which the damages are highest. Ten of the eighty-five suits allege Vallejo officers shot and killed people, and the plaintiffs in all of these deadly force cases had lawyers. But the majority of cases filed against the city of Vallejo and its officers—forty-three of the eighty-five—tell of

---

lying face down in a prone position and not resisting, and then slammed his head into their patrol car. *See* Complaint, Cooley v. City of Vallejo, No. 12-cv-00591 (E.D. Cal. Mar. 6, 2012). The officers injured Cooley's head and broke his hand, an injury that was further exacerbated when they put him in tight handcuffs. *Id.* at 3-4. The officers took Cooley to the hospital and claimed there that he had received his injuries in a car accident. *Id.* at 4. Cooley sued the officers and brought a *Monell v. Department of Social Services* claim against the city for a policy or custom of tolerating excessive force by its officers. *Id.*; *see also* 436 U.S. 658 (2018).

The court dismissed Cooley's *Monell* claim during its initial screening of the case, but Cooley amended his complaint to add additional detail about his *Monell* claim, and the court let it proceed. *See* Amended Complaint, *Cooley*, No. 12-cv-00591 (E.D. Cal. Apr. 18, 2012). Defendants moved for summary judgment. Notice of Motion and Motion for Summary Judgement in Favor of Defendants' City of Vallejo, Sean Kenney, Eric Jensen, *Cooley*, No. 12-cv-00591 (E.D. Cal. July 26, 2013). At around the same time, Cooley filed a motion to compel complaint records filed against the two officers who had assaulted him. *See* Order on Discovery & Protective Order, *Cooley*, No. 12-cv-00591 (E.D. Cal. Oct. 29, 2013). The court ruled that Cooley was entitled to this information and denied the summary judgment motion as premature. *Id.* at 17-19. The case settled soon thereafter.

From prison, Frederick Cooley began assisting other pro se plaintiffs with their § 1983 cases against the City of Vallejo and its officers. Cooley's name is mentioned in fourteen other pro se § 1983 cases in my dataset, including three of the other four pro se cases that settled. *See* Schwartz, *supra* note 233. Defendants repeatedly objected to Cooley's participation in these pro se cases, arguing that Cooley was engaged in the unauthorized practice of law.

gratuitous but nondeadly force used during routine stops and arrests: of officers beating people with batons; punching and kicking people in the head; slamming people into the concrete and against patrol car doors; and repeatedly tasing people when they posed little or no threat.[237]

Attorneys appear less eager to represent plaintiffs in these non-deadly force cases[238]—perhaps because the anticipated damages are lower, or because the force was used while arresting the plaintiff for a crime that sent them to jail or prison. Civil rights attorneys, given the choice, might also prefer to take § 1983 cases against the San Francisco or Oakland police departments' officers than against officers working in Vallejo. Although San Francisco and Oakland are just thirty miles from Vallejo, San Francisco and Oakland are in the Northern District of California and Vallejo is in the Eastern District of California.[239] Attorneys will tell you that the judges and jury pools in the Northern District are friendlier to civil rights cases than those in the Eastern.[240]

Of the forty-three cases alleging nondeadly force by Vallejo police officers during the course of arrest, twenty-one were filed pro se and twenty-two were filed with counsel. As of December 23, 2022, thirty-seven of the cases have been resolved. Among these resolved cases, the disparity in outcomes between counseled and pro se cases is stark.

---

237. *See* Schwartz, *supra* note 233; *infra* Table 3.

238. *See* Schwartz, *supra* note 233; *infra* Table 3.

239. *See* Jurisdiction Map for the Central District of California, U.S. Ct. C.D. Cal., https://www.cacd.uscourts.gov/jurisdiction [https://perma.cc/KR82-MJHL].

240. *See, e.g.*, Interview with N.D. Cal. Attorney F (Dec. 9, 2017) (on file with author) ("I'd say that the Eastern District [of California] judges are more prone to give the officers benefit of a doubt, grant qualified immunity versus the Northern District Judges. I mean, Northern District tends, to me, to be more open to litigation.... [Y]ou talk to the average lawyer who practices in both [the Northern and Eastern Districts of California], they are going to tell you that the Eastern District is more conservative, because in terms of jury panels, which may be reflective of judges too because of the voting records and so on and so forth of those areas, and who gets appointed, or proposed.").

2023]          CIVIL RIGHTS WITHOUT REPRESENTATION          683

Table 3. Dispositions for Represented and Pro Se Plaintiffs in Cases alleging Nondeadly Force During Arrest in Vallejo

| Disposition | Represented | Pro Se |
|---|---|---|
| Settlement | 15 (93.8%) | 4 (19%) |
| Screening dismissal by judge | 0 | 0 |
| Failure to prosecute | 0 | 14 (66.7%) |
| Voluntary dismissal | 0 | 1 (4.8%) |
| Case dismissed at MTD/SJ/trial | 1 (6.2%) | 2 (9.5%) |
| **Total** | 16 (100%) | 21 (100%) |

Of the counseled cases, fifteen of the sixteen (93.8 percent) settled, and among the fourteen cases for which I have settlement information, the payments ranged from $5,000-$750,000, with an average payment of $95,143, and a median payment of $37,500.[241] Of the pro se cases, four of the twenty-one (19 percent) settled with payments ranging from $1,650-$35,000.[242] The average payment in these four pro se cases was $12,287 and the median payment was $6,250.[243]

Only one of the sixteen counseled nondeadly force cases did not settle—that case was dismissed on the merits.[244] In contrast, seventeen of the twenty-one pro se nondeadly force cases did not settle—one was dismissed on the merits,[245] and the remaining sixteen cases were dismissed for failure to prosecute or other reasons seemingly related to the plaintiffs' pro se status instead of the merits of the claims.[246]

---

241. *See supra* Table 3; Email from Geoffrey King to author, *supra* note 236. Information about the settlement in one of the cases, *Lopez v. City of Vallejo*, is available at John Glidden, *Vallejo Settles Lawsuit Alleging Officers Beat Man During Illegal Entry for $120K*, VALLEJO SUN (May 24, 2022), https://www.vallejosun.com/vallejo-settles-lawsuit-alleging-officers-beat-man-during-illegal-entry-for-120k/ [https://perma.cc/KG8C-GHAC].

242. *See supra* Table 3; Email from Geoffrey King to author, *supra* note 236.

243. *See* Email from Geoffrey King to author, *supra* note 236.

244. *See supra* Table 3.

245. The plaintiff alleged that officers used excessive force against him by tasing him when he was running away, and the court granted the officer qualified immunity, ruling that the Fourth Amendment rules on tasers under these circumstances were not clearly established. *See* Black v. City of Vallejo, No. 12-cv-1439, 2013 WL 2245385, at *8 (E.D. Cal. May 21, 2013).

246. *See supra* Table 3.

684                WILLIAM & MARY LAW REVIEW            [Vol. 64:641

Just as "every unhappy family is unhappy in its own way,"[247] every failed pro se case is unsuccessful in its own way. What follows is a description of the path five of these seventeen unsuccessful pro se cases took, revealing some of the barriers—erected by prison officials, defense counsel, judges, and rules of procedure—faced by pro se plaintiffs fighting to get their cases heard on the merits.[248]

*1. Joshua Deleon*

On February 27, 2012, Joshua Deleon filed a lawsuit from the Solano County Jail alleging that,

> On October 18th, 2011, while being arrested by [a] Vallejo police officer ... I was put into a carotid restraint.... [T]he blood vessels in both eyes were popped caused by strangulation and continued use of the carotid restraint, which caused me to lose vision and black out. Which at the same time my head was slammed into the concrete. I was then tasered which at the time I was already in handcuffs... I was taken to the hospital due to the seriousness of the injuries. I now suffer loss of sight, headache, paranoia, and scars.... I would like the courts to shine light on an ongoing problem of Vallejo police department's officers using excessive force. Vallejo has a high number of lawsuits for the same offense ongoing! I would like to be paid for my injury's loss and suffering.[249]

On November 13, 2012, the court ruled that Deleon had made a "cognizable" claim against the officers but not the City of Vallejo and so ordered Deleon to file an amended complaint with facts that

---

247. LEO TOLSTOY, ANNA KARENINA 1 (Constance Garnett ed. & trans., Lerner Publ'g Grp., Inc. 2015) (1878) (ebook).

248. These five examples do not capture all of the challenges of proceeding pro se. For a discussion of additional challenges faced particularly by pro se prisoners, see generally Katherine A. MacFarlane, *Shadow Judges: Staff Attorney Adjudication of Prisoner Claims*, 95 OR. L. REV. 97, 114-15 (2016).

249. Complaint at 3, Deleon v. Vallejo Police Dep't, No. 12-cv-00510 (E.D. Cal. Feb. 27, 2012).

would support a *Monell* claim.[250] The order was sent to Deleon at the Solano County Jail but was returned to the court as undeliverable.[251] On October 25, 2013, the court issued an order to show cause why the action should not be dismissed for failure to file a notice of change of address.[252] The order to show cause was returned as undeliverable.[253] On December 24, 2013, Deleon's case was dismissed.[254]

### 2. Javier Leiva

Javier Leiva's first filing with the court was a letter, not a formal complaint, submitted on February 19, 2013.[255] In it, he explained that on July 2, 2012, as he was about to enter a liquor store, a police car pulled up.[256] An officer got out and asked Leiva what he was doing.[257] Leiva told the officer he was going in the liquor store.[258] He opened the door and entered.[259] Leiva's letter explained what happened next:

> The police officer jumped out his car and ran in the store with his Taser gun drawn. I put my hands up in the air the officer then ordered me to turn around. I complied. Next thing that happened he push/kicked me in the small of my back causing me to snap forward. My head hit the glass from where they keep deli meats behind. The officer then slammed me to the ground asked what was in my pockets, I said a knife. Then came the fire department officers to check me out. One of them asked the police officer why did you go after this guy. The officer replies he saw me make a drug transaction in front of the store which is a

---

250. Order at 2-4, *Deleon*, No. 12-cv-00510 (E.D. Cal. Nov. 13, 2012).
251. Order at 1, *Deleon*, No. 12-cv-00510 (E.D. Cal. Oct. 25, 2013).
252. *Id.*
253. Order at 2, *Deleon*, No. 12-cv-00510 (E.D. Cal. Dec. 24, 2013).
254. *See id.*
255. *See* Complaint at 1, Leiva v. Vallejo Police Dep't, No. 13-cv-00309 (E.D. Cal. Feb. 19, 2013).
256. *Id.*
257. *Id.*
258. *Id.*
259. *Id.*

lie. They found no drugs, cell phone, or money on me. I'm not on parole or probation. It was an illegal stop.[260]

Leiva explained in his letter to the court that he reached out to an attorney in August 2012, who said she thought he had a case and that "she would be filing for the lawsuit in court."[261] In the end of August, Leiva was arrested for being drunk in public and spent ninety days in jail.[262] When he got out, he contacted that same attorney "to see what was happening," and she called back a few days later to say, "they could not take my case because their office was overwhelmed with other cases."[263] At some point, Leiva was charged with knife possession from the July 2, 2012, incident, so he filed his letter to the court from jail.[264]

On February 26, 2013, the judge assigned to Leiva's case ordered that he file a proper complaint within the month.[265] Leiva requested and received a one-month extension of time to file the complaint.[266] When Leiva filed a second request for an extension, that request was denied.[267] Leiva then filed a "Government Tort Claim Form" with the court that another prisoner had advised him to use; the court rejected that form and ordered him to file a complaint that comported with the Federal Rules of Civil Procedure.[268] Leiva filed a complaint on May 28, 2013,[269] and in an order issued on June 11, the court ruled that the complaint alleged a "potentially cognizable claim" and instructed Leiva to

> complete the attached Notice of Submission of Documents and submit the following documents to the court [within thirty days]:
>     a. The completed Notice of Submission of Documents;
>     b. One completed summons;

---

260. *Id.*
261. *Id.* at 2.
262. *Id.*
263. *Id.*
264. *Id.*
265. Order at 2, *Leiva*, No. 13-cv-00309 (E.D. Cal. Feb. 26, 2013).
266. Order at 1, 3, *Leiva*, No. 13-cv-00309 (E.D. Cal. Mar. 18, 2013).
267. *See* Order at 1-2, *Leiva*, No. 13-cv-00309 (E.D. Cal. Apr. 10, 2013).
268. *See* Order to Show Cause at 1, 3, *Leiva*, No. 13-cv-00309 (E.D. Cal. May 2, 2013).
269. Complaint, *Leiva*, No. 13-cv-00309 (E.D. Cal. May 28, 2013).

    c. One completed USM-285 form for defendant Coleman; and
    d. Two copies of the endorsed complaint filed May 28, 2013.[270]

Leiva never responded to this order, and on July 29, 2013, the court dismissed his case.[271]

### 3. Frederick Marceles Cooley

On March 6, 2014, Frederick Marceles Cooley filed a lawsuit alleging that on September 5, 2011, he was at a house party when several Vallejo officers arrived.[272] He explained,

> Officers entered the residence yelling "get down." As Plaintiff was complying with officers' orders to get down, without warning [a Vallejo officer] deployed his taser in dart mode into Plaintiff's forehead just inches away from Plaintiff's left eye as Plaintiff was complying with officers' orders to get down. Plaintiff experienced excruciating pain from the tasing, blurred vision, intense headaches, dizziness and other substantial injuries.[273]

Defendants moved to dismiss Cooley's complaint as time-barred, and the court granted the motion, giving Cooley leave to amend his complaint.[274] Defendants moved to dismiss Cooley's amended complaint, this time arguing that a drug conviction that arose out of his arrest at the house party barred his § 1983 claim.[275] The court denied this motion[276] and set a schedule for discovery.[277]

On April 22, 2015, while the parties were in the midst of discovery, Cooley died.[278] His father, Frederick Marc Cooley—who had

---

270. *See* Order at 2-3, *Leiva*, No. 13-cv-00309 (E.D. Cal. June 10, 2013).

271. *See* Order at 1, *Leiva*, No. 13-cv-00309 (E.D. Cal. July 29, 2013).

272. 42 U.S.C. § 1983 Civil Rights Complaint and Demand for Jury Trial at 1, Cooley v. City of Vallejo, No. 14-cv-00620 (E.D. Cal. Mar. 6, 2014).

273. *Id.*

274. *See* Order at 4, 10, *Cooley*, No. 14-cv-00620 (E.D. Cal. May 12, 2014).

275. *See* Notice of Motion and Motion to Dismiss Plaintiff's Amended Complaint; Memorandum of Points and Authorities Supporting Motion to Dismiss [F.R.C.P. 12(b)(6)] at 3-4, *Cooley*, No. 14-cv-00620 (E.D. Cal. June 16, 2014).

276. Order at 2, *Cooley*, No. 14-cv-00620 (E.D. Cal. Sept. 2, 2014).

277. Pretrial Scheduling Order at 3, *Cooley*, No. 14-cv-00620 (E.D. Cal. Nov. 24, 2014).

278. Statement of Death of Frederick Marceles Cooley at 1, *Cooley*, No. 14-cv-00620 (E.D.

previously sued Vallejo officers for his own mistreatment and was the jailhouse lawyer in several other pro se cases against Vallejo and its officers—filed a motion to substitute himself as the successor-in-interest in the case.[279] The court denied the motion because it did not include sufficient detail.[280] When Cooley filed an amended motion with additional detail, the court again denied his request, concluding that the proper successor-in-interest was the three-year-old son of Frederick Marceles Cooley.[281] The court explained in its decision that a guardian ad litem would have to be appointed for the boy and that the guardian ad litem would have to retain an attorney to pursue the claims.[282] Frederick Marc Cooley asked for and received additional time to try to find a lawyer, but no lawyer would agree to take on the case.[283] The court dismissed the case for failure to prosecute.[284]

### 4. Anthony Garrison

On March 8, 2013, Anthony Garrison filed a lawsuit alleging that a Vallejo police officer named Bautista had kicked Garrison in the face while he was lying on the ground and stole $3,500 from him.[285] Garrison could not find a lawyer,[286] so he asked the judge to appoint a lawyer for him, explaining: "I can't read that well and don't understand these court papers sent to me, let alone comprehend them, if counsel isn't appointed, as I requested at the filing of this case to help me, I have no idea how to proceed."[287] The judge denied the request, finding that Garrison's circumstances were not

---

Cal. Apr. 23, 2015).

279. *See* Motion for Substitution at 1, *Cooley*, No. 14-cv-00620 (E.D. Cal. May 28, 2015); *see also supra* note 236 (describing Frederick Marc Cooley's litigation against Vallejo and its officers).

280. *See* Order at 1, 3-4, *Cooley*, No. 14-cv-00620 (E.D. Cal. June 19, 2015).

281. *See* Order at 1-2, *Cooley*, No. 14-cv-00620 (E.D. Cal. July 28, 2015).

282. *See id.* at 3.

283. *See* Findings and Recommendations at 4, *Cooley*, No. 14-cv-00620 (E.D. Cal. Feb. 2, 2016).

284. Order at 2, *Cooley*, No. 14-cv-00620 (E.D. Cal. Mar. 18, 2016).

285. Complaint Under the Civil Rights Act, Title 42 U.S.C. § 1983 at 3, Garrison v. Bautista, No. 13-cv-00479 (E.D. Cal. Mar. 8, 2013).

286. *See* Motion to Appoint Counsel at 1, *Garrison*, No. 13-cv-00479 (E.D. Cal. May 31, 2013).

287. *Id.*

exceptional because his "lack of legal education and limited law library access" were "[c]ircumstances common to most prisoners."[288] In September 2013, Garrison asked the judge to reconsider his request for a lawyer, explaining:

> I don't understand or know how to proceed with my suit. I don't comprehend the case law, or know what to research and file with the court. I'm sure Officer Bautista has legal counsel, why can't I be appointed one by this court? Being that, I'm ignorant in this area, again I've asked, the court to appoint me counsel in this matter. How can I proceed if I don't understand or know what to do? Please reconsider your earlier denial of counsel. If this isn't taken to the fullest extent, this officer will assault someone else if not kill them purposely as he wanted to do to me.[289]

Once again, the judge denied the request.[290] Garrison submitted a third request for counsel, writing: "I feel like a cow being led to the slaughterhouse. I don't understand the meaning of discovery and scheduling order... I'm asking for help that I need to pursue this case."[291] The judge again denied the request.[292]

Officer Bautista then moved for summary judgment, arguing that he had not been present when Garrison was arrested.[293] In support of his argument, Bautista pointed to the police report that he had written and signed, indicating it was another Vallejo police department employee, Corporal Estudillo, who had kicked Garrison—a detail in the police report that Garrison had apparently overlooked.[294] In response, Garrison asked to amend his complaint to drop Officer Bautista as a defendant in the case and proceed against Corporal Estudillo.[295] But the judge concluded that it was too late to

---

288. Order at 2-3, *Garrison*, No. 13-cv-00479 (E.D. Cal. June 11, 2013).

289. Motion for Appointment of Counsel at 1, *Garrison*, No. 13-cv-00479 (E.D. Cal. Sept. 26, 2013).

290. Order at 2, *Garrison*, No. 13-cv-00479 (E.D. Cal. Oct. 7, 2013).

291. Request for Counsel or Co-Counsel at 1, *Garrison*, No. 13-cv-00479 (E.D. Cal. Nov. 25, 2013).

292. Order at 3, *Garrison*, No. 13-cv-00479 (E.D. Cal. Dec. 10, 2013).

293. Defendants' Memorandum of Points and Authorities in Support of Motion for Summary Judgment at 3, *Garrison*, No. 13-cv-00479 (E.D. Cal. Oct. 3, 2014).

294. *See id.* at 4.

295. Declaration of Anthony Tyrone Garrison at 2, *Garrison*, No. 13-cv-00479 (E.D. Cal. Aug. 11, 2015); Plaintiff's Motion for Leave of Court to File a Third Amended Complaint

name Corporal Estudillo as a defendant, and dismissed Garrison's lawsuit altogether.[296]

### 5. Alfred Foy

Alfred Foy filed his pro se § 1983 suit on December 8, 2011, alleging that he was at his brother's home in Vallejo on November 18, 2011, when he

> saw several police officers approaching for unknown reasons so I got scared and ran. When they caught me on Sonoma Street, they told me to freeze or they would blow my fucking head off, so I complied and laid face down on the ground. They first shot me with a Taser, then 10 or 12 officers ambushed me from behind, beating me with their clubs putting 22 staples in my head, dogs were released on me then and allowed to bite me several times before being called off. Leaving me lay bloody while officers stomp and punch me. I would like some compensation for all the injuries, pain and suffering, false charges, time in jail and put a stop to this excessive force this police department is exercising on its suspects.[297]

Foy was arrested by the officers for robbery and filed his complaint from jail.[298] The judge dismissed Foy's complaint with leave to amend because Foy had not named the officers he was suing and had not included factual support for his *Monell* claim against the City of Vallejo.[299] Foy amended his complaint.[300] The judge found it was satisfactory and ordered Foy to submit a summons, USM-285

Adding City of Valle Police Corporal Brian Estudillo at 1, *Garrison*, No. 13-cv-00479 (E.D. Cal. Aug. 11, 2015).

296. Findings and Recommendations at 5, *Garrison*, No. 13-cv-00479 (E.D. Cal. Dec. 18, 2015); Order at 4-5, *Garrison*, No. 13-cv-00479 (E.D. Cal. Mar. 23, 2016).

297. Complaint at 3, Foy v. Vallejo Police Dep't, No. 11-cv-03262 (E.D. Cal. Dec. 8, 2011).

298. *Id.* at 2.

299. Order at 2-3, *Foy*, No. 11-cv-03262 (E.D. Cal. Feb. 6, 2012).

300. *See* Amended Complaint at 1, *Foy*, No. 11-cv-03262 (E.D. Cal. Feb. 6, 2012).

forms,[301] and seven copies of the complaint.[302] Foy did.[303] Defendants answered on July 30, 2012,[304] and the case entered discovery.[305]

During discovery, Foy—with the help of jailhouse lawyer Frederick Marc Cooley—submitted discovery requests to defendants to support his *Monell* claim, including requests for any "[c]omplaints made against any and all Vallejo Police Officers concerning Deadly and/or Excessive Use of Force that has occurred within the last ten (10) years," excessive force reports regarding the officers involved in Foy's assault and arrest, and Vallejo police policies regarding the use of force and police reports.[306] Defendants objected to the requests and refused to turn over any responsive information.[307] Foy submitted a thirty-seven page motion to compel with the court on January 15, 2013.[308] Defendants opposed the motion on the grounds that plaintiff's discovery requests were propounded under the wrong Rule and that the information was not discoverable.[309]

More than nine months later, on September 30, 2013, the court issued a decision denying Foy's motion to compel.[310] The court agreed that Foy had brought the requests under the wrong discovery rule—Rule 26's provision for initial disclosures—but gave him the opportunity to file new discovery requests under the "appropriate rule."[311] The court also cautioned Foy against filing broad

---

301. This is a five-copy form that must be filled out before a U.S. Marshal completes a service of process. *See* U.S. MARSHALS SERV., U.S. DEP'T OF JUST., PROCESS RECEIPT AND RETURN (2018), https://www.usmarshals.gov/sites/default/files/media/document/USM-285.pdf_process-receipt.pdf [https://perma.cc/C6WJ-USLR].

302. *See* Order at 2-3, *Foy*, No. 11-cv-03262 (E.D. Cal. Apr. 16, 2012).

303. Notice of Submission of Documents at 4, *Foy*, No. 11-cv-03262 (E.D. Cal. May. 8, 2012).

304. Answer of Defendants to Plaintiff's Amended Complaint at 1, *Foy*, No. 11-cv-03262 (E.D. Cal. July 30, 2012).

305. Order at 1-2, *Foy*, No. 11-cv-03262 (E.D. Cal. Aug. 31, 2012).

306. Plaintiff's Motion to Compel Discovery Responses Pursuant to FRCP, Rule 37 at 3-4, 11, 18, *Foy*, No. 11-cv-03262 (E.D. Cal. Jan. 15, 2013).

307. *See id.* at 4-5, 11-12, 18-19.

308. *See id.* at 1.

309. Defendants' Opposition to Motion to Compel Discovery Responses; Request for Protective Order; Declaration of Kelly J. Trujillo at 1-2, *Foy*, No. 11-cv-03262 (E.D. Cal. Feb. 1, 2013).

310. Order at 3, *Foy*, No. 11-cv-03262 (E.D. Cal. Sept. 30, 2013).

311. *Id.* at 2.

discovery requests and encouraged him to limit his requests to information about the defendants in the case.[312]

Foy then submitted requests for production that complied with Rule 34.[313] On January 27, 2014, Foy filed a second, 105-page motion to compel, arguing that the defendants had filed "incomplete, deficient and evasive responses" to his updated requests and going, request by request, through the defendants' responses.[314]

Before the court ruled on Foy's second motion to compel, the City of Vallejo moved for summary judgment.[315] In their summary judgment motion, defendants argued that Foy's "vague references to alleged incidents of excessive force" were not sufficient evidence of an unconstitutional city-wide policy or custom.[316]

In response to the defendants' summary judgment motion, Foy submitted a declaration asserting that he was among "a group of individuals who have or currently are vindicating their constitutional rights against Vallejo Police Officers for subjecting them to excessive force," and that Frederick Marc Cooley, his "Legal Assistant," was working on obtaining declarations from these individuals.[317] Foy also objected to the defendants' motion for summary judgment because his second motion to compel was still pending.[318] As Foy wrote, "City Defendants should not be allowed to not cooperate with discovery and then complain that Plaintiff has not provided the exact same evidence that the City of Vallejo refuses to disclose."[319]

Although the district court allowed the claims against the individual officers to proceed, it granted the City of Vallejo's motion for

---

312. *Id.*

313. *See* Plaintiff's Second Motion to Compel Discovery Responses at 2, *Foy*, No. 11-cv-03262 (E.D. Cal. Jan. 27, 2014).

314. *See id.* at 2-15, 29.

315. *See* Notice of Motion and Motion for Partial Summary Judgment in Favor of Defendant City of Vallejo at 1, *Foy*, No. 11-cv-03262 (E.D. Cal. Apr. 3, 2014).

316. Memorandum of Points and Authorities in Support of Defendants' Motion for Partial Summary Judgment as to Defendant City of Vallejo at 2, *Foy*, No. 11-cv-03262 (E.D. Cal. Apr. 3, 2014).

317. Plaintiff's Opposition to City of Vallejo Defendant's and City of Fairfield Police Officer J. Williams' Motion for Summary Judgment, Partial Summary Judgment or in the Alternative Summary Adjudication at 9, *Foy*, No. 11-cv-03262 (E.D. Cal. Apr. 24, 2014).

318. *Id.* at 1, 3.

319. *Id.* at 3.

summary judgment on the *Monell* claim.[320] The magistrate judge hearing the motion ruled that Foy had not produced evidence of a "persistent and widespread custom or policy" authorizing the use of excessive force.[321] The magistrate was unsympathetic to Foy's argument that he had been denied the information he needed to prove his claims:

> Plaintiff fails to provide any reasons, much less good cause, why he was unable to obtain the evidence he needed during discovery, and especially why he was unable to obtain the affidavits or declarations from the individuals who claim to also have been subjected to excessive force. He does not outline any steps he has taken to contact those individuals, explain why he did not obtain affidavits from them during the six months he was incarcerated with them or anytime during the more than three years this action has been active, and how he could obtain them if provided additional time in which to do so.[322]

Seeming to overlook the fact that Foy had filed a second motion to compel that had yet to be decided, the magistrate judge wrote that "[t]o the extent plaintiff is asking for additional time to obtain the necessary evidence to support his claims under Rule 56(d), plaintiff's motion to compel and for additional discovery has already been denied."[323] The district judge adopted the magistrate's report and recommendation in its entirety.[324]

On June 8, 2016, the magistrate judge sent an order with the schedule for pretrial filings and the final pretrial conference.[325] The order was returned as undeliverable to Foy on June 29.[326] On August 5, 2016, not having heard from Foy, the magistrate judge recommended that Foy's case be dismissed for lack of prosecution.[327] Less than a week later, Foy filed a notice of change of address—he

---

320. *See* Findings and Recommendation at 10, *Foy*, No. 11-cv-03262 (E.D. Cal. Mar. 3, 2015).

321. *Id.* at 8.

322. *Id.* at 3.

323. *Id.*

324. Order at 1, *Foy*, No. 11-cv-03262 (E.D. Cal. Mar. 24, 2015).

325. Order at 5, *Foy*, No. 11-cv-03262 (E.D. Cal. June 8, 2016).

326. Docket Entry 95, *Foy*, No. 11-cv-03262 (E.D. Cal. June 29, 2016).

327. Findings and Recommendation at 2, *Foy*, No. 11-cv-03262 (E.D. Cal. Aug. 5, 2016).

had been transferred to a different facility—and made clear that he wished to proceed to trial.[328] The magistrate set a new schedule,[329] and Foy timely submitted his pretrial statement.[330]

Jury trial was set to begin January 23, 2017, at 9:00 AM.[331] On the morning of January 23, Foy appeared in court with a motion for a continuance.[332] He had been transferred from the Salinas Valley Prison to the Solano County Jail for trial, but the Salinas prison officials had held back all of his trial materials.[333] Foy requested a continuance so that he could get his trial materials and requested that the judge order the Salinas Valley Prison to transfer his legal materials to the jail.[334] The judge denied Foy's request.[335] Without access to any of his evidence, Foy moved to dismiss his case, and the defense had no objection.[336] The prospective jurors were thanked and excused, and the case was closed.[337]

## IV. HOW THE LACK OF LAWYERS UNDERMINES § 1983's GOALS

Joshua Deleon, Javier Leiva, Frederick Marceles Cooley, Anthony Garrison, and Alfred Foy each sued the City of Vallejo and its police officers for assaulting them after they had already surrendered. Each was unable to find an attorney to represent them, and so litigated their cases pro se. It is impossible to know whether they would have been successful if they had lawyers. But it is certain that each had their cases dismissed for reasons directly tied to their pro se status instead of the merits of their cases.

The lack of fuel for the private attorney general engine clearly undermines § 1983's goals of compensation and deterrence for the people such as Deleon, Leiva, Cooley, Garrison, and Foy who must pursue their claims without counsel. It has negative downstream effects as well.

---

328. *See* Notice at 1, *Foy*, No. 11-cv-03262 (E.D. Cal. Aug. 11, 2016).

329. Order at 2, *Foy*, No. 11-cv-03262 (E.D. Cal. Oct. 12, 2016).

330. *See* Plaintiff's Pretrial Statement at 1, *Foy*, No. 11-cv-03262 (E.D. Cal. Nov. 21, 2016).

331. Amended Pretrial Order at 9, *Foy*, No. 11-cv-03262 (E.D. Cal. Jan. 18, 2017).

332. Motion for Continuance at 1, *Foy*, No. 11-cv-03262 (E.D. Cal. Jan. 23, 2017).

333. *Id.*

334. *Id.* at 1-2.

335. Docket Entry 127, *Foy*, No. 11-cv-03262 (E.D. Cal. Jan. 23, 2017).

336. *Id.*

337. *Id.*

At multiple stages of § 1983 litigation, plaintiffs' cases can be strengthened by pointing to prior analogous successful cases.[338] Prior similar successful cases help plaintiffs overcome qualified immunity, prove municipal liability, and establish entitlement to injunctive relief.[339] Overcoming these doctrinal hurdles would be daunting even if every person whose constitutional rights were violated were able to find competent counsel.[340] But if people with meritorious claims cannot find lawyers to represent them and cannot prevail on their claims when they represent themselves, future plaintiffs will not be able to rely on these cases to defeat qualified immunity, prove municipal liability, or establish entitlement to injunctive relief. The inadequacies of our system of compensating civil rights attorneys, therefore, jeopardize the entire ecosystem of civil rights enforcement.[341]

## A. Qualified Immunity

Qualified immunity protects officers from damages liability, even if they have violated the Constitution, unless they have violated "clearly established" law.[342] To defeat a qualified immunity motion, plaintiffs must find a prior court decision holding nearly identical facts unconstitutional.[343] The Supreme Court's decision in *Taylor v. Riojas* suggests that a prior factually analogous court decision is unnecessary in extreme cases with clear constitutional violations.[344] It is too early to know *Taylor*'s impact on the lower courts,[345] but many continue to analyze qualified immunity motions as the Sixth

---

338. *See* West v. City of Caldwell, 931 F.3d 978, 983 (9th Cir. 2019).

339. *See id.* at 982-83.

340. *See* Katherine Mims Crocker, *The Supreme Court's Reticent Qualified Immunity Retreat*, 71 DUKE L.J. ONLINE 1, 3 (2021).

341. For further discussion of the civil rights ecosystem, see generally Schwartz, *supra* note 58.

342. *See* Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

343. *See* Kisela v. Hughes, 138 S. Ct. 1148, 1152-53 (2018) (per curiam); *West*, 931 F.3d., at 983.

344. *See* 141 S. Ct. 52, 53-54 (2020) (per curiam).

345. For one exploration of the possible impact of *Taylor*, see Crocker, *supra* note 340, at 7-16.

Circuit did in *Baxter v. Bracey*, requiring a prior court decision with nearly identical facts to overcome the defense.[346]

If a pro se plaintiff's meritorious claim is dismissed for failure to plead a plausible claim or for failure to prosecute, that case cannot be used to clearly establish the law in future cases.[347] Because courts never ruled on the constitutionality of the officers' conduct as alleged in the lawsuits brought by Joshua Deleon, Javier Leiva, Frederick Marceles Cooley, Anthony Garrison, and Alfred Foy,[348] these suits cannot be used to overcome qualified immunity when officers engage in similar conduct in the future.

Even if a pro se plaintiff is able to get his case heard on the merits, the lack of counsel can make it more difficult to clearly establish the law for future cases. In *Baxter v. Bracey*, the Sixth Circuit granted the officers qualified immunity without ruling on whether they had violated the Fourth Amendment.[349] The Supreme Court has written that it makes sense to grant qualified immunity without answering whether the Constitution was violated in "cases in which the briefing of constitutional questions is woefully inadequate."[350] Citing this language in *Baxter*, the Sixth Circuit wrote that "because this court does not have the benefit of sophisticated adversarial briefing from both parties, we decline to resolve the more complex constitutional question raised by Baxter's claim."[351] Because the court in *Baxter* did not decide whether the officers had violated Baxter's constitutional rights, the Sixth Circuit's decision in his case cannot be used to overcome qualified immunity in a future similar case.

---

346. *See* 751 F. App'x 869, 872 (6th Cir. 2018) (highlighting the lack of analogous case law), *cert. denied*, 140 S. Ct. 1862 (2020).

347. *See id.* at 871 ("The 'clearly established' prong sets up an exacting standard.... 'It is not enough that the rule is *suggested* by then-existing precedent'—it must be 'beyond debate' and 'settled law.'" (quoting Hunter v. Bryant, 502 U.S. 224, 228 (1991))).

348. *See supra* Part III.B.

349. 751 F. App'x at 871.

350. Pearson v. Callahan, 555 U.S. 223, 239 (2009).

351. 751 F. App'x at 871.

### B. Municipal Liability

The Supreme Court's *Monell* cases have been understood to support three different theories of municipal liability. First, local governments can be held liable under § 1983 if they enact unconstitutional policies.[352] Second, local governments can be held liable if a policymaker violates the Constitution in an area where they have "final policymaking authority."[353] Third, the local government can be held liable under § 1983 if it had an informal custom or policy so "persistent and widespread as to practically have the force of law" that caused the constitutional violation.[354] The first two theories of municipal liability are relatively straightforward—but because they require proof of wrongdoing by those at the highest levels of government, they are uncommonly relied upon. Instead, it is usually the law enforcement officers on the front lines—police officers, sergeants, lieutenants, and detectives—who do the arresting and assaulting complained of in § 1983 lawsuits.[355]

This is where the third theory of municipal liability comes in. When an officer on the front lines—not the police chief—has violated the Constitution, the Supreme Court has said that the government can be held liable only if a persistent and widespread policy or custom caused the violation.[356] These claims often allege that the government failed to properly screen, train, supervise, or discipline its officers.[357] The Supreme Court has held that in order to succeed in this kind of "failure to" claim, the plaintiff must show that policymakers were "deliberately indifferent" to the need for better training—either because the need for that training was

---

352. *See* Pembaur v. City of Cincinnati, 475 U.S. 469, 478 n.6 (1986).

353. *Id.* at 483-84.

354. Connick v. Thompson, 563 U.S. 51, 60-61 (2011). Some courts and scholars recognize a fourth theory of municipal liability—failure to train and supervise officers. *See* City of Canton v. Harris, 489 U.S. 378, 380 (1989). Others view these "failure to" claims under the umbrella of the unwritten custom and policy theory. *See generally* Karen Blum, *The Theory of Municipal Custom and Practice*, 16 TOURO L. REV. 825, 829-30 (2000) (discussing the custom and policy theory of § 1983 claims).

355. A police chief can be held liable for these acts of supervisees but only if the chief knows of the constitutional violation and approves of it. This is referred to as a "ratification" theory of *Monell* liability. *See* City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988).

356. *Connick*, 563 U.S. at 60-61.

357. *See id.* at 61.

WILLIAM & MARY LAW REVIEW          [Vol. 64:641

obvious, or because policymakers knew of past misconduct by their officers yet failed to take proper steps to prevent similar conduct from recurring.[358] And the Supreme Court has narrowly defined the types of training needs that are obvious and has required plaintiffs to find nearly identical past misconduct to prove policymakers' deliberate indifference.[359]

The Supreme Court has not clarified what can serve as evidence of prior constitutional violations sufficient to put police chiefs on notice that their officers need better training or supervision,[360] but there are not that many options. In most cities, internal affairs divisions rarely sustain allegations of officer misconduct.[361] Officers are even more rarely convicted of crimes.[362] Proof of prior constitutional

---

358. City of Canton v. Harris, 489 U.S. 378, 390 n.10 (1989).

359. *See Connick*, 563 U.S. at 61.

360. *See id.*

361. For research about the shortcomings of police internal investigations, see Rachel Moran, *Ending the Internal Affairs Farce*, 64 BUFF. L. REV. 837, 853-68 (2016). For a sample of news reports about various police departments' lax investigation and disciplinary practices see, for example, Rio Lacanlale, *Report: Las Vegas Police Misconduct Complaints Rarely Lead to Discipline*, LAS VEGAS REV.-J. (June 2, 2021, 6:55 PM), https://www.reviewjournal.com/crime/report-las-vegas-police-misconduct-complaints-rarely-lead-to-discipline-2369536/ [https://perma.cc/NLR5-AQG6]; *see also* Robert Salonga & Maggie Angst, *Exclusive: New San Jose Police Records Show Officers Rarely Disciplined for Serious Use of Force*, SAN JOSE MERCURY NEWS (Oct. 5, 2020, 3:48 AM), https://www.mercurynews.com/2020/10/04/exclusive-new-san-jose-police-records-show-officers-rarely-disciplined-for-serious-use-of-force/ [https://perma.cc/2HSQ-3LYY]; Bill Cummings, *CT's Secretive Police Disciplinary System Rarely Leads to Serious Punishment*, CONN. POST (June 23, 2021, 4:30 PM), https://www.ctpost.com/projects/2021/police-misconduct/ [https://perma.cc/SP6A-SEP5]; Evan Allen, Matt Rocheleau & Andrew Ryan, *Within the Boston Police Department, Complaints Against Officers Are Rarely Confirmed or Result in Punishment*, BOS. GLOBE (July 18, 2020, 3:53 PM), https://www.bostonglobe.com/2020/07/18/metro/within-boston-police-department-complaints-against-officers-are-rarely-confirmed-or-result-punishment/ [https://perma.cc/JT2V-4276]; Violet Ikonomova, *"Deeply Broken:" How Detroit Lets Bad Cops Off the Hook*, DEADLINE DETROIT (Apr. 28, 2022, 11:00 PM), https://www.deadlinedetroit.com/articles/30418/deeply_broken_how_detroit_lets_bad_cops_off_the_hook [https://perma.cc/LW5U-3UXT].

362. For data about the frequency with which police are criminally prosecuted and the decisions by officers, prosecutors, and jurors that lead to low rates of prosecution and conviction, see Kimberly Kindy & Kimbriell Kelly, *Thousands Dead, Few Prosecuted*, WASH. POST (Apr. 11, 2015), http://www.washingtonpost.com/sf/investigative/2015/04/11/thousands-dead-few-prosecuted/ [https://perma.cc/JP7Y-KZWU] (noting the scarcity of charges against police officers despite thousands of deaths at their hands between 2005 and 2015); *see also* German Lopez, *Police Officers Are Prosecuted for Murder in Less than 2 Percent of Fatal Shootings*, VOX (Apr. 2, 2021, 11:30 AM), https://www.vox.com/21497089/derek-chauvin-george-floyd-trial-police-prosecutions-black-lives-matter [https://perma.cc/6XK3-FJNK]. Lopez relied on the Henry A. Wallace Police Crime Database, which tracks prosecutions of police officers. *The*

violations could come from prior § 1983 lawsuits. But what from a lawsuit can serve as proof of a constitutional violation? The complaint that begins the case contains allegations of unconstitutional conduct, not proof. When a plaintiff "succeeds" in their civil rights case, it is usually through a settlement—and those settlement agreements tend to include provisions that the defendant is not acknowledging any wrongdoing.[363] Judges rarely issue decisions that rule one way or another about whether an officer's conduct was unconstitutional—instead, court opinions tell the parties whether the plaintiff has done enough to get to the next stage of litigation.[364] Most often, when there is an announcement that an officer's conduct is unconstitutional, it comes from a jury—but civil rights cases rarely go to a jury and even more rarely end with a verdict for the plaintiff.[365] Plaintiffs proceeding pro se are especially unlikely to succeed before a jury.[366] As a result, pro se cases will rarely generate evidence that can support *Monell* claims in future cases.

For all of these reasons, establishing *Monell* liability is difficult even when meritorious cases are brought by plaintiffs assisted by counsel. When counsel are unwilling to bring meritorious cases, these cases are either abandoned or litigated pro se, and the challenges mount even higher.[367]

## C. Injunctive Relief

Pro se cases create similar challenges for people seeking injunctive relief. In 1983, the Supreme Court decided *City of Los Angeles v. Lyons*, which required that a person whose constitutional rights were violated and wants to seek an injunction must show that he or she is likely to be harmed in the same way in the future.[368] A Los Angeles police officer put Alfred Lyons in a choke hold after

*Henry A. Wallace Police Crime Database*, BOWLING GREEN STATE UNIV., https://policecrime. bgsu.edu/ [https://perma.cc/ME6M-7GXN].

   363. *See, e.g.*, Salonga & Angst, *supra* note 361 (describing settlements in San Jose).

   364. *See, e.g.*, Baxter v. Bracey, 751 F. App'x 869, 871-73 (6th Cir. 2018).

   365. In my study of 1,183 police misconduct cases, only ten cases ended with plaintiffs' verdicts, although two additional cases settled following plaintiffs' verdicts. For the distribution of case outcomes, see Schwartz, *supra* note 81, at 46 tbl.12.

   366. *See supra* Part III.A.

   367. *See supra* Part III.A.

   368. *See* 461 U.S. 95, 105, 112 (1983).

stopping him for a traffic violation, and the majority ruled that he could establish a "real and immediate" likelihood of future injury meriting injunctive relief only if he could show that he would be stopped again by a Los Angeles police officer, and that he would be illegally choked by that officer "without any provocation or resistance on his part."[369]

The *Lyons* standard is particularly challenging to meet in cases alleging excessive force by law enforcement, as it is difficult for plaintiffs to prove that they will likely be subjected to excessive force in the future. But when plaintiffs in § 1983 suits do try to seek injunctive relief, they may include information in their complaint about similar lawsuits that settled or are ongoing, and courts have viewed evidence of these prior successful suits as proof of an official policy adequate to satisfy the *Lyons* standard—at least at the motion to dismiss stage.[370] But when cases are brought pro se and fail, those cases are unlikely to be considered evidence that supports a *Lyons* claim.[371] If a person in Vallejo was assaulted during the course of an arrest and wanted to seek injunctive relief to stop future assaults by Vallejo officers, the suits Deleon, Leiva, Cooley, Garrison, and Foy brought would be unlikely to be considered proof of an unlawful policy that could support a claim for injunctive relief.[372]

## V. CIVIL RIGHTS REPRESENTATION REFORMS

People whose civil rights have been violated—but who did not suffer significant compensatory damages, are not sympathetic victims, or had the bad luck to have their rights violated in a part of the country with few civil rights lawyers—may not be able to find a lawyer to represent them.[373] Without a lawyer, people are likely to

---

369. *Id.*

370. *See, e.g.,* An v. City of New York, No. 16 Civ. 5381, 2017 WL 2376576, at *4 (S.D.N.Y. June 1, 2017) (granting plaintiff's request to file an amended complaint, and concluding that the complaint, which cites "47 lawsuits, 18 news reports and hundreds of complaints to the CCRB involving allegations that NYPD officers arrested or otherwise interfered with individuals who were recording them in public" sufficiently alleged "a history of employees mishandling the situation in which an officer is being recorded").

371. *See, e.g., id.* (citing only successful litigants in analysis of a *Lyons* claim).

372. *See supra* Part III.B.

373. *See supra* Part I.

2023]              CIVIL RIGHTS WITHOUT REPRESENTATION              701

lose in court, whether or not the merits are on their side.[374] And dismissals of meritorious cases not only deny relief to the people whose rights have been violated but also disrupt the broader civil rights ecosystem, making it more difficult to overcome qualified immunity, establish municipal liability, and demonstrate entitlement to injunctive relief.[375] This is not at all what Congress had in mind when it authorized plaintiffs' attorneys to recover their reasonable fees when their clients prevail.[376]

Today, most talk of civil rights reform focuses on qualified immunity doctrine. Qualified immunity is an important target of reform efforts—qualified immunity is complicated to learn, time-consuming to litigate, and difficult to overcome.[377] Because eliminating qualified immunity would reduce the costs of litigation and the risks of defeat, lawyers in a world without qualified immunity might be more willing to represent people in civil rights cases and might be willing to take more cases with modest damages.[378] But ending qualified immunity will not, on its own, address the need for more lawyers in more parts of the country to represent people in meritorious but limited-damages civil rights suits. Following are a few proposals to address this need.[379]

A most ambitious reform would be for Congress to amend § 1988 in ways that undo the Supreme Court's cramped interpretation of the statute. Congress could specify that attorneys should get their

---

374. *See supra* Part III.A.

375. *See supra* Part IV.A-B.

376. *See supra* notes 78-80 and accompanying text.

377. *See supra* Part I.

378. *See* Schwartz, *supra* note 65, at 338-51 (describing how abolishing qualified immunity might impact attorneys' case selection decisions and the complexity of litigating constitutional claims).

379. Other scholars, task forces, commissions, and committees have offered widespread recommendations to address the access to justice crisis—this Article echoes some of these recommendations but focuses particularly on the need for counsel in § 1983 cases. For other important suggestions, see, for example, Lois Bloom & Helen Hershkoff, *Federal Courts, Magistrate Judges, and the Pro Se Plaintiff*, 16 NOTRE DAME J.L. ETHICS & PUB. POL'Y 475 (2002) (describing the creation of a magistrate position in the Eastern District of New York focusing exclusively on pro se cases); Rhode, *supra* note 66, at 1816-18 (recommending "[s]implified forms and ... procedures," "[m]ore assistance for self-representation," "greater access to nonlawyer providers of legal services," "more effective channels for informal dispute resolution in out-of-court settings," and greater responsibility by courts, legislatures, and bar associations "to insure [sic] adequate legal assistance for those who need but cannot realistically afford it").

reasonable fees for every case that results in a settlement and forbid defendants from including fee waivers in settlement offers—undoing the Supreme Court's decision in *Evans*.[380] Congress could allow fee enhancements above the lodestar to reflect the fact that attorneys take § 1983 cases on a contingent-fee basis, assuming the risk of receiving no attorneys' fees at all.[381] Congress could make clear that a plaintiff should be understood to have prevailed in a suit seeking injunctive relief, entitling them to attorneys' fees, if the suit was the catalyst for the defendant's change in conduct—undoing the Supreme Court's decision in *Buckhannon*.[382] Congress could also amend 28 U.S.C. § 1915(e)(1) so that lawyers asked by judges to represent people proceeding pro se would be paid the modest, standard rate for court-appointed counsel—instead of having to take these cases pro bono or on contingency.[383]

An alternative—already in practice in some places[384]—is to fund legal clinics in federal courts with staff or volunteer attorneys who can help pro se plaintiffs draft their complaints and engage in discovery and motion practice. These clinics can also locate lawyers

380. Evans v. Jeff D., 475 U.S. 717, 742-43 (1986).

381. The Supreme Court rejected this type of upward lodestar adjustment in *City of Burlington v. Dague*, 505 U.S. 557, 566-67 (1992). For a series of proposals to better compensate plaintiffs' attorneys for risk in civil rights litigation, see Maureen Carroll, *Fee-Shifting Statutes and Compensation for Risk*, 95 IND. L.J. 1021, 1061-74 (2020).

382. *See* Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Hum. Res., 532 U.S. 598, 610 (2001).

383. *See supra* note 96 and accompanying text (describing the rates for court-appointed counsel). Some districts do allow court-appointed attorneys to request reimbursement for their costs, *see* Andrew Hammond, *The Federal Rules of Pro Se Procedure*, 90 FORDHAM L. REV. 2689, 2719 (2022), but amending § 1915 would allow attorneys to request compensation for their time as well.

384. For a summary of pro bono programs in U.S. District Courts, see Hammond, *supra* note 383, at 2716-18. For descriptions of some of these programs, see LEIGH FERRIN, FED. BAR ASS'N INNOVATION, EXPANDING "SUCCESS" AT FEDERAL PRO SE CLINICS IN THE CENTRAL DISTRICT OF CALIFORNIA, https://www.fedbar.org/wp-content/uploads/2019/12/Expanding-Success-at-Federal-Pro-Se-Clinics-Ferrin-pdf.pdf [https://perma.cc/6F9E-BXVD]; *see also Pro Se Assistance Program*, N.D.N.Y. FED. CT. BAR ASS'N, https://www.ndnyfcba.org/about-us/pro-se-assistance-program/ [https://perma.cc/P2CN-REYE]. For further information about the assistance provided to pro se plaintiffs in federal district courts, see generally DONNA STIENSTRA, JARED BATAILLON & JASON A. CANTONE, FED. JUD. CTR., ASSISTANCE TO PRO SE LITIGANTS IN U.S. DISTRICT COURTS: A REPORT ON SURVEYS OF CLERKS OF COURT AND CHIEF JUDGES (2011), https://www.prisonlegalnews.org/media/publications/Assistance%20to%20Pro%20Se%20Litigants%20in%20U.S.%20Dist.%20Courts%20Study%20Fed.%20Judicial%20Ctr.%202011.pdf [https://perma.cc/HR4N-L7TY].

for cases going to trial. One of many benefits of this type of arrangement is that if pro se plaintiffs are better able to present their claims, attorneys considering whether to take on a case will be better able to assess its merits. Cases are also less likely to be dismissed sua sponte by judges at their outset or later for failure to prosecute, allowing for resolution on their merits.[385]

Civil rights organizations also can create exciting opportunities for lawyers to embark on civil rights careers. In the most ambitious project of this kind, the NAACP Legal Defense Fund has created the Marshall-Motley Scholars Program, which aims to train the next generation of civil rights lawyers in the South.[386] The program intends to create a corps of fifty civil rights attorneys who are "equipped and prepared to advocate on behalf of Black communities in the South seeking racial justice and equity."[387] The scholars receive a full law school scholarship, summer internships, a two-year postgraduate fellowship with civil rights organizations in the South, and trainings by LDF.[388] These initiatives can help jump-start civil rights bars in places where attorneys have not historically signed on to take these cases.

Lawyers can be given more incentives to represent people in civil rights cases who would otherwise be pro se. Paying these attorneys the going rate for court-appointed counsel could encourage more attorneys to take on this type of representation.[389] But if there is a shortage of attorneys available to meet this increased demand, some of these appointments could be for a limited scope of representation—drafting an amended complaint or completing discovery, for example. In the alternative or in addition, federal district courts could make pro bono service in civil cases a condition of being admitted to practice in that district, as it is in the Northern District of Illinois.[390]

---

385. *See supra* Table 1 (detailing fluctuation rates in sua sponte dismissals, failure to prosecute dismissals, et cetera between pro se and represented litigants).

386. *See* Carrie Johnson, *The Next Generation of Civil Rights Lawyers Could Start Here*, NPR (May 17, 2021, 12:12 PM), https://www.npr.org/2021/05/17/997446916/the-next-generation-of-civil-rights-lawyers-could-start-here [https://perma.cc/4AB5-3KUL]; *Marshall-Motley Scholars Program*, LDF, https://marshallmotleyscholars.org/ [https://perma.cc/576L-9EZX].

387. *See Marshall-Motley Scholars Program*, *supra* note 386.

388. *See id.*

389. *See, e.g.*, Bagenstos, *supra* note 76.

390. N.D. ILL. R. 83.35. For discussion of the pro bono panel in the Northern District of

Finally, judges can be encouraged to more readily ask lawyers to represent people who have not been able to find lawyers themselves. If more pro se plaintiffs were appointed lawyers to assist them, it would benefit not only the plaintiffs but also the judges hearing their cases. Trent Taylor pointed this out in one of his applications for counsel. Although, Taylor wrote, he "believes each and every one of the claims he has submitted to this court if properly explained is a viable claim for violation of civil rights," he acknowledged that he did not know for sure—appointment of a lawyer could help narrow the claims and "shorten the trial and limit evidence to relevant issues, benefitting his client, opposing parties and the court."[391] Taylor concluded this application with one final observation about the benefits of appointing counsel:

> [T]here is a benefit to the court that is not easily quantified. Which is the ability to look back upon a career spent in properly balancing the interests of the state in that if the treatment Taylor describes actually exists and occurred as he describes it then it is truly beneficial to the conscience of the court to remedy such a social cancer by improving the institution by exposing it to the light and beginning to excise it.[392]

The judge in Taylor's case was unmoved by these suggestions. Perhaps, were Taylor's judge more aware of the challenges of finding a lawyer in § 1983 cases, even for people with strong claims, and the challenges facing plaintiffs litigating pro se, he would have helped find Taylor a lawyer. My greatest hope is that this Article might at least encourage a judge, considering a future motion to appoint counsel, to take a closer look.

CONCLUSION

Current efforts to improve civil rights enforcement often focus on restricting or abolishing qualified immunity. Yet for the pro se plaintiffs whose cases I have studied, the provision of counsel would

---

Illinois and pressures to create a similar panel in the Southern District of Indiana, see Hammond, *supra* note 383.

391. Motion for Appointment of Counsel, *supra* note 192, at 7-8.

392. *Id.* at 8.

likely be far more meaningful than the elimination of qualified immunity.[393] While 135 of the 273 pro se cases in my five-district dataset were dismissed by the judge at the outset of the case or for failure to prosecute during litigation, just five were dismissed on qualified immunity grounds.[394] Similarly, thirty-one out of the forty-one pro se cases filed against the city of Vallejo and its officers between 2010 and 2020 were dismissed by the judge at the outset or for failure to prosecute; just one of those cases was dismissed because of qualified immunity.[395]

Increasing access to counsel would not necessarily spell success for the plaintiffs who would otherwise be pro se. There remain many barriers to relief in § 1983 cases, including the standards for pleading a complaint, the standards for proving a constitutional violation, and the standards for overcoming qualified immunity, proving municipal liability, and establishing the entitlement to injunctive relief.[396] Juries and judges in many parts of the country remain skeptical of civil rights plaintiffs and sympathetic to government defendants. But ensuring that more civil rights plaintiffs have counsel would mean that those plaintiffs could fight these uphill battles instead of being kicked out of court because they did not submit a forwarding address, or because they were unable to submit copies of their summons and complaint from prison, or because they could not find an attorney to represent the child of their deceased son, or because they could not comprehend a police report, or because their legal materials were withheld by prison officials when they were transferred to another facility.

In Vallejo, and across the country, there are people whose constitutional rights have been violated but who cannot find a lawyer and cannot convince judges to appoint counsel for them. Without a lawyer, most pro se plaintiffs' stories are never heard or resolved on their merits. Only very few, including the cases Alex Baxter and Trent Taylor brought, ever see the light of day. This is likely not what the 1871 Congress had in mind when it enacted

---

393. *See supra* Table 1.
394. *See supra* Table 1.
395. *See supra* Table 2.
396. For further discussion of these barriers, see generally JOANNA SCHWARTZ, SHIELDED: HOW THE POLICE BECAME UNTOUCHABLE (2023).

42 U.S.C. § 1983, and is certainly not what the 1976 Congress had in mind when it enacted 42 U.S.C. § 1988.[397] Congress, the Supreme Court, local governments, federal judges, and the private bar all need to help set things right.

---

397. *See supra* notes 78-80 and accompanying text.