# EXHIBIT J



**DeWitt Lacy**
JOHN BURRIS LAW FIRM


Journal of Consumer Attorneys Associations for Southern California
**A**DVOCATE

February 2021

# Getting your civil-rights case to trial

## A LOOK AT THE BURDENS OF LAW AND MOTION PRACTICE IN CIVIL-RIGHTS LITIGATION

Civil rights – it seems like the phrase on everyone's lips these days. With so much ongoing civil unrest, it should not be surprising that both progressive and conservative folks alike feel like their constitutional rights are being trampled by someone. Accordingly, more people are turning to the courts in search of legal redress for their various civil-rights violations. Yet, many firms and attorneys have purposely steered clear of civil-rights litigation for various reasons. Federal courts are often unfamiliar territory for most personal-injury attorneys. Various privileges and immunities make the discovery process extremely difficult for attorneys unfamiliar with civil-rights law. Even more troublesome is the federal-court requirement of unanimous verdicts in civil litigation. Add in the fact that the subject matter is extremely polarizing, and it makes for a tough "row to hoe." However, daunting as it may be, success in civil-rights litigation is not impossible. With some guidance, these obstacles can be overcome, or at the very least diminished, making litigating civil-rights cases more palatable to more in the legal practice.

### Pleadings

In all of this, it is helpful to understand the job of the defense is to obstruct, prevent, or delay your client from obtaining recourse through litigation. The good news is the challenges to your pleadings can be overcome with some good planning. Challenges to your pleadings may come often for newer practitioners, but the courts are generally forgiving and will allow you to amend the pleadings to cure whatever defect the opposition has pointed out.

Civil-rights litigation often occurs in the federal courts because the main part of any case usually deals with a federal question pursuant to title 24 of the U.S. Code section 1983, or the law that allows one to take legal action against a government actor who violates one's civil rights. For that reason, civil-rights litigators will find it beneficial to know, or at least familiarize themselves with, the FRCP when confronting rigorous motion practice in the federal courts. Federal courts are known for their stringent standards, and civil-rights litigation offers little exception to that overarching truth.

**DeWitt Lacy**, continued



*Journal of Consumer Attorneys Associations for Southern California*

**Advocate**

February 2021

### FRCP 12(b) and demurrers

FRCP 12(b) motions are the most common initial challenge to pleadings. There are several grounds for the defense to begin the swirl of motion practice that is characteristic of civil rights matters pursuant to FRCP 12(b): (1) lack of subject-matter jurisdiction; (2) lack of personal jurisdiction; (3) improper venue; (4) insufficient process; (5) insufficient service of process; (6) failure to state a claim upon which relief can be granted; and (7) failure to join a party.

The most common of these is a 12(b)(6) motion. Generally, 12 (b)(6) is used when there is a lot of boiler plate language in the complaint without specifically articulating the violation or the remedy sought. More specifically, the defense will often use the Supreme Court's decision in *Ashcroft v. Iqbal* as legal authority describing the grounds for bringing the motion. The Court decided that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." (*Ashcroft v. Iqbal* (2009) 556 U.S. 662, 678-79.) Demurrers are the superior court equivalent of a 12(b)(6) motion.

The solution to avoiding these motions altogether is making sure you have filed a well-written complaint in which your legal conclusions are supported by specific factual allegations. For example, you may want to include language describing which agent specifically violated your client(s)' rights and how that violation factually occurred. It is thus prudent to begin informal discovery long before the FRCP or the Code of Civil Procedure permits the use of our various discovery tools like interrogatories or requests for production of documents.

More likely than not, that will require some digging for the names of the persons who violated your client(s)' civil rights. Law-enforcement agencies do not regularly volunteer this information, and these descriptions are often found in police reports or witness interviews of percipient witnesses maintained by law-enforcement agencies. At both the state and federal levels, statutes have been enacted which grant members of the public the right to access information that concerns the conduct of a public agency or that is maintained by those agencies. In California, the Public Records Act ("CPRA") was enacted to allow members of the public to have greater access to information in the possession of the public agency. (Gov. Code, § 6250.) The Government Code specifically provides for the procedures in submitting requests, responding to requests, and seeking judicial enforcement. The California legislature expanded the powers under public records requests in 2019. Accordingly, if the agency fails to respond to a CPRA request, you have the right to demand an appropriate response to your records request by way of a writ of mandate.

### Motions to stay litigation

Most civil cases regarding police brutality parallel some criminal action against your client. No, that does not mean you need to also begin a criminal-defense practice. However, the courts have broad discretion to stay a civil action in favor of a parallel criminal proceeding if a stay is in the interests of justice. (*Keating v. Office of Thrift Supervision* (9th Cir. 1995) 45 F.3d 322, 324.) However, keep in mind broad discretion is not the same thing as mandatory. A court must balance the following factors: (1) the interest of the plaintiffs in proceeding expeditiously with this litigation or any particular aspect of it, and the potential prejudice to plaintiffs of a delay; (2) the burden which any particular aspect of the proceedings may impose on defendants; (3) the convenience of the court in the management of its cases, and the efficient use of judicial resources; (4) the interests of persons not parties to the civil litigation; and (5) the interest of the public in the pending civil and criminal litigation. (*Keating*, 45 F.3d at 325.)

These days, where at least a handful of law-enforcement officers are actually facing criminal charges by the local authorities, it is common for the defendants to ask for a stay of the litigation for fear of the defendant officers being forced to testify against themselves. Yes, police officers can plead the Fifth too, and you should encourage them to do so if the defendants want a stay for this reason. Defendants will rarely have any confirmation the officers are being charged criminally and will often rely on pure speculation which is not enough according to the Ninth Circuit.

One of the inherent dangers in staying the litigation is the loss of evidence. Evidence tends to disappear over time, memories fade, witnesses may move, and document retention systems could change. All of these things can hamper your ability to meet your prima facie burden. Accordingly, if your client is not facing criminal prosecution, you may want to oppose motions to stay as they can dilute the prosecution of your case and cost you important credibility with your client.

## Discovery motions

Discovery is always a tough process and it gets no easier when your opponent is a municipality. There are a litany of discovery issues that exist in civil-rights litigation. There are physician-patient privileges, concealing the identity of minors, and of course the police officers' bill of rights. Nonetheless, a good discovery plan and some dedicated staff are all that you need to tackle discovery in civil rights litigation.

### Protective order

A protective order is generally thought of as a tool to prevent harassment or threats of violence. However, in civil-rights litigation they are generally stipulated to because of the subject matter of the litigation and the sometimes sensitive documents that may be discovered during litigation. Lucky for us, the Ninth Circuit has a model protective order that really takes a lot of the guess work out of the process of stipulating to a protective order. Be careful, however, to read the proposed stipulation, as some defendants may change the language of the Ninth Circuit's model protective order to

**DEWITT LACY**, continued

ADVOCATE

*Journal of Consumer Attorneys Associations for Southern California*

**February 2021**

place the burden of challenging "CONFIDENTIAL" designations on the plaintiff. This makes the discovery process more difficult because any challenge has to be justified by the plaintiff. That is difficult when you may be unsure of what documents are being withheld.

### Motions to compel

At some point during the litigation, the word *compel* may get over-utilized. More likely than not, disputes about what documents need to be, or should be, produced can be resolved with reasonable meet-and-confer sessions. Be sure to check the local rules and standing orders of the specific judge the matter is before, as many federal judges have outlined a dispute process that includes mandatory meet and confer sessions, joint discovery briefs, and other dispute alternatives that you must engage in before you are allowed to file a motion to compel. Courts do not generally like to hear pesky lawyers bickering back and forth about discovery matters. So, use them only when necessary.

## Motions to amend the scheduling order

Of course, you should always develop a discovery plan before attending the initial Case Management Conference/ Scheduling Conference. Make sure you not only account for all the time you will need to give a thoughtful review of the discovery in your particular case, but also the time necessary for meet and confer efforts with the opposition. The normal gestation time for a civil-rights case from start to trial is about 18 months to 24 months. Federal courts tend to set all those deadlines and dates in a format close to stone. However, if you find yourself in a circumstance where you do not believe you will be able to complete discovery in the time allotted by the court's initial scheduling order, then moving the court to amend the scheduling order may be just the relief you need.

When drafting your motion, be sure to list the diligent efforts you made to obtain needed discovery or schedule

another matter's trial at a different time. The bedrock for the court's decision will ultimately be whether there is good cause and the moving party can show diligence in its efforts to work within the schedule originally set by the court. Hopefully, you will have made good record of all the formal and informal discovery efforts, all the communications with the opposition regarding the issues surrounding the dispute in changing the schedule, and any other considerations you believe the court may need to be aware of in making its decision.

## Summary judgment

The largest brief that civil-rights litigators regularly tackle is the dreaded motion for summary judgment. They are often the last significant motion civil-rights litigators will see before trial. Federal Rules of Civil Procedure, Rule 56(c) provides that judgment shall be granted forthwith whenever the evidence presented in support of the motion shows that there is no genuine issue as to any material fact. Assuming all the necessary work of garnering fact and evidence to support your contentions in the complaint are done, there is still another part of refuting this motion that must be completed.

The national debate about the judicial doctrine of qualified immunity sparks controversy, discord between political and economic factions, and truly speaks to one of the great freedoms and civil protections afforded by the Constitution. George Floyd, Michael Brown, Tamir Rice and Eric Gardner, who all died at the hands of police officers years ago, have become a necessary part of the dialogue regarding police misconduct.

The doctrine of qualified immunity was created by the U.S. Supreme Court in *Pierson v. Ray* in 1967. It works to shield government officials from lawsuits when they violate an individual's constitutional rights, so long as the right was not clearly established at the time of the violative conduct. This includes incidents of police misconduct or violence, a burden which

unquestionably has been born by the darker and poorer neighborhoods throughout America.

Recent proponents of qualified immunity support the Supreme Court's expansion of the judicial doctrine to include any behavior that has not been specifically reviewed and necessarily decided by the Supreme Court. Support for this virtual absolute immunity of law enforcement officers from civil accountability comes at a time in our nation's history when there is a legitimate struggle for the protection of individual rights against unreasonable government intrusion.

The original intent of qualified immunity was argued to help establish a "good faith" defense to federal § 1983 litigation that mirrored the defense of good faith that existed in common law. At common law, and before § 1983 litigation was available as a remedy for violations of individual rights by government officials, those officials would routinely claim that their actions were a part of their official government duties and thus would make them immune from civil lawsuits. In § 1983 litigation, however, the common-law defense of "good faith" was unavailable. As § 1983 litigation became more prevalent in the 1950s and 1960s, courts began to limit the liabilities of offending government officials through the creation of the judicial doctrine of qualified immunity.

In *Pierson*, a group of clergymen on a prayer pilgrimage for racial integration were arrested for not leaving a segregated Jackson, Mississippi, bus terminal. Charges of disturbing the peace were later dropped on appeal, and the group filed a lawsuit for wrongful arrest. The Supreme Court ultimately decided it would be unfair to allow the offending officers to face civil liability when they acted in "good faith" to enforce a Mississippi statute that was later deemed unconstitutional.

To this day, courts continue to deny availability of suit because there was not a case that had been reviewed with substantially similar facts. In *Brooks v.*



**February 2021**

*Seattle, et al.* (2010) 599 F.3d 1018, qualified immunity was granted when two law enforcement officers applied a taser to a seven-month pregnant woman's arm, thigh and neck because she refused to sign a traffic citation. (See *Mattos v. Agarano* (9th Cir. 2011) 661 F.3d 433.) Despite the obvious crudeness and violative nature of the defendant officers' actions, the court applied the judicial doctrine of qualified immunity because there were no circuit stun-gun cases finding a Fourth Amendment violation.

### Facing the ever-expanding shield of qualified immunity

Recent interpretations of the judicial doctrine will almost certainly continue to expand its shield to cover more kinds of police misconduct. Already, attorneys defending police in civil-rights lawsuits use qualified immunity to justify abuses against people who committed no crimes but maybe were smoking outside an apartment on private property (allegedly violating a local smoking ordinance); sitting in a car with the ignition turned off (loitering); or asking too many questions of the officers (resisting arrest).

However, significant voices in political and judicial forums are presently calling for a reexamination of the judicial doctrine and its usefulness. Julian Castro, the former mayor of San Antonio and one-time 2020 Democratic presidential candidate, has made the reevaluation of qualified immunity a platform issue, arguing that it needs to be either severely limited or eliminated altogether. Supreme Court Justice Sonia Sotomayor has also focused criticism at the recent expansion of qualified immunity, arguing that recent decisions effectively treat the judicial doctrine as an absolute shield from all lawsuits. Even Supreme Court Justice Clarence Thomas, a noted conservative jurist, has argued that the modern interpretations of the doctrine have strayed significantly from its original intended purpose.

### You've made it through motion practice

Assuming one can get through the burden of motion practice in civil-rights litigation, then you will be ready for trial and to face the public scrutiny and bias that exists when prosecuting the bad apples. With more understanding of this area of law and people willing to take on these important issues, maybe we can be the change that we want to see in the world. Or at least, we can help restore some dignity to the lives of the persons who were affected by this American dilemma.

*DeWitt Lacy, of the* John Burris Law Firm, *has been practicing civil rights law for over a decade. He handles all aspects of litigation and has significant experience in the areas of section 1983 civil rights litigation, employment discrimination, and personal injury.*

